```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3

4   JAIME H. PIZARRO, ET AL.,        )
                                     )
5                 Plaintiffs,        )
            v.                       )   CIVIL ACTION
6                                    )   FILE NO. 1:18-CV-01566-WMR
    THE HOME DEPOT, INC. ET AL.,     )
7                                    )   MOTION HEARING
                  Defendants.        )
8   _____ )

9

10
    ---------------------------------------------------------------
11
            BEFORE THE HONORABLE WILLIAM M. RAY, II
12
                 TRANSCRIPT OF PROCEEDINGS
13
                     MARCH 14, 2019
14
    ---------------------------------------------------------------
15

16

17

18           Proceedings recorded by mechanical stenography
              and computer-aided transcript produced by
19

20               WYNETTE C. BLATHERS, RMR, CRR
                    Official Court Reporter
21                  1714 U.S. Courthouse
                    75 Ted Turner Drive, SW
22                  Atlanta, Georgia  30303
                      (404) 215-1547
23

24

25
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:          CHARLES H. FIELD, ESQ.
                                  Sanford Heisler Kimpel, LLP
 3                                San Diego, CA

 4                                DAVID H. TRACEY, ESQ.
                                  Sanford Heisler Kimpel, LLP
 5                                New York, NY

 6                                T. BRANDON WELCH, ESQ.
                                  Stillman Welch, LLC
 7                                Chamblee, GA

 8   For the Defendants:          BENJAMIN B. WATSON, ESQ.
                                  King & Spalding, LLP
 9                                Atlanta, GA

10                                DAVID TETRICK, JR., ESQ.
                                  King & Spalding LLP
11                                Atlanta, GA

12                                SARAH M. ADAMS, ESQ.
                                  Groom Law Group, Chartered
13                                Washington, DC

14                                ANTHONY L. COCHRAN, ESQ.
                                  Chilivis, Cochran, Larkins & Bever
15                                Atlanta, GA

16                                AMANDA S. AMERT, ESQ.
                                  CRAIG C. MARTIN, ESQ.
17                                Jenner & Block
                                  Chicago, IL
18
                                  HALSEY G. KNAPP, JR., ESQ.
19                                Krevolin & Horst, LLC
                                  Atlanta, GA
20

21

22

23

24

25
```

```
 1                     Thursday Morning Session

 2                        March 14, 2019

 3                          9:40 a.m.

 4                          -  -  -

 5                   P R O C E E D I N G S

 6            THE COURT:  I've only got like a hundred names of

 7   lawyers, so I'm just trying to look at my list and see who's

 8   here and figure out who you represent.  Ms. Adams, who do you

 9   represent?

10            MS. ADAMS:  Sure, your Honor.  Financial Engines

11   Advisors.

12            THE COURT:  What's the acronym?  AF?

13            MS. ADAMS:  FEA.

14            THE COURT:  FEA.

15            MS. ADAMS:  Or FE.

16            THE COURT:  FE.  Okay.  And then Mr. Cochran?

17            MR. COCHRAN:  Yes, sir.  Good morning, your Honor.

18            THE COURT:  You represent the same?

19            MR. COCHRAN:  Yes, sir.

20            THE COURT:  Okay.  All right.  And who represents --

21   I'm missing some people then, missing a lot of people.  But

22   who is representing the other movant on the motion?  Okay.  So

23   you're over here.  You're kind of confusing me because I'm

24   thinking you ought to be over here.  So who do you represent,

25   sir?  You're Mr. Knapp?
```

1          MR. KNAPP:  Yes, your Honor.  Alight Financial

2    Advisors or AFA, Halsey Knapp, Krevolin & Horst.

3    Ms. Karinshak could not be here because of legislature, and I

4    have with me Ms. Amanda Amert, Head of Jenner & Block's

5    national preeminent ERISA practice, and Mr. Craig Martin as

6    well, chair of the firm.

7          THE COURT:  Okay.  All right.  Then on behalf of the

8    plaintiffs, Mr. Welch?

9          MR. WELCH:  Yes, your Honor.

10         THE COURT:  Mr. Field?

11         MR. FIELD:  Yes, your Honor.

12         THE COURT:  And Mr. Tracey.  Okay.

13         MR. TRACEY:  Yes, your Honor.  Good morning.

14         THE COURT:  All right.  This is 18-CV-1566, Pizarro,

15   I'm guessing, v. The Home Depot et al.  Got a series of

16   motions to dismiss with obviously some related issues in there

17   so probably going to take them in the order that they were

18   filed.  Let me just check, double check that.  Maybe they were

19   all filed the same day.  Let's see.  They were.  Okay.  So

20   given that they were all filed on the same day, it appears, I

21   will hear Home Depot's -- that's how you're kind of aligned

22   anyway -- Home Depot's motion first, which is obviously a

23   little broader than the other two.

24         And I think the way we'll do it is I'll hear Home

25   Depot's argument, hear the plaintiffs' argument, then come

1  back to Home Depot.  I may or may not rule.  If I can rule,

2  then I'll decide, but then we'll move on to the other two

3  motions.  Okay.

4         MR. TETRICK:  Good morning, your Honor.  I'm David

5  Tetrick from King & Spalding.  And along with my colleague,

6  Ben Watson, we represent the Home Depot defendants in this

7  lawsuit.

8         The Home Depot defendants filed this motion to

9  dismiss, your Honor, because the amended complaint doesn't

10  state a claim that we breached our fiduciary duties or did

11  anything else wrong with regard to the company's 401(k) plan,

12  which we refer to as the FutureBuilder plan.  The amended

13  complaint says that we did two things wrong with regard to our

14  plan.

15         Count I is a claim that we breached our fiduciary

16  duty of prudence with regard to four of the funds that the

17  plan offers as investment options.  The complaint says that

18  those four funds were imprudent because of poor performance

19  during the class period alleged in the complaint.

20         Count II is an entirely different claim, and Count II

21  says that we violated both our duty of prudence and the

22  separate duty of loyalty with regard to our relationship with

23  Financial Engines and Alight Financial Advisors.  And as the

24  complaint sets forth, Financial Engines is an optional

25  investment advisory service that our plan participants could

1   opt into if they so chose.

2          Finally, Count VI is a derivative claim saying that

3   certain of the Home Depot defendants may have delegated their

4   duties to other people within Home Depot, and it is a

5   derivative claim for failing to monitor those people.

6          For today's purposes, your Honor, I think you can

7   assume that Count VI lives or dies with Count One and Count II

8   because it is a derivative claim.  So our argument this

9   morning will focus on Count One and Count II.  There are, of

10  course, other counts in the complaint.  Home Depot and the

11  Home Depot defendants are not defendants in those particular

12  counts, and so I will leave it to my co-defense counsel to

13  argue about those claims.

14         With regard to the claims against Home Depot, the

15  problem with the amended complaint, quite simply, is that it

16  only shows that we could have chosen different funds than the

17  challenged funds and that we could have chosen a different

18  investment advisor than the ones we chose.  That's not enough

19  to state a claim or to survive a motion to dismiss under

20  Supreme Court precedent because the Supreme Court requires

21  that a complaint do more.  It requires that it plausibly

22  allege some misconduct with regard to those facts that are in

23  the complaint so that the Court can draw a reasonable

24  inference that in this case the Home Depot defendants are

25  liable for that misconduct that has been alleged.

1        Turning first to Count I, Count I's fatal flaw is

2    that it alleges just one type of evidence; that is, the

3    alleged underperformance of the challenged funds.  And it

4    doesn't provide anything else that would allow the Court to

5    take the step from that alleged underperformance to some act

6    of imprudence on the part of the fiduciaries.  And this is

7    important because ERISA's duty of prudence doesn't judge

8    results.  It judges conduct.

9        So while the Court is required to accept plaintiffs'

10   allegations about the underperformance of these funds and the

11   relative better performance of the comparators, the mere

12   existence of better performing funds doesn't tell us that

13   there was anything wrong with the decision to choose those

14   funds.

15        THE COURT:  Yeah, but I thought the claim was -- I

16   mean, they complain, I guess, about the original selection

17   itself, but I thought they also basically allege that once it

18   was clear that the underperformance was there, that you had a

19   duty to change, and you didn't.

20        MR. TETRICK:  They do allege something to that

21   effect, your Honor.

22        THE COURT:  I mean, I'm certainly paraphrasing the

23   words, but, in any event, that's the way I distilled it, you

24   know.

25        MR. TETRICK:  And I think that that's a pretty clean

1  distillation.  And the reason why we think that you should

2  still dismiss Count I despite that allegation is that if you

3  were to go to virtually any 401(k) plan in this country, you

4  would be able to find that certain funds underperformed their

5  benchmark, and you would absolutely be able to find that funds

6  underperformed other funds that a plaintiff chose after the

7  results were in.  And that's the reason that we think that the

8  allegations here are so baseless.

9       The plaintiffs have set up a complaint whereby they

10  show you a table, and the table contains several comparators

11  chosen after the results were in.  And in two instances they

12  then show the benchmark by which the fiduciaries actually

13  monitoring those funds would have been reviewing the funds in

14  realtime.

15       For the two that they show the actual benchmark or at

16  least the one that you have to accept as the benchmark -- and

17  those are the two small cap funds, the Stephens Fund and the

18  TS&W Fund that they complain about.  What you'll see when you

19  look at the underperformance that they allege, is that in some

20  years there was underperformance.  In some years our funds did

21  better than their benchmarks.  It wasn't a sustained period of

22  underperformance such that this Court could find that the --

23  that there was an air of neglect.  And neglect is one of the

24  things that Courts look to when plaintiffs like our plaintiffs

25  here are trying to make a claim based on circumstantial

1  evidence.  So in this case while the Court is required to
2  accept as true the numbers that are in that chart, the Court
3  is not required to accept the conclusion that the plaintiffs
4  draw from those numbers.
5          The Court could find that it's equally plausible that
6  the funds underperformed or outperformed on a given year or
7  the Court could find it equally plausible in looking at those
8  same numbers that while the numbers differ, the trend does
9  not.  That is, with regard to both of those funds, when one
10 fund moved up, the other fund moved -- I'm sorry.  When one
11 fund moved up, its benchmark moved up with it.  When that fund
12 moved down, the benchmark moved down with it.
13         So there's not a case here, there's no fund that they
14 have presented where you can look at the numbers they provided
15 on a straight line and say significant underperformance for a
16 ten-year period like some of the cases --
17         THE COURT:  So what's the test?  I mean, I understand
18 the basic test, which is what they would have to show to
19 prevail at trial.  But what's the test for me to apply at the
20 motion to dismiss phase to determine whether they have alleged
21 enough?  I mean, you're talking about me looking at the
22 results and interpreting the results, but, you know, there's
23 got to be some kind of test I would have to apply if I'm going
24 to throw the case out without, you know, without there being
25 an evidentiary dynamic to the case itself.

1          MR. TETRICK:  That's right, your Honor, and I would

2    not suggest and I don't mean to suggest that the Court engage

3    in the type of number crunching that perhaps I've demonstrated

4    here.  My point is only that you're not required to accept

5    their characterization of what those numbers show.  But back

6    to the Court's question, I think that the Court is onto

7    something here because you're looking for a test rather than

8    interpreting numbers.

9          I think that the *Pledger v. Reliance* case that is

10   cited in our briefing and was decided by Judge Cohen in this

11   district, I think that it provides a decent roadmap for what

12   the Court should do.  Now, the Eleventh Circuit hasn't

13   provided any guidance for the Court with regard to these

14   claims.  Other circuits have, and Judge Cohen went through

15   what those other circuits have done.  And what Judge Cohen did

16   in that case was he found that if a plaintiff is relying on

17   underperformance of investment funds, that there must also be

18   something in addition; that is, either a conflict of interest

19   or there is something about an allegation of self-dealing.

20         So, for example, in the *Pledger v. Reliance* case one

21   of the allegations was that the record keeper was self-

22   interested.  And the way the plaintiffs were able to

23   demonstrate that is they were able to show that upon becoming

24   the record keeper, the record keeper required the Plan to use

25   the record keeper's proprietary funds, and it moved almost

1   $500 million out of funds that were well established and were

2   well known in the marketplace and used that money as seed

3   money for their own proprietary funds.

4           So there was a whiff of conflict of interest in the

5   air there, and the record keeper had discretionary authority

6   in that case, meaning that the person making the decision was

7   also using money to seed their own funds.  And Judge Cohen

8   found that's enough, that's underperformance plus.  There's

9   some --

10          THE COURT:  I'm sorry.  Was that his case or that was

11  just a case he was looking at?

12          MR. TETRICK:  That was his case.

13          THE COURT:  Well, that's an easy one.  I mean, you

14  see cases all the time with banks, you know, being charged

15  with steering their customers when they're managing funds to

16  buy their securities.  So that doesn't mean that that's

17  improper necessarily but it creates -- when it does poorly,

18  then your on shifting sand I suppose, but what about -- I

19  mean, it sounds like you're arguing that -- sounds like you're

20  arguing that underperformance can never be enough.  And I

21  don't think -- well, you may not be arguing that, but that

22  certainly could be the implication of what you're saying.

23  You're not arguing that a fiduciary -- and there's no question

24  Home Depot is a fiduciary; right?

25          MR. TETRICK:  That's right.

```
1            THE COURT:  I think Home Depot agrees to that, the
2   Home Depot defendants.  Then it certainly is possible that you
3   could make a decision, and it turns out that that ends up in
4   hindsight being a bad decision and that you could be
5   responsible if you don't step in and do something; right?  I
6   mean, you're not arguing that; right?  That there wouldn't be
7   an abstract duty to step in if it was clear; right?
8            MR. TETRICK:  That's right, your Honor.  There's two
9   ways really that the plaintiffs could overcome the
10  shortcomings in this complaint.  One is if they had alleged
11  that Home Depot was engaged in some sort of self-dealing with
12  regard to these funds.  There's nothing in the complaint about
13  that.  The other way that they could have is they could have
14  shown obvious and long-term underperformance.
15           THE COURT:  Yeah, but that's where I want to
16  concentrate.  So at this stage then what is my test to judge
17  whether or not the allegations sufficiently set forth obvious
18  and self -- obvious -- it would have to be a reasonable
19  standard that a reasonable fiduciary would have recognized
20  that this is a problem that you've got to address; right?
21           MR. TETRICK:  Right.
22           THE COURT:  Okay.  But I'm concerned about this is
23  the motion to dismiss stage.
24           MR. TETRICK:  And we understand, and what I can tell
25  you is that the cases that the plaintiffs cite in support of,
```

1  in their briefing, in support of their having demonstrated

2  long-term and obvious underperformance are a much longer track

3  record than we have here.  They involve cases where the

4  underperformance went on for a decade or more.

5          THE COURT:  What's the period that we're talking?

6  Five years?

7          MR. TETRICK:  Here it's -- the class period starts in

8  2012.

9          THE COURT:  Through currently?

10         MR. TETRICK:  It's to present, and for the most part

11  what the plaintiffs allege in their complaint are results

12  through 2017 because simply of the lag in some of the

13  reporting.

14         And so when you look at the period that they've

15  alleged, the actual 2012 through 2017, what you get is a mixed

16  bag.  You get years of overperformance, and you get years of

17  underperformance.  And that is not a demonstration of obvious

18  and long-term underperformance.  That's an indication that

19  some of these funds did not outperform their benchmarks in

20  some years and did perform their benchmarks in other years.

21         As we said in our briefing, in one instance two out

22  of five years we outperformed or our fund outperformed its

23  benchmark.  And I'm not suggesting that there is any magic to

24  the two out of five.  What I am suggesting is that in a short

25  sample period like a five-year period, underperformance in

1   three out of the five years is not obvious or long term,

2   especially when the funds themselves are moving more or less

3   with their benchmark each and every year.

4          THE COURT:  All right.  All these arguments are as to

5   Count I; right?

6          MR. TETRICK:  They are to Count I, your Honor, and I

7   would encourage the Court to look at that *Pledger v. Reliance*

8   case.

9          THE COURT:  Do you happen to have the cite handy?

10         MR. TETRICK:  I do, your Honor.  It is 240 F.Supp.3d

11   1314, and it is a Northern District of Georgia case from 2017.

12   I would also add, your Honor, that the *White v. Chevron* case

13   that we cited in our briefing, which was a district court

14   case, has since been affirmed by the Ninth Circuit, and I have

15   that cite available as well if the Court would like it.

16         THE COURT:  Yes, sir.  I know I read that in your

17   brief, but I haven't checked the case.  What is your cite?

18         MR. TETRICK:  The Ninth Circuit case cite is 2018 WL

19   5919670, and that was decided on November 13, 2018.

20        I would also direct the Court's attention to the

21   Eighth Circuit's recent *Meiners v. Wells Fargo* case, which we

22   did include in our briefing, and the reason that I would

23   emphasize the *Meiners v. Wells Fargo* case out of the Eighth

24   Circuit is that it confirmed this understanding that we're

25   presenting this morning that allegations of underperformance

1   must be accompanied by something more to survive a motion to

2   dismiss.  And it did that by requiring the plaintiffs to offer

3   meaningful benchmarks to demonstrate something more than

4   underperformance.  I think that the -- I'm sorry.  And it did

5   so secondly by affirming the district court's dismissal of

6   allegations, quite similar to these allegations because the

7   plaintiffs in that case had failed to show a meaningful

8   benchmark with regard to the challenged funds.

9           I think that that case is particularly instructive

10  here with regard to the plaintiffs' allegations concerning

11  target date funds, and I would direct your Honor's

12  allegations -- I'm sorry -- your Honor's attention to the

13  allegations in the complaint concerning those target date

14  funds because what's missing from the tables that the

15  plaintiffs have presented concerning those target date funds

16  is performance of those target date funds versus their actual

17  benchmarks.

18          And there's a lot of tables in the complaint, and

19  when the Court goes through them, it will notice that with

20  regard to the first three challenged funds; that is, the

21  Stephens Fund, the TS&W Fund, and the J.P. Morgan Stable Value

22  Funds, at the very bottom of each of those tables the

23  plaintiffs have presented you'll find a benchmark that they

24  are comparing those funds to.  They have their comparator

25  funds chosen after the fact, but then they have benchmarks.

1          When you get to the target date funds, your Honor

2     will notice that there is no benchmark.  What they provide

3     instead for each of the target date funds are three or four

4     other target date funds that ended up doing better after the

5     results were in.  Those were the -- that was the same flaw,

6     the failure to provide a meaningful benchmark that led the

7     Eighth Circuit to affirm the district court's dismissal of the

8     case against Wells Fargo that was all about target date funds.

9          So in that case with regard to the target date funds,

10    that one is one where there is a clear test, albeit one that

11    the Eleventh Circuit hasn't adopted yet, but that's a clear

12    test for the Court to apply.

13         Judge, our bottom line on Count I is that the

14    plaintiffs have no direct allegations of imprudence with

15    regard to our monitoring of these challenged funds, and so

16    they have taken the exceptional route of attempting to allege

17    circumstantial evidence of what we would call underperformance

18    plus.  And there's no plus in this complaint.  That's the test

19    that we would encourage the Court to apply, and we would for

20    those reasons ask the Court to dismiss Count I of the

21    complaint with prejudice.

22         Unless your Honor has additional questions concerning

23    Count I, I would move on to Count II.

24         THE COURT:  Okay.

25         MR. TETRICK:  Count II, as I said in my opening

1   remarks, is a completely different type of claim, and it

2   alleges both loyalty and prudence claims against Home Depot.

3   Count I of course only has prudence claims now, but Count II

4   has both prudence and loyalty claims.  These claims both

5   concern our monitoring of Financial Engines and then later in

6   the class period Alight Financial Advisors.

7         I'd like to take on the loyalty claim first because I

8   think it's the easiest one to dispose of.  The amended

9   complaint has no allegations that we did anything with regard

10   to Financial Engines or Alight for the purpose of benefiting

11   The Home Depot or any other third party, and that's the test.

12   In order to state a plausible claim for breach of the duty of

13   loyalty, a plaintiff must show that the fiduciaries acted for

14   the purpose of enriching themselves or a third party over the

15   Plan participants.  We accept everything that they say as

16   true.  What we have here is a situation where we hired

17   Financial Engines, and they collected a fee.

18         THE COURT:  So I understand the complaint, that

19   plaintiffs don't like the fee structure.  They don't like the

20   way it was set up.  Is there another allegation in this count?

21   I mean, they're not also using -- well, I guess there was

22   complaints about phone calls and wait times and live human

23   interaction versus automatic computer generated AI type stuff.

24   But is there anything else that supports this count?

25         MR. TETRICK:  With regard to the duty of loyalty

1   claim as against Home Depot, there is nothing else that

2   pertains to Home Depot's loyalty.

3           THE COURT:  Okay.  But even as to the prudence part,

4   do they bootstrap the claims from Count I into this count as

5   well?

6           MR. TETRICK:  No, they don't, your Honor.  They're

7   completely separate allegations, and what they say is that by

8   hiring Financial Engines and allowing it to engage in the

9   misconduct that they allege.

10          THE COURT:  Which was what?

11          MR. TETRICK:  What they refer to --

12          THE COURT:  Which is what the contract provided the

13  billing structure to be and then, you know, maybe a claim

14  related to if they knew that people were waiting so long and

15  couldn't actually reach live people.  But, I mean, was

16  anything that was -- maybe the wait times is something a

17  little bit different.  But there's nothing else my guess -- my

18  understanding is that it was a surprise.  I mean, otherwise it

19  was all provided for in the contract.

20          MR. TETRICK:  That's right, your Honor, and I would

21  direct the Court's attention to the plaintiffs' response to

22  Alight's motion to dismiss where the plaintiffs characterize

23  this as a case where Alight breached its contract with Home

24  Depot by not providing the services.

25          So these are all about the claims that are in the

1   complaint about the phone calls that were not returned and

2   things along those lines, but there's not a single allegation

3   in the complaint that any harm resulted from the things that

4   they complain about.  And that goes to the prudence claim.

5         The loyalty claim, if I can just finish up with that

6   very quickly, your Honor, I would say that the plaintiffs'

7   response to our Home Depot brief on page 23 effectively

8   concedes that they don't have a loyalty claim.  In response to

9   our arguments that the Court should dismiss their loyalty

10  claim, the plaintiffs provided three sentences on page 23.

11  And what they say is that a loyalty claim here exists because

12  our decision to hire Financial Engines permitted Financial

13  Engines to collect fees for providing services.  That, of

14  course, is true for every service provider that we hire, and

15  it doesn't show disloyalty to do so.  So at a minimum the

16  Court should dismiss the loyalty prong of Count II.

17        Turning then to the prudence prong of Count II, the

18  analysis that we think applies here is very similar to the

19  analysis that applies to the prudence claim with respect to

20  Count I; that is, what we have here is an optional investment

21  advisory service.  We didn't force anyone to use Financial

22  Engines.  We thought that it was a benefit to the participants

23  who did, obviously, or we would not have hired them in the

24  first place, but we didn't force anyone to use them.

25        They were participants that wanted to use Financial

1  Engines, could opt in.  There's no allegation that there was a

2  problem with the disclosure of the fee that was charged here.

3  There's no allegation that we hid anything about Financial

4  Engines, and as a result of that, what we've got is something

5  that is more akin to an investment option that a participant

6  could have opted into, as opposed to some of the cases the

7  plaintiffs cite in their response having to do with record

8  keeper fees.

9          And the difference is apparent.  It's the difference

10  between something that you have to pay, like a recordkeeping

11  fee, and something that you choose to pay.  And the difference

12  is important here with regard to Home Depot in particular

13  because what we're accused of is failing to monitor.  And

14  that, of course, is a fiduciary duty, and it's not one that I

15  mean to diminish.  But it is a secondary duty.  It presupposes

16  that you've got someone else doing a job, and as a fiduciary

17  your job is to monitor what they are doing.

18          So when you've got an optional investment advisory

19  service and you don't have anything that looks like a red

20  flag, such as the participants who opted in are actually

21  getting performance results that are worse than those who

22  chose not to opt in, if you had something like that, if you

23  had complaints that were bubbling up, if you had allegations

24  showing the fiduciaries knew that this was a bad product and

25  neglected to do anything about it, then that would state a

1    claim for imprudence.

2            Here we don't have that.  What we've got is that we

3    failed to adequately monitor an incumbent service provider by

4    doing a couple of things specifically.  One is we failed to

5    seek competitive bids for other investment advisory services.

6    That allegation can be found in paragraph 179 of the amended

7    complaint.

8            The other allegation that they have is that we failed

9    to poll participants in our plan.

10           THE COURT:  Failed to what?

11           MR. TETRICK:  "Poll" is the word they used.  I think

12   they mean survey, to survey --

13           THE COURT:  To see how they it?

14           MR. TETRICK:  To see if they like it.  Exactly.  They

15   say we didn't do that, we should have.  And that's in

16   paragraph 65 of the amended complaint.  But there is nothing

17   here that says that these services were mandatory or that the

18   fees weren't disclosed.  There's no concrete allegations like

19   many of the cases cited by the plaintiffs that show, for

20   example, that we could have leveraged our size to get a lower

21   fee from Financial Engines.  They make one allegation in the

22   complaint that on information and belief Financial Engines

23   offered lower fees to other unidentified 401(k) plans, and I

24   think the Court is required to accept that as true for the

25   purposes of a motion to dismiss, but it only goes so far.

```
 1          Even if that fact is true, it doesn't show how we
 2   failed in our duty of prudence by not getting a lower fee.
 3   It's equally plausible that the results of our negotiations
 4   with Financial Engines resulted in the best arm's length deal
 5   that we could get given the specifics of our Plan.  And we
 6   don't know anything about these other plans because the
 7   plaintiffs didn't allege anything about those other plans.
 8          So that allegation doesn't move the needle.
 9          THE COURT:  Okay.  So I don't understand that
10   argument.  I mean, I don't understand how much you would say
11   that they've got to allege by another plan.  They basically
12   have said -- and I'm talking your words.  I'm not -- I don't
13   independently remember that allegation in the complaint, but
14   that there was a similarly situated 401(k) plan.  Maybe I'm
15   adding the word similarly, but I would think that it's
16   probably alleged something like that, and they didn't
17   negotiate a better deal than you negotiated.
18          So you're saying, well, they're not showing that we
19   didn't get the best deal that we could get under the
20   circumstances.  That sounds like what discovery is for.  I
21   mean, your contention would be that we did get the best deal
22   we could get.  I mean, if the case goes forward, theirs would
23   be that you didn't, and obviously they would have the burden
24   on that.
25          But what more would they need to say about this other
```

1    plan?  I mean, like give all the terms of its contract versus

2    the contract that you negotiated?  I'm not sure that they even

3    have access -- they would have access to what the consumers

4    have access of, but I'm not sure that they would have access

5    to all the other things that you would have access to relative

6    to your negotiation until discovery was commenced.

7            MR. TETRICK:  Your Honor, they certainly would have

8    access to information about those other plans that would be

9    enough for them to beef up the complaint here enough to

10   survive a motion to dismiss.

11           THE COURT:  You mean like what their fee structure

12   was --

13           MR. TETRICK:  They would -- and I'm sorry to

14   interrupt.

15           THE COURT:  Is that what you mean?  Because, I mean,

16   that would be obvious that they probably would have access to

17   that if they knew about it at all, but as far as the

18   negotiation give and takes, I mean, no third party is going to

19   give them that unless they happen to have had it in another

20   case, I guess.

21           MR. TETRICK:  Your Honor, the information about other

22   comparator plans is publicly available through an annual

23   report that qualified plans like ours are required to file.

24           THE COURT:  But we're talking about the fee, like,

25   okay, that's how they know that there was a better deal out

1    there that somebody else got; right?

2          MR. TETRICK:  Which -- well, I don't know how they

3    know that there's a better deal because they only say upon

4    information and belief.  That's all the information they

5    provide.  But even accepting that as true, that someone got a

6    better deal, that doesn't show imprudence on our part.  If

7    they had, for example, shown the Court that there was another

8    plan in the same industry of the same size with the same

9    amount of assets with a similar number of participants so that

10   you could back into the average account balance --

11         THE COURT:  How would they find out how many

12   participants another plan has without discovery?

13         MR. TETRICK:  They would go to the Department of

14   Labor's website, and they would search by name or by plan

15   number or any other number of identifiers, and they can pull

16   up all of the information that I have just provided through

17   publicly available means on their iPad.  That's how they could

18   find it.

19         So the weakness of the upon-information-and-belief

20   allegation really stands out in a case where information about

21   other plans during the class period is publicly available.

22   They don't need discovery in order to go and make concrete

23   allegations about these other plans that supposedly are

24   similar to us even if those plans were able to get better

25   deals than we did.

1          THE COURT:  So let me ask you this then:  I

2    understand your point, but if they had alleged that there is a

3    plan of comparable size, value, number of investments, all

4    that information that might be available, and it shows that a

5    much better fee structure was negotiated for the plan

6    participants than Home Depot negotiated for its plan, would

7    that be the type of evidence then that you would concede would

8    survive a motion to dismiss if they had done that?

9          MR. TETRICK:  I think if they had provided specific

10   information about a plan that was actually a comparator and

11   they had shown a significant enough difference between the fee

12   structure that we negotiated and the fee structure that the

13   other plan negotiated, then the Court would have to look

14   really hard at that and would have to say is that enough for

15   me as a judge to give them the benefit of the doubt and say,

16   yeah, there's an air of neglect there or incompetence or

17   something.

18          But the fact that the other Courts in this area have

19   required something akin to neglect or incompetence means that

20   it would have to be something that would really get the

21   Court's attention.  It's not something where the Court looks

22   at it and says, well, yeah, that's kind of close.  It would

23   have to be something that was different enough where your

24   Honor could look at it and say something else is going on.

25          THE COURT:  So the allegation in the complaint

1  relative to this better hypothetical plan gives no specifics

2  about how better?

3         MR. TETRICK:  None.

4         THE COURT:  Just that it was better.

5         MR. TETRICK:  Upon information and belief other

6  similar 401(k) plans got a better deal.  That's it.  It's

7  about as bare bones as could be.  And so we don't make much of

8  that, and, you know, we also would point the Court's attention

9  to some of the cases that were cited in our briefing,

10  including the *Hecker v. Deere* case out of the Seventh Circuit

11  that says that when it comes to service providers and

12  investments, that fiduciaries are required to look at more

13  than simply price, that we're not required to get the best

14  possible deal out of it.

15         THE COURT:  Right.  But that's certainly getting into

16  the weeds of motion for summary judgment, not motion to

17  dismiss; right?  If you're asking a judge who's a lawyer --

18  you know, I've got a little bit of financial understanding,

19  but I don't invest in individual stocks intentionally because

20  I realize that it's better for me to be in mutual funds, to

21  diversify and not have the risk.  So certainly at this stage,

22  just on the whatever knowledge I might have, you're not asking

23  that I try to evaluate that kind of stuff.  You're just

24  saying -- it seems like your best argument is they didn't tell

25  us anything.  So if they didn't tell us anything, then there's

1  really no allegation at all.  It's just a conclusion is what

2  you're saying.

3       MR. TETRICK:  That's exactly what I'm saying, and I'm

4  saying that the *Hecker v. Deere* case shows that other judges

5  have taken allegations that somebody got a better deal and

6  have dismissed those allegations.  That's all.

7       They also allege, of course, that we failed to seek

8  competitive bids and --

9       THE COURT:  Does that matter?  I mean, ultimately it

10  comes down to the deal that you got and whether or not that

11  was a prudent decision to take that; right?

12       MR. TETRICK:  That's exactly right, Judge.  There's

13  no requirement in ERISA or in the case law interpreting it

14  that you put things out for competitive bids.

15       And, finally, we would say with regard to Count II,

16  that the allegations concerning the change in 2017 that

17  occurred, that is, up until 2017 Financial Engines provided

18  the investment advisory services, beginning on July 1 of 2017

19  Alight Financial Advisors stepped into that role, and it

20  subcontracted with Financial Engines for the period thereafter

21  to provide those investment advisory services.

22       Those allegations with regard to Home Depot, they

23  don't move the needle on Count II, and the plaintiffs

24  specifically allege that we allowed that to happen; that is,

25  the changeover from Financial Engines being a direct service

1  provider to being an indirect service provider.  They say we

2  allowed that to happen, and therefore we allowed a bad deal to

3  continue, and we don't believe that that changes the outcome.

4  That is, Count II still needs to be dismissed because there's

5  no allegations whatsoever that that change in relationships

6  had any impact on the fees that were charged to the

7  participants using the service.

8          So the point here for us on Count II is that the

9  loyalty claim needs to be dismissed at a minimum, and the

10  prudence claim just doesn't show enough to survive a motion to

11  dismiss.  And for these reasons we would ask that the Court

12  dismiss Count II.

13         And, finally, what we would say is that there's

14  nothing in this amended complaint that shows that Home Depot's

15  process was so flawed or that it acted so disloyally that it

16  would merit Home Depot expending the significant time, energy

17  and money required to defend itself against claims that could

18  be filed against any 401(k) plan in the country that contains

19  mutual funds that occasionally underperform the benchmarks and

20  which offer Financial Engines as an optional investment

21  advisory service.

22         I'd remind the Court that the plaintiffs have already

23  amended the complaint once in response to our initial motions

24  to dismiss, and so we would ask that the Court dismiss Counts

25  I, II, and VI and do so with prejudice.

1          THE COURT:  All right.  Thank you, sir.

2          MR. TETRICK:  Thank you.

3          THE COURT:  Who is going to -- Mr. Welch, you're

4    going to argue?

5          MR. WELCH:  Mr. Field will argue, your Honor.

6          THE COURT:  All right.  Thank you.  Give me just a

7    second, if you would.  All right, Mr. Field.

8          MR. FIELD:  Thank you, your Honor, and good morning.

9          THE COURT:  Good morning.

10          MR. FIELD:  The plaintiffs here have pled sufficient

11   facts from which this Court can infer that Home Depot breached

12   its fiduciary duty under ERISA.  Our claim goes to two

13   positions.  One, that Home Depot failed to monitor the

14   investments in the plan and remove imprudent investments.

15   Plaintiffs also allege that Home Depot failed to monitor

16   Financial Engines and Alight and stood by while these entities

17   overcharged plan participants for substandard services.

18          The first claim goes to the investments and the

19   standard there -- and you asked for a standard.  The standard

20   was set by the United States Supreme Court in *Tibble v. Edison*

21   which says that Home Depot has a duty to monitor its

22   investments and remove imprudent investments.  It doesn't say

23   remove imprudence if certain other facts are present.  It just

24   says remove imprudent investments.

25          And what we're going to do is demonstrate why these

1    investments were imprudent, and we're going to show and we

2    showed in our pleadings that the underperformance of these

3    funds spanned ten years, both before and during the class

4    period.  And we're not talking about 2 or 3 or 4 funds.  We're

5    talking about 11 funds out of 20 fund options that these

6    participants had.

7           And we don't need to look any farther than Home

8    Depot's own performance disclosure, which they gave plan

9    participants, and that disclosure shows that these funds

10   underperformed their benchmark for one, five, and ten years.

11   We can start with the TSW Small Cap Value Fund, and their own

12   disclosure shows that for one year, five year, and ten years

13   that fund underperformed the Russell 2000 Value Index, the

14   benchmark that Home Depot had identified for this fund.  And

15   it shows that for a ten-year period the underperformance was

16   80 basis points or eight-tenths of one percent.

17          That may not sound like a lot, but over a ten-year

18   period that amounts to eight percent.  For someone who had a

19   hundred thousand dollar account, that's $8,000 for a plan

20   participant.  For a fund of this size that was $200 million,

21   that was a $15 million difference in performance versus the

22   benchmark.  This is not mild cumulative underperformance.

23   This is real underperformance of a significant amount.

24          Now, Home Depot, they complained about our charts,

25   and it is true that Home Depot did not underperform every

1  single year.  And we'll take a look at the TSW.  You look at

2  our complaint, and we show you the performance over ten years.

3  And over a ten-year period that fund underperformed seven out

4  of the ten years.

5          In the four years leading up or the five years

6  leading up --

7          THE COURT:  So let's talk about that.  So taking your

8  allegation at face value, underperformed for ten years.  So at

9  what point in that ten years does that trigger Home Depot's

10 obligation to make a change?  You're looking at it at the end

11 of ten years.

12         MR. FIELD:  I think, if I might, an expert is

13 probably better qualified to say that, but in my view that

14 after four or five years if somebody is continuing to

15 underperform the benchmark, it's time to be removing that

16 investment.

17         THE COURT:  You remove an investment because of a

18 five-year trend?

19         MR. FIELD:  Yes.

20         THE COURT:  So you've got an expert that will say

21 that, that for any stock or fund, you look at five years, and

22 if it's underperformed versus its benchmark, then it's time

23 for it to go?

24         MR. FIELD:  Yes.

25         THE COURT:  Okay.  Well, I mean, there's also the

```
1   corollary, which is when you sell things when they're low,
2   then you're going to lose too.  So I'll take you for your word
3   that you've got an expert that will say that, but I don't
4   know.  I mean, certainly not a one year.  I mean, you're not
5   saying fund underperforms for one year, that triggers an
6   obligation to dump it; right?
7           MR. FIELD:  I'm not and --
8           THE COURT:  I mean if it underperforms by like 80
9   percent, okay, but, I mean, that's not what we're talking
10  about.
11          MR. FIELD:  I think what you would find most
12  professionals who do this for a living, what they will do is
13  that they'll engage in investment advisor to manage their
14  assets, and I'm talking about institutional type investors,
15  not you or me.  And so they will turn their money over to an
16  advisor, and if the advisor in the first year underperforms
17  the benchmark, there's probably going to be a meeting.  Why
18  did you do this?  What happened?  Tell me about the
19  performance attribution.  Explain this to me.  Why is this?
20  I'm paying you to beat the benchmark not to give me
21  underperformance.
22          Second year if that happens again, the investment
23  advisor is likely going to get put on what's called a watch,
24  and so now beware that if you don't do any better, you're
25  likely going to be terminated.
```

1          In the third year if that happens again and the

2    investment advisor is still underperforming its benchmark for

3    a three-year period, it's very, very likely that that

4    investment advisor will be terminated.

5          And at five years, depending on the level of the

6    underperformance, it's almost a certainty that's going to

7    happen.

8          THE COURT:  But I thought at least for two of the

9    five funds that we were talking about -- maybe it was more

10   than that.  But I thought for some of the funds we were

11   talking about, that in a couple of those years they actually

12   overperformed rather than underperformed, and so we're not

13   talking about, at least as to those particular ones, we're not

14   talking about five straight years of underperformance; right?

15         MR. FIELD:  We are about the TS&W Fund.  If you look

16   at that between 2008 and, I think, 2012, if you look at that

17   five-year period, it was under its benchmark by about eight

18   percent.

19         THE COURT:  Every year?

20         MR. FIELD:  No, not every year, and you can't expect

21   it to underperform every year.

22         THE COURT:  Well, but your hypo basically said that

23   one year if you underperform, that you're going to -- we're

24   going to have a meeting.  And then second year you over

25   perform, we're going to probably put you on some kind of

1  double secret probation, you know, maybe not so secret.  Third

2  year, then it's even more serious.  You may be terminated.

3  But if in one of those years it actually overperforms, how

4  does that change the dynamics of your review?

5        MR. FIELD:  It changes the dynamics based on the

6  amount of overperformance.  So if I underperform the first

7  year by five percent and I outperform the next year by three

8  percent, I'm still under the benchmark by two percent.  You

9  have to look at it over a period of time cumulatively much

10  like you would a baseball game or a football game that's

11  measured in innings or quarters.

12        So you're not looking -- they're not going to

13  underperform every year because the law of averages are going

14  to say there's going to be one year where you're going to do

15  better or two years.  So that's why you have to look --

16        THE COURT:  I know, but you're suing the defendants

17  saying they should make a change.  And I'll try to put things

18  in analogies that I can understand.  If my football coach has

19  a losing record -- I'm under Georgia.  Kirby Smart had a

20  pretty bad losing record his first year.  It was horrible.

21  But the second year was pretty dadgum good.  We didn't win a

22  national championship, but it was pretty good.  So he's not on

23  probation with me even though he didn't win a national

24  championship that second year.

25        Last year was a really good year too.  It wasn't as

1    good as the year before, but it was good.  That first year,

2    though, was really bad.  I mean, we lost to teams that we

3    hadn't lost to in a long time.  We lost three home games, I

4    think.  But I guarantee you I don't feel real bad about that

5    first year after that second year and that third year.  And

6    then so if we turn out to lose next year and we lose a couple

7    of games that we shouldn't win, you know, I'm not sure where

8    I'm going to be, but I doubt I'm going to be at the firing

9    stage.

10           And finance is different I understand, but we're

11   looking at Home Depot's decision year to year.  So if we have

12   a year next year that's disappointing and we lose a

13   championship game or we lose a game in the middle of the

14   season, then, you know, I'm going to have a feeling, but I

15   doubt I'm going to be at the firing stage.

16           So I understand your point.  I'm really less

17   concerned with the overall picture at summary judgment that we

18   would be talking about.  And then, of course, if we're there,

19   then we've got expert witnesses who are aiding me from a

20   financial basis, but, you know, I'm concerned about the

21   allegations as they are.  So I know I'm sort of just rambling,

22   but, in any event, do with it what you can.

23           MR. FIELD:  Well, there are cases that support our

24   view.  There are a number of cases, one here in the Northern

25   District, which was *Henderson v. Emory University*, which said

1  that if you can show underperformance over a one, five, and

2  ten-year period, that's sufficient to survive a motion to

3  dismiss.  *Castle v. Vanderbilt University* in Tennessee was the

4  same thing.  And there are a number of these university cases

5  that go on and on that say five years of historical

6  underperformance is sufficient, one, five, and ten years.  And

7  there are just a number of them, *Cunningham v. Cornell* in New

8  York, *Nicholas v. Princeton* in New Jersey.  And it just goes

9  on and on, and all of these cases have said that at a motion

10  to dismiss stage years of underperformance is sufficient to

11  survive a motion to dismiss.

12          There was a case in Colorado, *Trout v. Oracle;* in New

13  York, *Jacobs v. Verizon*, that essentially said the same thing,

14  that when you have funds that are underperforming over an

15  extended period of time, that that's sufficient and that

16  whether or not it is sufficient enough to win a case, that's

17  something for summary judgment, like you just mentioned, your

18  Honor.

19          THE COURT:  Well, so what about the allegations

20  that -- the arguments that Mr. Tetrick made relative to the

21  target funds that you said you didn't include benchmarks, you

22  know, alleged that they've underperformed.  Like you did with

23  some of the individual funds, you didn't do it with regard to

24  these generic -- I guess these are retirement dated type

25  things, 2020 and 2030.  Like what's your horizon at

1 retirement?  If I'm wrong, then tell me.  But he says you

2 didn't give benchmarks in those situations.

3           MR. FIELD:  The benchmarks that we did use we used

4 the ones that they had in their --

5           THE COURT:  Did they have, Home Depot --

6           MR. FIELD:  In their disclosure to their participants

7 they showed the performance versus the benchmark, which was

8 the Dow Jones -- the Dow Jones Global Target 2030 or Target

9 Date Index Fund.  For us we could not find that index, and we

10 couldn't access it.  We looked, and we couldn't find something

11 that was called the Dow Jones Global Target Index.  So we used

12 what we felt was the closest to an index, and that was

13 Vanguard.  But we didn't have access to it.  We couldn't

14 access it, couldn't find it.

15           And so if you look, though, at their own disclosure,

16 they'll show you that -- and we put this in our brief that --

17 in our complaint that based on their disclosure, not a single

18 one of these target date funds outperformed their benchmark

19 for ten years or since inception.  Six of the eight failed to

20 underperform for five years, and five of eight failed to

21 perform for one year.

22           So their own disclosure --

23           THE COURT:  Five of eight failed to what?

24           MR. FIELD:  Their benchmark, they failed to beat

25 their benchmark.

```
1              THE COURT:  Okay.

2              MR. FIELD:  Is what their own disclosure says.

3              THE COURT:  One year?

4              MR. FIELD:  One-year, five-year, and ten-year.

5              THE COURT:  Wait a minute.  But did you just say that

6   one of the funds failed to beat its benchmark one year?

7              MR. FIELD:  Five of the eight failed to beat for one

8   year.

9              THE COURT:  One year.  I'm sorry.  Go ahead.

10             MR. FIELD:  No, please.

11             THE COURT:  Would you have any of those funds that

12  you're complaining about that beat its benchmark as you allege

13  more than half the time?

14             MR. FIELD:  No.

15             THE COURT:  Okay.  All of them was less than

16  50 percent?

17             MR. FIELD:  Yes, if you look.

18             THE COURT:  And what kind of percentages are we

19  talking about?

20             MR. FIELD:  Well, for example, for the ten-year

21  performance not a single one of these funds beat its

22  benchmark.

23             THE COURT:  Okay.  That's a hundred percent.  I don't

24  mean like that.  I mean percentage under the benchmark.

25             MR. FIELD:  You mean the actual --
```

1          THE COURT:  Yeah, like the benchmark was at a hundred

2  and it was at ninety.

3          MR. FIELD:  All right.  I understand.  Sorry.  So,

4  for example, we looked at the 2040, and for ten years that

5  underperformed its benchmark on an annualized basis by about

6  1.3 percent.  Cumulatively that's 13 percent over a ten-year

7  period.  That's pretty significant.

8          THE COURT:  All right.  Go ahead, sir.

9          MR. FIELD:  So we answered that with the TSW fund,

10  and then we turn to the Stephens Small Cap Fund, and it again

11  shows pretty significant underperformance.  The ten-year

12  underperformance was about four percent versus seven and three

13  quarters percent, so that's three and three quarters percent

14  difference over a ten-year period.  That's thirty some

15  percent.  That's a big number.  That is significant

16  underperformance.  That's not mild cumulative

17  underperformance.

18          For this fund, which was a small $50 million fund,

19  that amounts to about $10 million in lost retirement savings

20  for these participants.

21          We talked about the target date fund.  Again, we used

22  their own numbers, your Honor, to show that over a one, five,

23  and ten-year period these eight target date funds were vastly

24  underperforming their benchmark.

25          And we also used comparator funds.  Now, these

1  comparator funds that we used, we didn't identify them as

2  comparators.  These were funds that Morningstar identifies as

3  comparators to these Home Depot funds, and Morningstar is the

4  leading organization in this country on funds, fund

5  performance, fund rankings, and fund ratings.  So we took

6  their ratings and their analysis and used it, so these are not

7  comparator funds that we just pulled out of thin air.  So we

8  compared those with what Morningstar had, their rankings,

9  their ratings, and showed that some of these, for example, the

10  target date funds were in the bottom quartile of all target

11  date funds.  They just weren't that good.

12          And so at the end of the day what we've shown here by

13  this underperformance is that these participants lost money

14  and --

15          THE COURT:  Would you mind if we jumped ahead, not on

16  the issues that we're talking about but maybe at the stage of

17  the litigation.  So let's assume we're at the summary judgment

18  stage.  What is it that I would have to find at the summary

19  judgment stage to decide that there is a triable issue as to

20  whether or not Home Depot defendants failed in their duty,

21  duty of prudence with regard to monitoring the funds, deciding

22  whether to get rid of them or not?  What is it that I would

23  have to find to decide that?  You've quoted me some evidence

24  but I'm -- before I had my last job I was a trial judge a long

25  time, and I'm always interested in what those tests are.  So I

1   would have to find what?

2          MR. FIELD:  That test you would need to satisfy is

3   that Home Depot had a prudent process.  Losing money --

4          THE COURT:  I'm sorry.  Had what?

5          MR. FIELD:  A prudent process.  Losing money is the

6   result.  And so why did they lose money?  And we believe that

7   it was because they had a process in place that was not

8   vigorous, and the only way we can find that out is to see what

9   went on in these committee meetings and what kind of a process

10  did they follow when they selected these funds.  What were

11  they looking at?  How were they comparing these funds to the

12  benchmark?  How were they comparing these funds to comparable

13  funds?  What were the comparable funds?  Is there anything

14  else we could have been doing as a fiduciary to be exercising

15  due care and loyalty?

16         THE COURT:  So apart from the results, if they have

17  an expert that testifies, well, you know they really

18  considered all the things that they should consider.  At the

19  end of the day the results were less than what the market

20  allowed on an average these benchmarks.  And you don't have an

21  expert that says -- again, I know that's a pretty big

22  hypothetical, but you don't have an expert that really can

23  meaningfully criticize the process but can criticize the

24  results.  Results speak for themselves as to what they are.

25  Then where does that leave you?

1          MR. FIELD:  That leaves me in a bad spot because if I

2     can't show that the process was defective or deficient, it's

3     not about results.  It's not about whether they lost money or

4     made money.  That's the result that happened from a process

5     that we claim was tainted by a failure of competency and

6     effort, and that's what we need to be able to prove.

7          THE COURT:  Okay.

8          MR. FIELD:  Does that answer?

9          THE COURT:  Yes, sir.

10         MR. FIELD:  All we're saying is that the evidence

11    that we have raises a pretty strong inference that what was

12    going on here was not, was not vigorous, and that's what we're

13    saying.

14         THE COURT:  And, of course, you're getting to that

15    conclusion because the results are what they are.

16         MR. FIELD:  That's right, because we don't have

17    access to any of the other information.

18         Are there any other questions you have for me on

19    this?

20         THE COURT:  On Count I?  That's what we've really

21    been talking about is Count I.  No.

22         MR. FIELD:  All right.  So now I'll move on to the

23    other count and this is --

24         THE COURT:  Can't we dispense with the loyalty part

25    of this --

```
1              MR. FIELD:  Yes.
2              THE COURT:  Easily?  That that's not really a claim
3    that you've got?
4              MR. FIELD:  The only claim that -- the only loyalty
5    that we saw there is that they didn't go out and seek
6    competitive pricing, and our thinking --
7              THE COURT:  What does that have to do with loyalty,
8    though?
9              MR. FIELD:  Well, here's what our thinking was.  Our
10   thinking is that a loyal person, if you're loyal to somebody,
11   then you will go out and do your best.  Just like you and I
12   would if we're shopping for a car or insurance, we're going to
13   go out and price shop.  Now, whether that's prudence or
14   loyalty, I guess it remains to be seen, but if your Honor
15   would like to dispense of --
16             THE COURT:  Well, what's the difference in -- if
17   it's -- you would clearly agree that it's prudence; right?
18             MR. FIELD:  Yes.
19             THE COURT:  So if it's the same as loyalty, then
20   what's the difference?
21             MR. FIELD:  You're right.
22             THE COURT:  So it's got to be a difference or we
23   wouldn't have two different things here.  So it sounds like
24   what you're really complaining about is the decision they
25   made, not that they were dishonest or self-dealing or trying
```

1  to prefer someone.  I mean, you don't have any allegations in

2  your complaint that it was some kind of relationship with

3  Financial Engines or AFA that caused them to steer -- make

4  decisions and steer stuff the way they did or these funds that

5  were included.

6          MR. FIELD:  We can dispense with that.

7          THE COURT:  All right.

8          MR. FIELD:  So now we're looking at Home Depot's

9  selection of Financial Engines and Alight, and just like with

10  any other fiduciary and just like with these funds that Home

11  Depot selected, they have a duty to prudently select them and

12  then monitor them and evaluate them over time.

13          THE COURT:  You've complained about the original set

14  up, but I'm assuming you concede that the original decision is

15  barred by the statute of limitations.

16          MR. FIELD:  I see that.

17          THE COURT:  Okay.  So then your real complaint is

18  that they didn't change it at some point?

19          MR. FIELD:  It does because the cases that we have

20  found have essentially said that the fiduciary has a duty to

21  periodically look at price and compare price, and we looked at

22  these university cases again.  There was *Henderson* here in the

23  Northern District.  We've got *Tracey v. MIT*, *Short v. Brown*.

24  This was an issue that was all over the country, and the

25  Courts in all of these cases said that, yes, a failure to

1  solicit competitive bids on a periodic basis, although is not

2  a requirement, it could raise a plausible issue that there was

3  imprudence here and we're going to take a look at it further.

4  And what was --

5       THE COURT:  But only if the competitive bid you could

6  prove would have yielded better results; right?  I mean, the

7  fact that the process of negotiation versus competitive bid

8  was chosen doesn't matter if the evidence would be that they

9  got the best deal that they could get under the circumstances

10  for their employees.

11       MR. FIELD:  Well, that's not what they said at a

12  motion to dismiss stage.  That may be further on down, but at

13  a motion to dismiss each one of these cases said that a

14  failure to get a competitive bid raises an issue.

15       THE COURT:  What issue does it raise?

16       MR. FIELD:  Whether they were exercising --

17       THE COURT:  But you have to then assume that the

18  competitive bid would have yielded a better price, and that's

19  not always true, particularly when price isn't the only

20  factor, you know.  So I'm not sure how any judge anywhere

21  could automatically know that a competitive bid was going to

22  be better.  I mean, it makes intuitive sense that it could be,

23  but it might not be.  And you don't know; right?  You just

24  know that they didn't have competitive bids.

25       MR. FIELD:  Well, we also know -- and we alleged this

1  in our complaint -- that there was a vast number of

2  competitors out there that were giving much better pricing.

3        THE COURT:  Do you know whether they gave that

4  through negotiation or competitive bidding?

5        MR. FIELD:  I don't.

6        THE COURT:  So that's my point, that it doesn't sound

7  like -- it seems like the -- competitive bidding to me sounds

8  like a red herring.  You have an appellate court that has said

9  that that in and of itself would show imprudence?

10        MR. FIELD:  No.

11        THE COURT:  Yeah, I mean, that sounds like results

12  oriented justice to me.  The end result is did they get the

13  best deal that they could get under the circumstances or even

14  arguably so, you know.

15        MR. FIELD:  I think what these courts have been

16  saying -- and they're not appellate courts, but they've been

17  saying that one would expect a fiduciary to do this kind of a

18  thing, especially for something as important as investment

19  advice that was running fees into the millions of dollars

20  every year.  Somebody should have been looking at this.  This

21  is not some small minor issue that -- service that was being

22  performed here.  This was a fiduciary service, and there were

23  lots of money at stake.  And so somebody should have been out

24  there at least looking at what competitors were charging for a

25  similar service, and that's our issue.

```
 1              THE COURT:  What about the defendants' claim that you
 2   didn't give enough specifics about what these -- the whole
 3   information and belief argument that there was this better
 4   plan out there, this comparable plan that had better rates?
 5   You know, he says you could have gotten all that information
 6   and put it in your complaint.  One, could you have?  And, two,
 7   did you need to?
 8              MR. FIELD:  I don't think we needed to, and at the
 9   time we could not.  We were -- it was explained to us that
10   they would prefer that that not be put in the complaint.
11              THE COURT:  Who?  Who prefers --
12              MR. FIELD:  The person that gave us the information.
13              THE COURT:  So you didn't get it from a website like
14   he was suggesting you could?
15              MR. FIELD:  No.
16              THE COURT:  Could you have gotten it from a website?
17              MR. FIELD:  From the 5500s?  The DOL website that
18   he's talking -- yeah, he's talking about --
19              THE COURT:  I don't think he named it -- yeah,
20   Department of Labor, he did say that, yeah.
21              MR. FIELD:  There was a form called a 5500.  It's a
22   pretty massive document, and if we wanted to spend hours and
23   hours scouring these forms, yes, we probably could have dug
24   that up.
25              THE COURT:  Okay.
```

1          MR. FIELD:  And so what we did is that we identified

2     rather than doing -- we identified competitors that Financial

3     Engines had said were competitors, and we looked at what their

4     fees were.  And those fees you can find on a website.  You can

5     find them in other places, and we found that the fees for

6     similar type services where they were selecting among mutual

7     fund allocation programs ran from 7 basis points to the most

8     expensive was 30 basis points.  And Financial Engines was 50,

9     50 basis points which --

10         THE COURT:  That's half a percent?  Is that half a

11    percent?  Is that what we're talking about?

12         MR. FIELD:  Yes.  Now, that may not sound like a lot,

13    but if you span that over 10 years, 20 years, it begins to

14    get -- becomes real money.  And we showed an example in our

15    complaint that over a period of 35 years one percent, a one

16    percent difference in expenses amounts to a 28 percent

17    difference in what you have in terms of savings at the end of

18    that 35 years.

19         It sounds like very small, but over time that amount

20    of money, when it's compounded every single year, it adds up

21    to real significant money.  And they have a duty to make sure

22    that they're defraying expenses.  Home Depot has that duty,

23    and they breached that duty by not doing these things.  They

24    did not defray the expenses, as we think that a loyal and

25    prudent fiduciary would.

1          THE COURT:  So we're talking about Count II.  So that

2    part of Count II as it relates to damages I understand, but

3    what about this complaint or the allegations that relate to

4    bad phone call etiquette, you know, voicemail hell, and all

5    that kind of stuff?  I mean, how do you show damages for that

6    to the individual members that you sue for?  Frustration,

7    yeah, I understand that but as far as damages.

8          MR. FIELD:  Well, what it is, it's the overall

9    service that they were to be getting from Financial Engines.

10   So I'm going to back --

11         THE COURT:  But that doesn't matter if the results --

12   if all the evidence is that they paid a reasonable fee, under

13   all things considered, and got a reasonable return, all things

14   considered, benchmark comparisons, all those things, the fact

15   that they dealt with computers and not people, the fact that

16   they were on hold or had a hard time getting phone calls

17   returned, that really doesn't matter, does it?  It matters in

18   frustration for the employees, but, I mean, it's not

19   articulable as far as damages are concerned, is it?

20         MR. FIELD:  It is.  Not what you just mentioned, but

21   when you look at it as a whole, the whole package.

22         THE COURT:  Let's say that's all there is.  Let's say

23   your allegations are that they didn't use prudence because

24   they hired financial companies that provided bad customer

25   service.  That's the way they want to characterize it.  I know

1    that's not the way you want to characterize it, but otherwise

2    got good results financially.  I mean, there's no complaint;

3    right?  I mean, bad boss maybe but not for money.  You

4    couldn't sue for that.  You couldn't withstand a motion for

5    summary judgment on something like that.

6         MR. FIELD:  Well, they have fees that they've been

7    collecting.

8         THE COURT:  So because if they got a fee and they

9    didn't get their phone call returned promptly but they got

10   good results, maybe even superior results, that would --

11   they'd be entitled to some kind of claim based on that?

12        MR. FIELD:  Well, our position is that they weren't

13   getting superior results.

14        THE COURT:  I understand that, but I'm trying to

15   isolate your allegations to determine if it provides -- the

16   allegation provides a basis for a claim and --

17        MR. FIELD:  And it might.  And what we're saying

18   here -- this is kind of a novel claim, and we understand that.

19   And you have seen in our complaint that we refer to this as

20   what's called reverse churning, and reverse churning is when

21   you charge an asset-based sales charge or an asset-based fee,

22   and you don't do anything to earn it.  You don't earn

23   anything.  You don't do anything.  You don't rebalance.  You

24   don't get all the information that you need from your client

25   in order to give them good, strong financial advise.  You're

1    not doing anything to earn that fee.

2            And this is something that the regulators have

3    identified.  The regulators being the SEC and the Department

4    of Labor have identified this type of an issue as something

5    that requires further scrutiny because it's a conflict of

6    interest the way this is being --

7            THE COURT:  Has it been embraced by the Courts yet?

8            MR. FIELD:  No, it has not.

9            THE COURT:  So you want a judge in Atlanta, Georgia

10   to do that?

11           MR. FIELD:  Let me step back.  It has been embraced

12   by the Courts.  They have looked at this, but they have been

13   Courts where the SEC has brought the claim.  It's not been

14   plaintiff against defendant.

15           THE COURT:  So how -- okay.  Let's say that's all

16   this case was about.  How does a jury determine what the

17   damages are?  Let's say they agree with you that it was bad.

18   They didn't -- I mean, you're saying, I guess, that they

19   didn't rebalance.  I guess you could prove perhaps that a

20   prudent advisor like, you know, some other company that was

21   doing this would have given -- would have rebalanced these and

22   that could have led to greater returns?  Is that what you

23   would have to prove to get damages?

24           MR. FIELD:  Or you could say that they charged money

25   unnecessarily that they shouldn't have been charging.  They

1  overcharged them and didn't give them the service that they

2  were supposed to be giving them.

3          THE COURT:  I don't mean this rhetorically, but what

4  responsibility does the customer have to realize these things?

5          MR. FIELD:  Realize which --

6          THE COURT:  Yeah, when my phone calls aren't being

7  returned, I'm not able to get investment advice, my results

8  aren't good enough because of the lack of diversification and

9  rebalancing, what role does that play?

10          MR. FIELD:  You mean what duty does a customer have?

11          THE COURT:  Yeah.

12          MR. FIELD:  Well, if you look under the law, they

13  don't have really any duty under the securities laws or the

14  DOL.  The duty is all on the fiduciary to do what's in the

15  customer's best interest.

16          THE COURT:  Okay.  So you're saying there's not a --

17  for each customer there's not a mitigation issue?

18          MR. FIELD:  They have a duty to mitigate, yes.

19          THE COURT:  And part of that might be I don't want

20  this service anymore.

21          MR. FIELD:  It might be.  Fire them.

22          THE COURT:  I mean, we're looking down the road here,

23  but then what does that do to your class certification when

24  there's a requirement of mitigation that each individual

25  customer might have based on their experience, because each

1  customer would have a different experience like, for example,

2  on the customer service side, you know, when they call -- some

3  may not call at all.  I would guess most don't call.  They

4  just put their money in this fund, and they look at the

5  result, if they do, and maybe compare it to something else if

6  that information is provided or if they have access to it.

7          MR. FIELD:  Well, this raises another point.  At what

8  point does Home Depot, should they have been looking at this?

9  Should they have been contacting their plan participants?

10 Should they have been overlooking and monitoring what they

11 were doing?

12         THE COURT:  Is that the term that Mr. Tetrick used as

13 "polling"?

14         MR. FIELD:  Polling, yeah, surveying, whatever you

15 want to do, but Home Depot has that duty.  If they appoint a

16 fiduciary, they have that duty to oversee what they're doing

17 and making sure that they're doing the right thing.

18         THE COURT:  I'm going to guess you don't have a case

19 where a Court has ever held that a fiduciary has breached

20 their duty by not polling their -- not seeking customer

21 feedback?

22         MR. FIELD:  No, we don't.  But this is just one of

23 the things that they should have done.  We think that they

24 should have been looking at all of these things, not just that

25 one piece but the whole process.

1          THE COURT:  So the plaintiff seems to take issue with

2    the very nature of -- I mean, this will go to the other

3    motions to dismiss that we'll talk about, the very nature of a

4    fee an asset fee-based structure; right?  I mean, you don't --

5    it's not just the process that led to it and the amount of it.

6    You don't like the way it was set up.

7          MR. FIELD:  Or the way it was operating.

8          THE COURT:  So how else should it have been then?  So

9    where they got -- how would -- and this is chargeable to Home

10   Depot and their allegations because you said they could have

11   changed it or maybe something else.  If it wasn't the way it

12   was done, then how would it have occurred?

13         MR. FIELD:  Well, the way it would have occurred is,

14   first of all, Home Depot would have gone out and found the

15   competitive bids, what are these services, how much do others

16   charge for this same service, what is it.  And let's say they

17   assumed that -- concluded that Home Depot -- Home Depot

18   concluded that they were still the better service, Financial

19   Engines.  They've concluded that.  They hired them.  They paid

20   more.  And we're not saying just because they paid more it was

21   necessarily bad, but they had a duty to go and see if these

22   people were getting their monies worth.

23         THE COURT:  But you don't like -- what I'm saying,

24   though, is your complaint is also not that it was just too

25   much and too much for what they got but that the way the fee

1    was structured was not the right way; right?  I mean, you're

2    saying that there should have been a different kind of way

3    that the fees were calculated, not just a fixed amount based

4    on however much was in the fund.

5          MR. FIELD:  That was an option.  That's an option

6    that they could have analyzed, and they didn't.

7          THE COURT:  So what was the other way that -- I'm

8    trying to understand.  What's the other way they would have

9    done it?

10         MR. FIELD:  They could have charged every time we're

11   going to rebalance your account we're going to charge you a

12   fee, period, and that each count would have been charged a

13   different time that the account was rebalanced.  That's how

14   you would have done it.

15         THE COURT:  So every time they sell stuff and buy new

16   stuff to put in that fund, then they would be charged a fee --

17         MR. FIELD:  Yes.

18         THE COURT:  -- for their services not irrespective of

19   what the cost was?

20         MR. FIELD:  Yes.

21         THE COURT:  I thought that's what the industry was

22   moving away from to prevent the churning -- you used reverse

23   churning for your claim -- but to prevent churning so that

24   there's just not buying and selling for the sake of buying and

25   selling.

1        MR. FIELD:  They are, and they are moving away from

2   that.  But by moving away from that they've moved from one

3   conflict, and now they've found another.  And the other

4   conflict --

5        THE COURT:  But you complain about both.  You

6   complain about that the fee was too high the way it was

7   structured, and then you say, well, it shouldn't be structured

8   that way.  It ought to be structured this other way, which is

9   what Clark Howard and every other consumer advocate says you

10  move away from.  You move away from stuff that gives stock

11  brokers -- these aren't brokers but similar analogy -- away

12  from the opportunity to bill you every time they've changed,

13  which seems particularly apt when you consider that there are

14  similar stocks, and a stockbroker can go between one stock and

15  another, get the same type of return, but earn a fee and not

16  really substantially enhance your diversification or growth

17  potential and all that; right?

18        MR. FIELD:  That's right.  And we're not saying you

19  have to move away from one fee or the other.  We're saying

20  that you have to charge a fee that's reasonable.

21        THE COURT:  But I thought your complaint against

22  these other two people that we're going to talk to was that

23  the fee was structured that way and that it was too much.  Of

24  course, I'm not sure how that's chargeable to them.  I mean,

25  they're in the business of making as much as money as they can

1    make.  So if they could have gotten one percent, I'm sure they

2    would have been happy.

3         But you also complain that the structure itself was

4    the wrong kind of structure, and this seems like you've got to

5    pick a lane.  Know what I'm saying?  You've got to pick which

6    one of those you want to go with because if you go with both

7    of them, you run the risk that nobody believes you on either

8    of them.  You know what I'm saying?  It's like filing a

9    hundred-page brief might make me miss the one page that's got

10   something good in it for you, you know.

11        Anything else you want to say about Count II, which

12   is the claim for prudence?  And we've already dealt with, I

13   think, the issue of loyalty.

14        MR. FIELD:  I don't think I do, your Honor.  I'll

15   just close by saying, as we said in the beginning, we think

16   that we have alleged more than adequate facts to allow you to

17   infer that there was a breach of duty here.

18        THE COURT:  Okay.

19        MR. FIELD:  And we would like you to dismiss their

20   motion.

21        THE COURT:  Thank you, sir, or deny it.  You mean

22   deny it; right?

23        Mr. Tetrick, do you have anything else you want to

24   say in response?

25        MR. TETRICK:  No, your Honor.

```
1              THE COURT:  Okay.  All right.  So, you know, I've got
2    a lot of doubts about the case.  I'm not sure that that's
3    going to prevent -- is going to cause me to dismiss the case
4    at this point in time other than the duty of loyalty, which I
5    think has been conceded here.
6              So, you know, I understand there's conceptually a
7    difference between state and federal court as it relates to
8    motion to dismiss, but the rules are exactly the same if you
9    look at them.  I mean, there's just sort of a different
10   practice, I suppose, because of Twombly and other cases like
11   that.
12             I certainly buy the theory that I think everybody
13   concedes, that Home Depot has a duty to give a good deal, the
14   best deal that it can get for its customers.  And the
15   allegation is, the customers being its employees, and the
16   allegation is it didn't do that relative to what it negotiated
17   and relative to the fulfillment of its responsibility to
18   maintain, you know, and look at the results that it was
19   getting.
20             I'll just be honest and tell you I am unlikely to
21   grant the motion to dismiss at this stage.  That doesn't mean
22   to forecast.  That doesn't mean to forecast that that would be
23   the same result while we're deciding the case on the merits,
24   but I do believe most likely I'm going to need some additional
25   help in that regard relative to testimony as to the actual
```

1  scenario on the ground.

2        So I'm not making a final decision right now.  I'm

3  going to go and read the cases that both of you, primarily

4  that the plaintiff -- excuse me -- the defendant, the movant,

5  has asked me to look at and I may very well -- once I make my

6  mind up, certainly if I'm ruling in favor of Home Depot, I

7  will probably have Mr. Lundy, who's the staff lawyer who will

8  be working on this case with me, email defense counsel to

9  assist with drafting of the orders in that regard, if that's

10  where I go.  Of course the order would need to be submitted,

11  you know, electronically so in a way that we can make

12  modifications.

13        Obviously if cases are dismissed, the Eleventh

14  Circuit requires greater detail than if they're denied.  So if

15  the claims are denied, then we'll just do it ourselves.  But,

16  you know, I want to be fair as it relates to the arguments

17  that you made.  I want to go look at Judge Cohen's case that

18  was cited as well as a few others.  So I'll reserve ruling on

19  it.  And I can't tell you exactly when I will rule, but my

20  general practice is to rule quicker rather than later.  I

21  don't think my memory gets better a week away than it will be

22  right now.

23        All right.  So I guess we'll set up shop now.  If I

24  could just have both of the other two defendants maybe come,

25  you know, be prepared to argue, I will probably want to hear

1    from both of them before I hear from the plaintiff in response

2    because the arguments are somewhat similar.

3            All right.  Anything else, Home Depot?

4            MR. TETRICK:  No, your Honor.  Thank you.

5            THE COURT:  Okay.  All right.  Thank you.  So if

6    y'all can just reposition or if you're ready to come up and

7    argue, then I guess I'll hear whichever one wants to

8    volunteer.  Y'all filed it the same day, so it doesn't really

9    matter who starts.

10           MS. ADAMS:  Your Honor, I'll go next if it's all

11   right, Financial Engines.

12           THE COURT:  Okay.  Thank you.  Is anybody here for my

13   hearing at 11:30?  You might want to be very patient or -- I

14   mean, it may be another 45 minutes or so before I get to you.

15   Okay.  Thank you.

16           And you're Ms. Adams?

17           MS. ADAMS:  Yes, your Honor.

18           THE COURT:  Okay.

19           MS. ADAMS:  Good morning, your Honor.  Your Honor,

20   I'd laid out a number of points that I wanted to be absolutely

21   certain that you understood.  It's clear from your discussion

22   with plaintiffs' counsel that you've understood a lot of the

23   points that we've made, even though you were discussing Home

24   Depot's motion.  But a lot of them will apply, so I'll try to

25   focus on just a couple of things.

1          One, I wanted to confirm what Mr. Tetrick said with

2     respect to Count I that the claims regarding the performance

3     of mutual funds have absolutely nothing to do with Financial

4     Engines, that we had no responsibility and we're not alleged

5     to have had with respect to any of those.

6          So with respect to Counts III and V, the fiduciary

7     duty and prohibited transaction claims against Financial

8     Engines, your Honor, I think we've already -- the Court has

9     already discussed in detail the difficulties with plaintiffs'

10    allegations regarding customer service and the outcome and the

11    lack of loss.  So I'd like to mention just to turn quickly to

12    the idea of asset-based fees and, also, this idea that there

13    was a motivation somehow, an inappropriate motivation on

14    Financial Engines' part not to do any work.

15         Your Honor, Financial Engines was built on the idea

16    and the belief that high quality investment advisory services

17    ought to be available to everyone regardless of their wealth.

18    And this is a case where Home Depot recognized that as well,

19    that they are offering 20 some -- 20 investment options to

20    participants, and they have a lot of participants who may not

21    have the means to do traditional investment -- to obtain

22    traditional investment advice where one might walk into a big

23    office downtown and sit down with a guy in a pinstripe suit to

24    walk through their finances.

25         They need something that's more appropriate and

1    designed for people with lower account balances, and Financial
2    Engines developed this technology-enhanced way to take the
3    theories of their Nobel prize winning economists, put it
4    together with high-powered technological advances, and to
5    provide a service that is different from traditional
6    investment advising but still provides the type of advice that
7    participants are going to need in this sort of situation.  And
8    to do that they gathered a significant amount of information
9    from those participants.
10          They got information from Home Depot and the plan
11   directly and also from those participants at the outset
12   regarding such factors as their age, their risk tolerance,
13   their investment horizon, savings, and other assets that the
14   participants might hold either in tax qualified plans like
15   perhaps spouse's 401-K or other taxable savings vehicles.
16   They gather all this information and then conclude -- and, of
17   course, as Mr. Tetrick mentioned, this is only if the
18   participant opts into this service.  Then Financial Engines
19   will decide what is the optimal allocation among the
20   investment options offered in the plan for this participant's
21   purpose.
22          Now, once that's running Financial Engines is accused
23   of setting it and letting it go.  It's clear in the Form ADV
24   that's referenced in the complaint and that we provided to you
25   that's not what happens.  The measure isn't how much work we

1  did anyway, but if it were, there's plenty of work being done

2  on Financial Engines Advisors' part that it's not necessarily

3  apparent to the participants.

4       As the Form ADV tells you, there's a monthly review

5  that goes on where the technological devices will generate

6  outputs that tell Financial Engines how much variance there is

7  from the optimal investment allocation.  And then actual human

8  beings, the investment committee that's referred to in the

9  Form ADV, not a committee of robots but of humans, takes a

10 look at those variances and decides whether changes need to be

11 made.

12      That's what's happening in the background, and it's

13 not surprising at all that there are not very large numbers of

14 trades being made.  These are retirement plans.  The purpose

15 and the intent behind retirement plans is to plan for the long

16 term, for the future, and that's even disclosed in Financial

17 Engines' Form ADV, page 16, where we tell the public it's

18 generally anticipated that the dominant mode of advice will

19 recommend long-term purchases.

20      So, of course, there's rebalancing.  There are

21 changes to make sure that the participant is still in the

22 optimal asset allocation band, but it's not day trading.  Of

23 course there are not daily changes and transactions going on

24 at any given time.  And in return for this ongoing asset

25 management, Financial Engines charged a modest asset-based

1  fee.  And I'm a little unclear, following the argument,

2  whether plaintiffs are letting go of the argument that there's

3  something inherently wrong with an asset-based fee.  But I

4  think the way I read the complaint was that was the entire

5  premise, that there's something wrong with charging an

6  asset-based fee because it creates this perverse incentive for

7  us to do nothing.

8          THE COURT:  So tell me, Ms. Adams, as you can

9  understand it, for the claims that have been asserted against

10 your client, tell me the bad things they say you did.  Okay?

11 One was it seems that they have inversely argued that you

12 couldn't -- it was a violation of your duty by negotiating

13 that fee to start with.  So I'm going to say that's one of the

14 things they said.

15         MS. ADAMS:  Right.

16         THE COURT:  That you allowed Home Depot -- you asked

17 Home Depot to give you this kind of fee, and then as soon as

18 it went into place, then you were in violation of your

19 fiduciary duty.  So one is the fee itself.

20         MS. ADAMS:  That's number one.  I think the second is

21 poor customer service.

22         THE COURT:  Okay.  And this has to do with the phone

23 calls --

24         MS. ADAMS:  The phone calls.

25         THE COURT:  Or lack of response.

1          MS. ADAMS:  Lack of responsiveness.

2          THE COURT:  Okay.  What else?

3          MS. ADAMS:  The third I have to read into the

4    complaint and sort of read between the lines to get there, but

5    I think there's some suggestion that we should have been doing

6    more to affect the account allocation, the asset allocation in

7    accounts, that we just weren't tinkering with them enough.  I

8    don't think that's fully articulated, but I think there's that

9    implication there.

10         Would you like me to start with one of those in

11   particular, your Honor?

12         THE COURT:  As far as you can tell, those are the

13   three things?

14         MS. ADAMS:  As far as I can tell, yes, your Honor.

15         THE COURT:  You can start wherever you wish.

16         MS. ADAMS:  So in terms of the fiduciary duties, your

17   Honor, I think this was quite clear.  The case law is very,

18   very clear that a plan service provider or fiduciary is not a

19   fiduciary with respect to its negotiation of its own fees or

20   its offering of its own fees.  Plaintiffs have tried to draw

21   some distinction between, well, okay, maybe not that but the

22   collecting of the fees.  We're carrying out the agreement that

23   was negotiated.  That's a distinction without a difference.

24         Certainly, your Honor, if we came knocking on Home

25   Depot's door with a fee arrangement that was wildly

1  unreasonable, it would be up to Home Depot to decide whether

2  or not to offer this service to its plan participants.  They

3  can tell us to go away.  But it's not Financial Engine's duty

4  to the participants, to potential customers, that it's going

5  out and trying to get to have a particularly beneficial fee

6  arrangement.  That's the duty that Home Depot has admitted its

7  had and it certainly does, and it's looking out for its

8  participants at that time.

9          And it's very important to determine whether we were

10 a fiduciary at that point because the Supreme Court tells

11 us -- and I think almost literally every ERISA breach of

12 fiduciary duty case that you will read starts with the

13 citation, the *Pegram v. Herdrich*, that fiduciary duty is the

14 threshold question, was the defendant acting as a fiduciary

15 when taking the actions alleged in the complaint.

16         And here that's important because ERISA makes very

17 clear this is perhaps the most fundamental principle of

18 fiduciary duty in ERISA, that a fiduciary is a fiduciary only

19 to the extent that it takes those fiduciary actions.  So it's

20 possible and commonplace to be a fiduciary for some things and

21 not for others.

22         So Financial Engines did undertake a fiduciary duty

23 here, and it was limited.  The fiduciary duty was to properly

24 allocate in a prudent manner the assets among the investment

25 options that were made available to the participants.  That is

1  the fiduciary duty that Financial Engines took on, but that

2  does not make it a fiduciary duty with respect to its

3  negotiation or acceptance of its own fees.

4          And, your Honor, I think there was a reference during

5  your discussion earlier regarding rebalancing and that kind of

6  thing.  There is no allegation, no specific factual allegation

7  in the complaint, that Financial Engines did anything

8  imprudent with respect to that area where it did have a

9  fiduciary duty.  There is no allegation that there was -- that

10 any participant's account should have been rebalanced and

11 wasn't.

12         There's no allegation that, for example, a

13 participant said he was going to -- he was 35 years old, and

14 the Financial Engines Advisors crafted a portfolio for him

15 that was appropriate for a 60-year-old.  Those are the types

16 of things that could be plausible in this situation and fall

17 under the fiduciary duties that Financial Engines actually

18 had, and there is nothing like that in this complaint.

19         Those types of things could have led to damages if

20 you were able to show say this is the asset allocation that

21 was appropriate, and this is what I actually got.  But there's

22 nothing in this complaint that suggests that in any way, shape

23 or form.  Instead, it's the discussion of, well, they didn't

24 answer the phone -- and I won't belabor this point, your

25 Honor, because I think you went into it earlier.  But there is

1   no harm articulated from any failure to answer the phone.

2           It might have been a different situation if one of

3   the plaintiffs had been able to say I called to tell you this

4   "x" fact that is among the things that you consider -- have

5   disclosed to you that you consider when crafting my asset

6   allocation.  I was going to tell you this fact.  You didn't

7   answer.  If I had told you this fact, you would have changed

8   my asset allocation.  Because you didn't, my assets didn't

9   perform as well, and I was harmed.  That isn't the complaint

10  that we have here, your Honor.

11          Your Honor, I think that addresses all three of the

12  types of alleged breaches.  Are there any further questions on

13  that?

14          THE COURT:  I have any questions.

15          MS. ADAMS:  Let me just address a few points, if I

16  might, that I think go to some demonstrably incorrect or at

17  least confusing aspects of the complaint, and one is this idea

18  that there were inappropriate layers of fees because the

19  mutual funds charged fees and Financial Engines also charged

20  fees.  Those are two entirely different types of fees.  Of

21  course when an investment advisor to a mutual fund is deciding

22  what's going to be in the fund, that advisor is selecting

23  individual stocks and deciding what the fund will be that is

24  offered to the general public to plans like this around the

25  country.

1          Financial Engines is doing something very different,

2   taking a look at the 20 or so investment options offered in

3   the plan and saying how should we choose among this menu.

4   They're two different services.  By saying they're

5   duplicative, I think plaintiffs are raising an issue -- for

6   example, if I were to offer a service that said I would go to

7   a restaurant with you and I'm going to -- if you pay me, I

8   will tell you exactly the best things to choose from the menu

9   because I know this restaurant really well and I know what you

10  like, pay me a fee for it, they're saying it would be

11  duplicative if the restaurant then charged a fee for the food

12  that they provide.  Two entirely different things in that

13  section of the complaint, adds nothing to the claims here.

14          Second, your Honor, I would respond to the idea that

15  Financial Engines Advisors services were redundant or

16  unnecessary because there are Target Date Funds in the plan.

17  That's an apples to oranges comparison, your Honor.  A Target

18  Date Fund asks a single question, and in paragraph 105 of the

19  complaint the plaintiffs make this reference.  And that

20  question is, what year will you retire?  And they're offered

21  in five-year increments typically.

22          So if your answer is, well, I'm not going to retire

23  in 2030 or 2035, I'm going to retire in 2033, I would like

24  more personalization, I would like to have more adjustments to

25  the asset allocation so that I can craft my portfolio more in

1    line with who I am, then that's a time when Financial Engines

2    Advisors might make more sense.  And Financial Engines is not

3    asking just that single question about when you're going to

4    retire.  They're asking many more questions that we talked

5    about earlier and including, what are your other assets?  Are

6    they held in taxable and nontaxable accounts?  What's your

7    risk tolerance?  All of those things are the services

8    Financial Engines offers, which is much more robust than what

9    a Target Date Fund offers.

10            Your Honor, if you have no other questions on

11   fiduciary duty, would you like me to discuss the prohibited

12   transaction claim?

13           THE COURT:  I'm sorry.  Discuss what?

14           MS. ADAMS:  The prohibited transaction claim.

15           THE COURT:  Sure.  So, your Honor, this is a

16   situation, I think, where the plaintiffs seem to be

17   floundering around a bit to figure out what the claim should

18   be.  They first raised claims under ERISA 406(a), and we made

19   a motion to dismiss and explained why that subsection did not

20   apply.  They came back with claims under ERISA 406(b)(1) and

21   (2).  We explained in our motion to dismiss why 406(b)(2)

22   doesn't apply.  In their brief they said, oh, okay, you're

23   right, we're dropping 406(b)(2).  We need to plead 406(b)(3).

24   Let us replead.

25           Your Honor, the reason they're having such a hard

```
1   time is because it's not a prohibited transaction to collect
2   fees that you're owed.  It's not a prohibited transaction for
3   a plan or its participants --
4              THE COURT:  I don't really need to hear any argument
5   more about that.
6              MS. ADAMS:  Your Honor, that's all I have, unless you
7   have any other questions.
8              THE COURT:  I do not.  Thank you.
9              MS. ADAMS:  Thank you.
10             THE COURT:  All right.  So Mr. Martin or Ms. Amert?
11  Is it Amert?  Is that how we say it?
12             MS. AMERT:  You're the judge so --
13             THE COURT:  How do you say it?
14             MS. AMERT:  I say Amert.
15             THE COURT:  Amert.  Well, I say it Albany.  How do
16  you say it?  Are you from Georgia?
17             MS. AMERT:  I am not.
18             THE COURT:  You'll most likely say it incorrectly.
19             MS. AMERT:  Your Honor, I will be brief.  A little
20  bit of context setting since there are a number of overlapping
21  claims, a number of parties before you.  My client, Alight
22  Financial Advisors, took over the role of providing these
23  investment advisory services from Financial Engines in July of
24  2017.
25             THE COURT:  So is it true that when you took it over
```

1   and you subbed out some responsibilities, that the fee was

2   otherwise -- remained unchanged?

3        MS. AMERT:  It's accurate if that's what -- that's

4   what the complaint alleges.  It's actually not my

5   understanding that that's accurate.  But we're here on a

6   motion to dismiss, so we'll go with that, that the fees remain

7   the same.  There is no increase in fees.

8        THE COURT:  Okay.  All right.

9        MS. AMERT:  And, your Honor, it's also accurate that

10  once AFA, which I'm going to use because we use it in the

11  brief and it's shorter than Alight Financial Advisors, took

12  over the role of being the investment advisor, it

13  subcontracted with Financial Engines to do the automated and

14  investment advisory services that Ms. Adams was primarily

15  describing.

16       AFA took over the direct fiduciary responsibility for

17  the advice and AFA also -- AFA takes over responsibility for

18  everything from the perspective of Home Depot and the

19  participants.  There's a separate contract with Financial

20  Advisors to do some of those services.

21       Other services like communications with participants,

22  online investment advice, which is what we think of when we

23  say advice as opposed to automatically rebalancing accounts

24  and that kind of thing, was taken over by AFA.  So AFA is in

25  this case starting in July of 2017 and through the present, so

1    when the original complaint was filed.  They've been providing

2    these services for about six months.

3           The allegations against AFA are quite similar to the

4    allegations against Financial Engines.  Count IV alleges a

5    breach of the duties of prudence and loyalty against AFA.

6    Count V is actually the same prohibited transactions claim as

7    is asserted against Financial Engines.

8           THE COURT:  I'm sorry.  What was the last one?  V?

9           MS. AMERT:  Count V.  And that's the prohibited

10   transaction claim.  Both of these claims, big picture, your

11   Honor, are precluded by the decisions of the -- the reasoning

12   of the four other Courts who considered these exact claims.

13   They are an attempt to replead the rejected theory that a

14   fiduciary is responsible for upholding its fiduciary duties

15   when negotiating its own compensation.  That theory has been

16   rejected by the Courts both because the case law is clear that

17   just because you're being hired to be a fiduciary doesn't mean

18   you're not entitled to negotiate a fee and make a profit and

19   because of the nature of ERISA's fiduciary duties.

20          So ERISA is kind of a strange statute when it comes

21   to fiduciary duties.  Traditional trust law you didn't allow a

22   trustee to have an adverse interest to beneficiaries.  ERISA

23   changes that model and moves the fiduciary duty around, like

24   to be sliced up into pieces, depending on the various roles of

25   the fiduciary.

1        So here your Honor has the fiduciary responsible for

2   negotiating things like fees on behalf the plan and the Home

3   Depot defendants and then has AFA and Financial Engines, who

4   are fiduciaries with respect to the investment advice services

5   that they provide but --

6        THE COURT:  Obviously, if you're given advice, either

7   of you, are given advice to invest in funds that somehow

8   benefit your company as opposed -- well, I mean, I guess if

9   you had had a fee-based structure that was where you got fees

10  based on the transactions and you were directing them to

11  certain stocks that generated higher fees because of purchase

12  price times whatever the percent is, there might be an

13  allegation with regard to that.

14       MS. AMERT:  That might be an allegation --

15       THE COURT:  But that's not what we have here.

16       MS. AMERT:  That's not what we have here.  To pick up

17  on a comment your Honor made earlier, if we had a transaction-

18  based compensation model, we got paid every time a trade was

19  made and there was evidence that we were making trades in

20  order to generate fees for ourselves instead of because it was

21  the right thing to do for the plan participants, that might be

22  a claim.  But that's not alleged here either.

23       THE COURT:  So other than the complaints about phone

24  calls and stuff like that and that your fee was unreasonable

25  and so when you collected it, that was a breach of fiduciary

1   duty, the main argument is this reverse churning theory;

2   right?  That you didn't do anything because it benefited you

3   not to do anything.  It kept costs low, your own internal

4   stuff that you wouldn't have to do if you were active.  And

5   then you got fees that were already set based on whatever the

6   value of the investment was.  So you just did little to

7   nothing for money is essentially what they're arguing.

8            MS. AMERT:  That is what they argue.  It's not --

9            THE COURT:  You should have been doing more.  So if

10  we would cut apart the fee itself, then they'd just say you

11  should have been doing more.

12           MS. AMERT:  I think that is what plaintiffs are

13  alleging here, you should have been doing more, and that's

14  certainly what they're arguing in their brief.  I think if you

15  go back to the complaint and try and parse out what's pled in

16  the complaint that we ought to have been doing that we weren't

17  doing that had any impact on the returns that the participants

18  got at the end of the day, it's not there.

19           So in the briefing you hear and from plaintiffs'

20  counsel you hear complaints that rebalancing should have

21  happened more often.  Not only does the complaint not plead

22  how frequently rebalancing should have happened or plead, you

23  know, what the negative impact of infrequent rebalancing was

24  and there's no harm pled, it does not actually specifically

25  say you should have rebalanced a certain number of times and

1  you didn't do that.

2          Instead, what plaintiffs critique is the general

3  approach to retirement plan investing that was implemented

4  first by Financial Engines and later by AFA.  And that is the

5  general buy and hold strategy.  It's the idea that for a

6  retirement investment in particular the best approach is to

7  take a long-term view, to stake out particular positions, and

8  hold them for a long period of time; that doesn't mean you

9  never change it, but frequent trading can lock in losses.  It

10 does generate some transactional expenses for the plan, and

11 long term it doesn't improve investment performance.

12         So I believe that your Honor has put your finger on

13 it.  It is the set of stuff that they describe as reverse

14 churning that seems to be different from the previous cases

15 that rejected the critique of asset-based fees, but there's no

16 specificity as to what AFA or Financial Engines should have

17 been doing differently.  And, more importantly, from the

18 perspective of trying to establish whether there is an actual

19 fiduciary breach, there is no injury to the plan that's

20 alleged as a result.

21         There's no -- there are a couple of conclusory

22 allegations that but for these services, the participants

23 could have had relative better returns, I think, or relative

24 positive returns.  But there's no follow-through or

25 explanation as to how that would have happened, how they

1   generated worse returns using these services than they would

2   have had they not used these services or had they used an

3   alternative approach.

4        I would just point out that plaintiffs' point to

5   Target Date Funds as an alternative that might work better.

6   That was an option for the participants in this plan if they

7   wanted to use it, and as your Honor heard this morning,

8   plaintiffs are also dissatisfied with the performance of

9   Target Date Funds that were offered in this plan.  There's

10  just not a connection between the allegations about the way

11  this business was conducted and the damages that plaintiffs

12  are seeking.

13       THE COURT:  So let me make sure I'm right about this.

14  There's no allegations like against Home Depot and these

15  benchmarks.  There's really -- because each individual, what

16  is appropriate for them based on their risk averse status and

17  goals generally some -- I guess some investors might have had

18  social issues that would guide their investments.  Is that

19  also a function of what they would have been asked?

20       MS. AMERT:  So you're right that there are no --

21       THE COURT:  Because each person is different as to

22  what they want or need.

23       MS. AMERT:  Right.

24       THE COURT:  There's nothing to really compare to try

25  to come up with a damage like there is this benchmark that

1   they want to argue about I guess Home Depot generates its

2   funds.

3          MS. AMERT:  I think that's right.  Everyone making

4   their own investment decisions; right?  Doing their own 401(k)

5   allocations presumably would come to a different conclusion;

6   right?  So if you were going to try to compare my account as I

7   would have allocated it versus my account as the Financial

8   Engines' methodology that Ms. Adams described would have

9   allocated, it would be different than if we tried to do the

10  same thing for you.

11         Everyone is differently situated, but even for the

12  named plaintiffs, your Honor, the complaint doesn't articulate

13  what that difference is or what they, you know, should have

14  gotten if we had somehow done a better job, and without that

15  they really can't establish the loss to the plan element of a

16  breach of fiduciary duty claim.  And I think that is the

17  primary point.

18         The other point I want to make, your Honor, is that

19  the plaintiffs themselves plead that Financial Engines is

20  operating in a competitive marketplace, and all of the other

21  kinds of options that the plaintiffs identify in the complaint

22  also charge asset-based fees.  And that's because asset-based

23  fees for investment advisors or investment fund managers align

24  the interest of the investment advisor or manager with the

25  interest of the plan participant.

1          You want your financial advisor to have an interest
2     in your account balance going up, and a straightforward way of
3     doing that is to use an asset-based fee.  If you create other
4     incentives by, for example, a transaction-based fee, you
5     create the opportunity for a conflict of interest between the
6     plan participant and the advisor.  You would prefer not to do
7     that.
8          Unless your Honor has additional questions, that's
9     really all that I wanted to cover.  I'm also happy to talk
10    about the prohibited transaction claim, but I'm guessing you
11    don't want to hear from me about it anymore than you want
12    to --
13         THE COURT:  I've read what both sides have written
14    about that.  All right.  Thank you.
15         MS. AMERT:  Thank you.
16         THE COURT:  Mr. Field, are you going to argue this
17    one as well or --
18         MR. FIELD:  No, sir.  Mr. Tracey.
19         THE COURT:  Mr. Tracey is?  Okay.
20         MR. TRACEY:  Thank you, your Honor.  The gravamen of
21    what we argue, what we allege Financial Engines and later AFA
22    committed as fiduciary breaches is that they failed to adhere
23    to the minimum standards, the minimum standards that are
24    required by law of investment advisors.  Our clients and the
25    members of the class paid for investment advisory services,

1    and they didn't get investment advisory services that met
2    fiduciary standards.  They didn't get what they paid for.
3          Now, for over 55 years, your Honor, for over 55 years
4    since the seminal United States Supreme Court case *Capital*
5    *Gains Research*, it has been the law that investment advisors
6    must, quote, furnish to clients on a personal basis competent,
7    unbiased, and continuous advice regarding the sound management
8    of their investments.  We allege that Financial Engines and
9    later AFA wholly failed in this regard.
10         Here are some of the allegations:  One, Financial --
11   and remember this is an investment advisor.  Financial Engines
12   enrolls participants based on an unduly simplified
13   questionnaire.  What does the questionnaire ask?  It simply
14   asks participants to select for themselves, for themselves the
15   type of portfolio they want, A, B, or C, conservative,
16   moderate or risk.
17         Now, opposing counsel suggested that Financial
18   Engines was sort of the equivalent or was designed to be an
19   equivalent for folks who didn't have as much resources to the
20   person downtown in the office in the pinstripe suit.  But
21   Financial Engines still has the same obligations as that
22   person in the office in the pinstripe suit.
23         So imagine you walk into that office, and this person
24   promises you, like Financial Engines promises, we're going to
25   provide you professional management, professional management

1   of your account.  You walk into that office, and the person

2   sitting behind the desk lays out some options for you and

3   says, we've got small, medium, and large.  What would you

4   like?  That's essentially what's happening to our clients.

5   Now, I think everyone would say that's ridiculous.  I'll never

6   pay an investment advisor, someone who has a fiduciary

7   standard, who is supposed to meet fiduciary standards, to

8   offer me small, medium or large and have me select for myself.

9   But that's what we allege is going on here.

10          THE COURT:  So how would you get to the -- if you

11  didn't have the advice, how do you get to the conservative,

12  moderate or aggressive portfolio?

13          MR. TRACEY:  I mean, that's a great question.  I

14  don't know what basis a plan participant has to select

15  conservative, moderate, aggressive.

16          THE COURT:  That's my point.  So if the investment

17  advisors are putting together the stocks that they believe

18  meet conservative, aggressive, and moderate, then what's the

19  problem with that?

20          MR. TRACEY:  Because what investment advisors must do

21  is provide personal -- as the Supreme Court said, investment

22  advisors must provide on a personal basis competent, unbiased,

23  and continuous advice.

24          THE COURT:  I don't see the conflict you're talking

25  about.  A personal basis is what is it that you want?  You

1   know, do you want to be aggressive?  Do you want to be

2   conservative?  Do you want to have a mixture?  So, I mean,

3   those are three different options; right?

4          MR. TRACEY:  They're three different options, but you

5   need guidance as to which option is appropriate for you.  I'm

6   an employee of Home Depot.  I'm trying to figure out, you

7   know, what's right for me.  I'm not an investment

8   professional.  I'm trying to figure out do I need a moderate

9   one?  What's the difference between moderate and conservative?

10  What's the real distinction there?  And, by the way, you know,

11  I just inherited a whole bunch of money from my uncle, my

12  estranged uncle.  How does that affect my finances?  Oh, I

13  just lost my spouse.  How does that affect my finances?  I

14  just got fired from Home Depot.  I'm still a member of the

15  plan.  I got fired from Home Depot.  I lost my job.  How

16  should that affect my finances?

17         Our participants, our clients are simply left with,

18  well, you choose.  That's not what a financial advisor does.

19  That's not what an investment advisor does.  That's not the

20  standard that they're required to meet.  They're fiduciaries

21  like lawyers, like lawyers.  Imagine you go into a lawyer's

22  office and you say to the lawyer, I've got this legal problem.

23  I don't know what to do about it; right?  And the lawyer says,

24  well, you've got Option A, Option B, and Option C.  You

25  choose.  I'm not giving you any advice; right?  We'd all say

1    that's a breach of the lawyer's fiduciary duties.

2          And what we're saying is at the initiation of our

3    clients, the plan participants' engagement with Financial

4    Engines, that same type of breach is happening.  They're not

5    giving you the advice.  They're not taking into account all

6    the information that you -- that they need to advise you as to

7    what's the difference between moderate and conservative.

8    Frankly, standing here today I'm not sure I know what the

9    difference is.

10         How is a plan participant, the thousands and

11   thousands of employees and former employees of Home Depot, how

12   on earth are they supposed to know which one is appropriate

13   for them?  They can have a sense of what it sounds like, what

14   the word means, but what the nuts and bolts are they need

15   financial advice for.  And that's what they're paying for, and

16   they're not getting that.  And that's the fundamental issue

17   that we see here, and it goes on.  That's just the initiation.

18   That's just the first step.

19         What happens going forward?  Is Financial Engines

20   following up with the participants in any way?  I don't care

21   if it's AI following up.  I don't care if they get an email

22   that's generated and sent to them, and they fill out a form.

23   It can be AI.  We're not saying AI is per se bad.  We're not

24   saying computers are per se bad.  What we're saying is there

25   should be some follow-up happening because things change.

1   Things change.

2          I might inherit that wealth from my estranged uncle.

3   My spouse might pass away.  I might lose my job.  Where can

4   plan participants, our clients, provide that information to

5   Financial Engines and later to AFA?  We allege they don't have

6   that, that there was no follow-up.  There's no ongoing, as the

7   Supreme Court requires, ongoing continuous investment advice.

8   It's not happening, and that's the second problem that we see

9   here.

10          Now, it's not just a customer service issue.  It is

11   an investment advisory issue.  This is what investment

12   advisors are required to do.  This is why you pay for an

13   investment advisor.  Going forward when our -- and this is

14   even more disturbing, and it's somewhat disturbing that it's

15   even described by defendants as a customer service issue.  Our

16   clients instructed -- wanted to instruct I should say, wanted

17   to instruct Financial Engines to change the asset allocation

18   in their accounts, to make changes, to move from conservative

19   to moderate.  And guess what, didn't happen.

20          That is a clear breach of fiduciary duty.  So it's

21   not just a customer service issue when no one is picking up

22   the phone.  It's a fiduciary issue because you can't give

23   instruction, the fiduciary, if no one is picking up the phone.

24          Based on what we've alleged, there's really no way

25   for our clients -- we don't believe there was any way for our

1    clients to get the message to Financial Engines that, hey, I

2    need to change my account.  I need to go from conservative to

3    moderate.  I need to go from small to large.  It was never

4    available to them.  And what we're saying is that an

5    investment advisor is required -- just like an attorney is

6    required to follow his or her clients' instructions, an

7    investment advisor, also a fiduciary like an attorney, must

8    follow their clients' instructions.

9            And we're saying that Financial Engines and AFA don't

10   do that.  They don't even make it possible for our clients to

11   do that -- for the plan participants to do that.  That's the

12   fundamental issue that we see here, and that is why we think

13   it's a breach of fiduciary duty.

14           And if you look at the sources, if you look at the

15   sources that we cite throughout here, this is an issue that

16   has been addressed by the SEC.  It's also in the ERISA

17   regulations.  The SEC, the SEC staff study in January 2011

18   said that investment advisors have a duty of care required to

19   make a reasonable investigation to determine that it's not

20   basing its recommendations on materially inaccurate or

21   incomplete information.

22           ERISA, the regulations interpreting ERISA, require

23   that appropriate consideration to those facts and

24   circumstances must be given to those facts and circumstances

25   that a fiduciary knows or should know are relevant to a

1  particular investment or particular course of action involved.

2  And, of course, when the SEC has looked particularly at robo

3  advisors, it said, it admonished them to, quote, elicit

4  sufficient information to allow the robo advisor to conclude

5  that its initial recommendation and ongoing investment advice

6  are suitable and appropriate for that client based on his or

7  her financial information and investment objective.

8         They're not -- these are plain -- this is plain black

9  letter requirements for investment advisors.  It's 55 years

10 old and announced by the Supreme Court, and we allege that,

11 simply put, our clients are not getting it.

12        THE COURT:  So what are your measure of damages?

13        MR. TRACEY:  Two ways, your Honor.  Two ways, your

14 Honor.  First of all, our clients are paying.  As I said, our

15 clients are paying for a service, and they're not getting that

16 service.  That's a loss.  That's a loss.  Essentially what

17 they're getting is akin to a Target Date Fund.  Now, there may

18 be one or two factors that are slightly different, but there

19 are other types of funds out there that do essentially the

20 same thing that are basically -- and I think as counsel for

21 Financial Engines described, they're allocating investments in

22 portfolios.

23        Well, it's what a mutual fund manager does; right?

24 So they weren't paying for a mutual fund; right?  They're not

25 paying fees for a mutual fund service.  What they're paying

1   for is an investment advisor, which is a much more involved

2   service than simply just allocating funds.  So the difference,

3   they're paying for something they didn't get, they essentially

4   were cheated out of.  They were cheated out of services, and

5   the loss is the additional amount of money that they paid over

6   the services that they got.  That's one way.

7           And a second point, your Honor, is that ERISA doesn't

8   require loss to the client.  When a fiduciary -- and there's

9   no doubt that Financial Engines and AFA are fiduciaries.  29

10  USC Section 1109(a) says a fiduciary who breaches its

11  fiduciary duties under ERISA, quote, shall be personally

12  liable to restore to such plan any profits of such fiduciary

13  which have been made through the use of assets of the plan by

14  the fiduciary.

15          They have to restore their profits to the plan

16  because they used the plan in breach of their fiduciary duty.

17  They used the --

18          THE COURT:  How do you fit that into your allegation,

19  sir?  All you did was quote me the law.  How does it fit here

20  if you can't show that your clients would have made more money

21  if they had had different advice?  You haven't even alleged

22  that, I don't believe, have you?

23          MR. TRACEY:  First of all, your Honor, I believe we

24  do allege that, essentially when we're talking about the fees

25  that they're paying for.

```
1              THE COURT:  Well, the fees are different.  The fees
2    are totally different.  I mean, I understand you could say,
3    well, those are fees if they weren't taken, would have been
4    invested, and they would have made some money.  That's not
5    what I'm asking you about.  I'm asking you about if your
6    allegation -- is your allegation other than the fees and any
7    profits that would have been generated on those fees, is it
8    for the balance of the money?  Are you claiming that they
9    would have made additional monies based on different types of
10   investments?
11             MR. TRACEY:  I think that's something that we'd have
12   to --
13             THE COURT:  Have you alleged that?
14             MR. TRACEY:  I think we've alleged that it was nearly
15   impossible.  The way these investments are structured was
16   nearly impossible for them to turn -- to get positive returns
17   on their investment.  So, yes, I think we have alleged that.
18             THE COURT:  With what facts?
19             MR. TRACEY:  Beg your pardon?
20             THE COURT:  With what facts?
21             MR. TRACEY:  Well, I think it's with respect to fees,
22   but I want to explain something.
23             THE COURT:  Tell me what's in there.  Don't give me
24   lawyer speak.  All right.  Tell me what's in there.  That's
25   what I'm looking for.
```

1          MR. TRACEY:  Okay.  So what's in there is the fact --
2     this is what --
3          THE COURT:  The fees, I understand the fees argument.
4          MR. TRACEY:  Right.  What's important to understand
5     is that fees and performance are two sides of the same coin;
6     right?  I don't get good performance if I have high fees
7     because, guess what, my performance is eaten up by my fees.
8     And so what we're saying here, your Honor --
9          THE COURT:  Mr. Tracey, I understand the fees part.
10    Is there anything else that you've alleged specifically?  Are
11    you alleging that any of the named plaintiffs would have had
12    higher profits to the amount of money other than the fees and
13    what the fees could have compounded to?
14         MR. TRACEY:  Here's the problem.  Thank you, your
15    Honor.  Thank you for directing me there.  Here's the problem.
16    We're dealing with a 401(k) plan, the Home Depot plan that
17    doesn't have sound investment options, so our plan
18    participants are kind of in a catch-22 here.
19         THE COURT:  But you can't cross pollinate this
20    because these defendants are only responsible for what they're
21    responsible for.
22         MR. TRACEY:  But you asked me what --
23         THE COURT:  So your answer is no.
24         MR. TRACEY:  My answer is --
25         THE COURT:  It's okay to say no.

1          MR. TRACEY:  No, my answer -- I will say I think we

2     do allege very clearly and I can find the --

3          THE COURT:  It's got to be more than conclusions.

4          MR. TRACEY:  Well, it's not a conclusion because we

5     show you how the fees eat up the performance.

6          THE COURT:  You want to keep talking about the fees.

7     Okay.  I understand your fee argument.  I'm not talking about

8     fees.  I'm not talking about what the fees would have

9     generated.  I'm talking about everything else.  So let's say

10    the fees were 10 percent, awful high, but we'll just assume

11    it.  For you to prevail on the other 90 percent, you've got to

12    show me that your clients would have had 90 percent or they

13    would have made more money if they had gotten their phone

14    calls answered, if they would have gotten it rebalanced in

15    some way, if they'd gotten it moved from aggressive to

16    moderate.  In fact, really I guess that only really works if

17    there's been sales.

18          I mean, you've got to show that.  I'm sensing that

19    you can't show that, you don't even really want to talk about

20    it.

21          MR. TRACEY:  Well, I can't say -- you're right.  I

22    can't say that we have that alleged in the complaint because

23    the problem is there are other options, the other options that

24    were available --

25          THE COURT:  And they're bad too.  Yeah, but at some

1  point you have to put a flag in the ground; right?

2          MR. TRACEY:  And the flag we're planting is that they

3  paid for something, and they didn't get what they paid for.

4          THE COURT:  Okay.  I understand your argument on

5  that.  Then let's focus on what you really -- you want to

6  define the universe as really big, and then you want to talk

7  about what's really small because invariably a five percent, a

8  half a basis point, not even five percent, a half a percent

9  fee is not going to be as much even with the growth that it

10  would have obtained if it hadn't been paid, all things the

11  same, being, you know, ceteris paribus, if that's the right

12  economic word.

13          So I'm just trying to make sure I understand your

14  claim.  I think I do.  All right.  Anything else that you

15  haven't had a chance to argue about your claim?

16          MR. TRACEY:  Well, I just want to make a quick point

17  about their Form ADVs, which they use as sort of counter

18  allegations.  And, of course, their Form ADV -- first of all,

19  the Court cannot take judicial notice of any -- the Court can

20  take judicial notice if this is a document that's filed and

21  the document says this.  But the Court, of course, cannot take

22  the document for the truth of matters asserted therein.  So

23  simply because their Form ADV says they do something doesn't

24  mean that they actually do it.  And we dispute that they do

25  certain things that they say in their Form ADV.

1          Furthermore, the Form ADV, things that they say, oh,
2   we do because our Form ADV says we do this, the Form ADV
3   actually says they may do it.  It doesn't say they actually do
4   do it.
5          And, finally, as I mentioned, because there are
6   reasonable disputes about the validity of the document,
7   there's a question as to whether the Court could even take
8   judicial notice of it.  So that's our --
9          THE COURT:  When you take judicial notice, you're
10  just taking judicial notice of its existence; right?
11         MR. TRACEY:  Essentially.
12         THE COURT:  Without having to lay a foundation for
13  what it is.
14         MR. TRACEY:  I mean, that's what they've asked you to
15  do, and we think that at a motion to dismiss certainly --
16         THE COURT:  You're just saying it's filled with
17  hearsay.
18         MR. TRACEY:  Essentially, yes, essentially.  And the
19  one other point, just to go back on the loss point -- I just
20  want to make sure this was clear -- is that because ERISA is
21  dealing with trust law, if a fiduciary breaches its duty and
22  earns profits because it breaches its duty, it has to disgorge
23  those profits back.  That's in the statute.  And so there's
24  all this -- you know, there's been a lot of talk, and there's
25  a lot in defendants' briefs about we didn't plead loss.  Well,

1  we said that.  In our response we said ERISA requires a

2  breaching fiduciary to disgorge its profits.  There was no

3  response in their reply to that point.

4        THE COURT:  Can't argue with the law.

5        MR. TRACEY:  Exactly, exactly.

6        THE COURT:  All right.  They just say they haven't

7  breached it.

8        MR. TRACEY:  They have claims about -- right.  They

9  have arguments about breach but in terms of --

10        THE COURT:  But you are just talking about fees, but

11  you don't want to limit it to that.  You're talking about fees

12  and what they would have been if they hadn't been paid, what

13  they could have turned into.  Obviously when they're

14  subtracted out, then they can't compound and grow.  And so I

15  understand all that but -- I got it.

16        MR. TRACEY:  Got it.  Thank you, your Honor.  Thank

17  you.  The one other point I want to make is we're not

18  complaining that asset-based fees are per se bad.  We're not.

19  What we're saying is asset-based fees create bad incentives,

20  and these defendants acted on those incentives by claiming to

21  provide professional management but not actually providing it.

22  That's that in a nutshell.

23        THE COURT:  Okay.  You're going to talk about the

24  prohibited transactions?  Or you just want to let that go?

25  Because I know where it's going.

1          MR. TRACEY:  If your Honor knows where it's going --

2          THE COURT:  How is it not arguing the same thing that

3    the Courts have said you can't argue?  Because if you want to

4    come back and say, well, but your services didn't justify it,

5    well, that's arguing about the services, and that's arguing

6    about breach of fiduciary duty.  Has nothing to do with the

7    fee itself.  The fee itself -- it's not a breach of fiduciary

8    duty to have negotiated the fee.  You agree with that; right?

9          MR. TRACEY:  It's not -- it is not a breach of

10   Financial Engines' and AFA's duty to negotiate the fees,

11   breach of Home Depot's, yes, but Financial Engines, yes, I

12   agree, your Honor.  I agree.

13         THE COURT:  Okay.

14         MR. TRACEY:  I agree.  I will let your Honor -- I

15   will rest on the papers with the prohibited transaction claim.

16         THE COURT:  All right.  Thank you.

17         MR. TRACEY:  Thank you, your Honor.

18         THE COURT:  Do either of the two defendants want to

19   be heard in response?  Okay.  Yes, ma'am.

20         What about his point that people were not able to

21   make changes?  He says their allegations are they wanted to

22   change from moderate to aggressive, and they weren't able to

23   and that they suffered harm because of that.  I didn't --

24   maybe they did, maybe they didn't.  But because they weren't

25   able to make the change that they wanted to make and were

1    entitled to make, that your client didn't earn whatever they

2    were charging.

3          MS. ADAMS:  Sure.  And taking the complaint as

4    pleaded and setting aside whether there were electronic or

5    other means to communicate with Financial Engines, I agree

6    that there could be some case that some plaintiff could plead

7    somewhere where they could say I had information to tell you,

8    you did not find a way for me to get it to you, and as a

9    result you provided me inappropriate investment advice and I

10   was harmed as a result.

11         In theory that could state a claim.  There just

12   aren't those allegations in the complaint.  We have the

13   allegation that Mr. Pizarro called and wanted to change his

14   asset allocation.  That's all it says.  But the --

15         THE COURT:  No, it's a little bit more than that,

16   though, because what he's also saying is because you didn't

17   provide me with an opportunity to make that change

18   meaningfully, then you didn't earn any money for me.  I mean,

19   that's his allegation.  So I want my money back, and I want

20   what I lost, all my opportunity costs for that money too.

21         I mean, clearly he's not alleging that his investment

22   globally suffered because of it, but he is saying that you

23   took stuff from him that you didn't earn.  I mean, like

24   paying -- use a lawyer.  I'll pay your retainer.  I expect you

25   to take my call and provide me advice and listen to what I

1  have to say, and you wouldn't take my call.  My wife is a

2  psychologist, so maybe that's a better example.  I pay you

3  money to listen to me.  You wouldn't take my call, and you

4  didn't listen to me.

5          MS. ADAMS:  Right.

6          THE COURT:  So you didn't earn what I've paid you.

7  You didn't earn that retainer.

8          MS. ADAMS:  Right.  Your Honor --

9          THE COURT:  Does that not state a claim?

10         MS. ADAMS:  No, your Honor.  It doesn't state a claim

11 because they have not alleged any harm from that.

12         THE COURT:  So he doesn't -- does he have a

13 contractual relationship with your client?  I mean, the breach

14 of fiduciary duty exists, but does he have a breach of

15 contract cause of action?  If he's paying for something he's

16 not getting, that's a breach of contract we'd normally assume.

17 Does he have standing to bring a breach of contract claim?

18         MS. ADAMS:  He may have standing.  It would be

19 preempted by ERISA's broad preemption --

20         THE COURT:  So really the only thing he can do is

21 bring a breach of fiduciary duty claim.

22         MS. ADAMS:  Right, your Honor.  And the reason I

23 wanted to come up here was to correct the point of law, and

24 that is the idea that Mr. Tracey presented that a plaintiff

25 does not have to allege a loss to state a breach of fiduciary

1  duty claim.  That is incorrect.  The fact that the statutory

2  provision provides for the, in certain circumstances, the

3  recoupment of profits goes to remedy.  There could be a remedy

4  that the Court could devise as more appropriate.

5       THE COURT:  How is the loss not what he paid for the

6  service if he didn't get the service?  That's his allegation.

7  So he said I didn't get the service, but I paid for it so

8  there's my loss at least as to that.

9       MS. ADAMS:  Your Honor, didn't get the service, I

10  think, would be we did not take in his information, allocate

11  the investments.

12       THE COURT:  But the way you argue it is it's a

13  one-time shot because he's saying we had -- I mean, I

14  understand that there's going to be evidence otherwise when we

15  get to the evidence stage -- that he's saying I didn't have a

16  chance to make changes.

17       MS. ADAMS:  I'm certainly not arguing it's a one-time

18  shot, your Honor.

19       THE COURT:  So if the allegation is that he had no

20  way to communicate different preferences in different

21  situations after the initial changes were made -- that's what

22  Mr. Tracey argued -- then your client didn't have a duty

23  somehow?  That wouldn't be a breach of its duty if it didn't

24  provide a means for him to communicate those different

25  preferences?  Because he's paying on an ongoing basis every

1    month.  There's that fee that's being taken out of the fund or

2    maybe it's quarterly or yearly.  I don't know.  So that

3    financial advice component he argues, Mr. Tracey argues, is

4    ongoing, not just once.

5             MS. ADAMS:  Right.  And I think it's clear from the

6    complaint that there were ongoing services from the Form ADV

7    that was --

8             THE COURT:  You were doing stuff in the background.

9    You were doing your balancing.  You were doing all the -- I'm

10   assuming there would be evidence of tinkering with the

11   algorithms and all that kind of stuff that helped determine

12   what to buy.  But you've got to have the input for that

13   algorithm to run, and plaintiff says they wanted to change the

14   input and that they couldn't.

15            MS. ADAMS:  Right.  I understand that, your Honor.

16   They say that there was no opportunity.  When they say there

17   was 45 minutes on hold, maybe one participant didn't -- but,

18   there again, did he get no investment advisory services

19   whatsoever?

20            THE COURT:  Because he didn't get what he wanted,

21   which was his preferences to be used by you in helping to

22   formulate where he was and decide -- have your formula decide

23   what he should get.

24            MS. ADAMS:  Your Honor, I would submit that he states

25   that in a most conclusory fashion without any indication what

1  he was trying to communicate, whether he ever was successful

2  in communicating, whether there were other options for

3  communications, and how that led to him not receiving the

4  investment allocation advice that he paid for.

5      THE COURT:  So what was he supposed to say?  If he

6  said if I tried to reach them, I couldn't get through to them

7  to tell them what I wanted -- and they do have some specifics.

8  We were put on hold.  We couldn't get through.  Calls weren't

9  answered.  Calls weren't returned; right?  And so couldn't

10  tell them, couldn't the defendants what my changes would be so

11  that they could give me the advice and change -- you're right

12  there may have been no actual change in what you would have

13  recommended, you being Financial Advisors or Alight in the

14  other situation.  But they're saying I didn't have a chance to

15  communicate that to you, and so you didn't earn the fee that

16  is associated or maybe part of the fee that was associated.

17      MS. ADAMS:  And, your Honor, as you brought up

18  several times, looking down the road, if that kind of claim

19  were to go forward, how would they show that there were

20  damages there?  How would you measure the fact that someone

21  waited 45 minutes and some of -- one of the participants, I

22  believe, did get through.  And how would you say we provided

23  you ongoing investment advice and allocation?  How would you

24  weigh that fee to say you've got the service you paid for

25  versus what you didn't?

1          THE COURT:  I don't know.

2          MS. ADAMS:  I don't know either.

3          THE COURT:  But at the same time I'm trying to -- I

4  mean, it almost seems like your argument is that you, at least

5  for this stage, is that you had no duty to modify once it

6  starts if they need to communicate differences.  I mean, I

7  know you don't agree with that factually, but that's after

8  motion to dismiss stage.  So I'm at the motion to dismiss

9  stage.  Don't you agree that there is a fiduciary duty to

10  receive the information that the clients want to communicate

11  for purposes of deciding what's best for them?

12          MS. ADAMS:  I believe there's a fiduciary duty to

13  make a prudent asset allocation.

14          THE COURT:  Based on what they want; right?  Right?

15  What they want.  That's why you ask them questions; right?

16  You ask them questions to know what they want, and you're

17  using that, what they want, as a major factor in what you

18  recommend.

19          MS. ADAMS:  What they want in terms of how aggressive

20  they want to be, that is one consideration, right.  I believe

21  there's a fiduciary duty to make a prudent allocation decision

22  if there --

23          THE COURT:  You agree it's ongoing; right?

24          MS. ADAMS:  Yes.

25          THE COURT:  So if someone says theoretically I want

1  to be aggressive, and they have some kind of change in their

2  life that causes them not to want to be aggressive anymore --

3  maybe they've become more conservative because of their fear

4  of what's going on in politics, or whatever, and they want to

5  be more conservative, you've got to be able to react to that;

6  right?

7        MS. ADAMS:  Right.  And I think the complaint is

8  inadequate in alleging that there was not a method for doing

9  that.

10        THE COURT:  Okay.  So how would it have been

11  adequate?  If they say we called the numbers and we couldn't

12  get through, what more are they supposed to say?

13        MS. ADAMS:  Your Honor, what they were offered was,

14  in addition to the numbers that were provided, online

15  interface --

16        THE COURT:  That's what you're telling me now; right?

17  Is that in the complaint?

18        MS. ADAMS:  It's in the Form 10K and the --

19        THE COURT:  You understand that's hearsay; right?  I

20  mean, am I able to take what's in there as the truth of the

21  matter asserted?

22        MS. ADAMS:  They are referenced in the complaint.

23        THE COURT:  That document is referenced in the

24  complaint?

25        MS. ADAMS:  The Form ADV and the Form 10K, yes, sir.

1          THE COURT:  Referenced how?  Tell me about that.

2          MS. ADAMS:  When they're describing the services that

3    Financial Engines provides.

4          THE COURT:  All right.  So finish what your thought

5    was on that then.  So in that form it says what?

6          MS. ADAMS:  It discusses that they're providing an

7    online and electronic interface and continue to gather this

8    type of information.

9          THE COURT:  Does the form have anymore specifics

10   about this is how people contact us, this is what we do when

11   they do, this is what -- anything like that?

12         MS. ADAMS:  I'd have to take a look --

13         THE COURT:  As opposed to generic online?  I mean,

14   I've dealt with a lot of online companies that I never get

15   responses to, you know, myself.  And Southwest Airlines has a

16   great airline portal, but they don't respond.  If you tweet at

17   them, sometimes they might but -- because everybody sees that.

18   But the online stuff they're not real good.

19         MS. ADAMS:  And I understand the frustration, your

20   Honor, but whether it's a breach of fiduciary duty is --

21         THE COURT:  Well, it could be right if they're -- you

22   don't disagree with the fact that your duty to make changes

23   exists if the customer expresses information that they want to

24   change; right?

25         MS. ADAMS:  I would caveat that a little bit, your

1  Honor.

2          THE COURT:  You don't have the independent right to

3  do what you think is best for them even if it's against what

4  they want.  If they want aggressive, you don't have the right

5  to go conservative.

6          MS. ADAMS:  No, but could I provide a little nuance

7  to that?

8          THE COURT:  Yeah.

9          MS. ADAMS:  What they have paid for is full

10 discretionary investment management.  What Financial Engines

11 did not offer is investment management where you -- the

12 participant gets to say I want you to manage my investments

13 but not this and not this and not this.  What they offered as

14 a service was we will take this kind of information, and we

15 will craft a portfolio that's appropriate for you under that.

16         So when Mr. Pizarro called and said he wanted to

17 change his asset allocation, that's not something that is

18 offered under the professional management program we're

19 talking about here.  If they wanted a service where Financial

20 Engines offered advice and the participants could take or

21 leave it, that's online access.  That's another option.  They

22 could have chosen that instead, but, no, what they gave was

23 discretionary authority.  We had a duty to gather appropriate

24 information, but, no, the discretion lies with Financial

25 Engines and not --

1          THE COURT:  Discretion lies consistent with what

2    they've communicated is their general preferences; right?  You

3    would not have the discretionary authority to invest in penny

4    stocks if someone says I want a conservative portfolio.  You

5    can go out and pick what conservative portfolio you want.  You

6    can go, you know, Home Depot stock, Coca-Cola stock, any blue

7    chip stocks, but you're not going to be able to go get a

8    start-up company that doesn't pay dividends and is growth-

9    oriented in an industry that is very suspect.

10          I mean, I think we agree to that; right?

11          MS. ADAMS:  Sure.  That's a customization we offer,

12    the aggressiveness preference, but it's not a pick and

13    choose --

14          THE COURT:  Right.  So if they picked aggressive but

15    then they want to become conservative because of some fears

16    they have, you've got a fiduciary duty to do what they want

17    when that is to go conservative in a general sense.  You're

18    not able -- maybe they can't direct you to buy certain stocks,

19    but they certainly can direct the tone of the strategy that is

20    used; right?

21          MS. ADAMS:  That is the service that we offer, yes.

22          THE COURT:  All right.  I just think sometimes it's

23    so hard -- I mean, you and I have been talking about this for

24    20 minutes, and we're going to get to the same spot.  I'm not

25    letting it go because I know the answer to the question, and I

1  think you do too.  Sometimes you just have to admit, yeah, you

2  know, they do have that right.  I understand your argument

3  that they didn't plead it well enough, but don't argue against

4  something that's obvious, you know.  I mean, that's obvious

5  that they -- they're in charge of the general overall theme of

6  their investment strategy.  You're in charge of fulfilling

7  that thing; right?  You agree with that?

8          MS. ADAMS:  Yes, we allow them to customize within

9  those three categories and a wealth of other --

10          THE COURT:  You allow them to change that too.

11          MS. ADAMS:  Yes.

12          THE COURT:  All right.  Anything else you want to

13  talk about?

14          MS. ADAMS:  No, your Honor.

15          THE COURT:  All right.  Do you have anything else,

16  Ms. -- I was fixing to say your last name -- I was going to

17  mispronounce it so --

18          MS. AMERT:  Amert.

19          THE COURT:  Amert.

20          MS. AMERT:  The A is just like in re.

21          THE COURT:  A. Okay.

22          MS. AMERT:  I will be brief because your Honor has

23  been very patient today.  I just wanted to offer a further

24  thought on the conversation you were just having with

25  Ms. Adams, and I think it's helpful to think of investment

1   advisory services' sort of level of service as falling across

2   a range.  So on one end you have a one-size-fits-all approach.

3   Okay.  And I would describe that as this:  When I got my first

4   job, my co-worker told me you've got a 401(k).  You should put

5   one-third in domestic equities, one-third in overseas

6   equities, and a third in bonds.  And that's a good investment

7   allocation.  That's the one-size-fits-all approach.  It's

8   free, and it actually works okay if you want to implement it

9   that way.

10          At the other end of the spectrum you've got a bespoke

11  approach; right?  You hire an individual investment advisor

12  who's trained to be very responsive, to look at your whole

13  situation and, you know, how many kids you have, how much your

14  mortgage is, what other investments you have, whether you own

15  farmland, the whole spectrum, and give you individualized

16  ongoing customized advice and take a lot of direction from

17  you.  That's a much more expensive service than the one we're

18  talking about here today.

19          The one we're talking about here today is really in

20  the middle.  It's off the rack; right?  So you go in, and you

21  can choose from -- you have input into a variety of things.

22  They don't all fit you.  You pick your size.  You, you know,

23  ideally might want the sleeves shortened, but that's not a

24  service that the store offers so you work with the advisor.

25  You provide information.

1          And what having that mid level of service lets happen

2     is basically the provision of group investment advice.  People

3     who have these characteristics generally should fall into --

4     you know, this is a generally good portfolio for them.  It's

5     not as customized as the, you know, bespoke individual model,

6     but it's a lot more detailed than the one-size-fits-all

7     everybody should allocate this way approach.

8          The question of whether there's a fiduciary duty in

9     that middle model to tweak what you're doing in response to

10    ongoing participant input is an interesting one, and although

11    participant direction is really an important thing, I don't

12    want to downplay it.  Not being good at executing on that

13    direction in every circumstance doesn't automatically become a

14    breach of fiduciary duty.

15         THE COURT:  Look.  I'm with you on the discretionary

16    functions that your clients have, but I do think the plaintiff

17    raises a valid issue for us to at least talk about what

18    happens when they can't communicate to your clients where they

19    are because you can't make decisions based on -- and no matter

20    whether -- I guess the one shoe fits all, we'll throw that one

21    out the window because it really wouldn't matter what they

22    communicated because they could always just change it, I

23    guess, themselves by going online.  I think with most

24    companies you can make changes in whatever you want, unlike

25    insurance.

1        But if you've got someone like the two defendants in

2    this case that are actually picking the stocks that fit the

3    profiles, what happens when they can't communicate where they

4    are or changes that cause them to change where they want to

5    be?  Because that's what Mr. Tracey was arguing, is that his

6    client wanted to change but couldn't change because he

7    couldn't get through, and it was made impossible by the set

8    up.

9        Now, I don't believe any of the defense agreed that

10   was true, but taking it as true for here, my fundamental

11   question is I think everybody would agree they should be able

12   to change the risk level that they want.  They may not be able

13   to parse it into ten level risk levels.  I want four.  Maybe

14   there's got to be a two or a five or an eight on a one to ten

15   scale.  But if they couldn't communicate it to you, then that

16   raises the question of are there damages that they suffer.

17   And he argues those damages are the money that they paid for

18   the service of being able to make that change, and they

19   couldn't make the change.  That's the response I'm trying to

20   figure out what y'all think about.

21        MS. AMERT:  Right.  So if they could demonstrate that

22   they asked for a change that's in the possible range, right,

23   so within the model and, you know, would have made a

24   measurable difference and that there was some structural

25   failure, right, something about the way the whole system is

1   set up that made it impossible for them to actually give input

2   that could have been implemented and would have made a

3   difference in their long-term results, at some point that

4   might rise to a breach of fiduciary duty claim.

5           THE COURT:  So your basic argument then is they're

6   not automatically entitled to a refund, and any profits they

7   would have made on the advice -- I mean on the fee for the

8   advice, unless they can demonstrate that because they were not

9   able to communicate they changed in risk preferences, that it

10  would somehow cause them to suffer financially as to the

11  fund -- as to the rest of money.

12          MS. AMERT:  I think that's the minimum.  I think they

13  would also actually need to be able to plead not just that the

14  customer service rep they called was having a bad day and was

15  unresponsive but that there was a pattern and practice that

16  prevented anyone from being able to make a change.  And there

17  are cases where there's a direction to a trustee that doesn't

18  get executed on, and that can give rise to losses.  But,

19  again, the losses are, you know, the different -- are the

20  money you should have made.  They're not of fees that you

21  paid.  Their argument doesn't --

22          THE COURT:  So breach of contract claim is what it

23  is.

24          MS. AMERT:  It's a breach of contract claim, and it's

25  a, you know, complaint that should be raised to Home Depot

1   who, you know, picks the service provider.  The plaintiffs

2   aren't happy with the service provider, they should give that

3   feedback to the people who have the opportunity to make a

4   change.  Employers are actually really interested in whether

5   their plan participants like the services that they're

6   getting.  That's why they offer things like this.

7           But to the extent that what the plaintiffs are trying

8   to do is fight with the model, you put people into categories,

9   and you advise them accordingly.  And the way you advise them

10  is by managing their accounts.  That's not a breach of

11  fiduciary duty.  It's also, you know, been approved by the

12  SEC.  It's been approved by the Department of Labor as a way

13  of providing this middle category of investment advisory

14  services.

15          If you put all of the fiduciary obligations of

16  responsiveness that an individual advisor has on somebody

17  trying to provide this middle level of services, you

18  basically -- you do away with the middle level of services.

19  You can only have the full bespoke option.

20          THE COURT:  Okay.  All right.  Thank you.

21          MS. AMERT:  Thank you.

22          THE COURT:  Mr. Field, I wouldn't call on you for

23  response because it was their motion, and y'all had your

24  opportunity to argue.

25          So I'm not going to rule today on this either.  I say

1  today.  I mean right this minute.  I may rule on it today.

2  The likelihood is that I'm going to dismiss the claims against

3  both the other two defendants.  I think it is -- I think

4  Mr. Tracey does argue a breach of contract claim and not a

5  breach of fiduciary duty claim.  So notwithstanding the

6  questions I was asking Ms. Adams on that, that's where I'm

7  likely going to be at the end of the day on it, but I do want

8  to take some time to talk about it and think about it.

9         If I do lean in that direction, then I'll send an

10  order to each of you to help me draft that order.  Obviously I

11  may make changes.  Your argument is a little bit different as

12  to some of the counts, so obviously I don't expect your orders

13  to look exactly alike.

14         All right.  So I've got another case here.  I'm going

15  to take a recess for about five minutes and come back and

16  start on that.

17         COURTROOM SECURITY OFFICER:  All rise.  Court is in

18  recess for about five minutes.

19         (Whereupon, the proceedings were adjourned at 12:30

20  p.m.)

21                        -  -  -

22

23

24

25

```
 1                    REPORTERS CERTIFICATE

 2

 3

 4          I, Wynette C. Blathers, Official Court Reporter for

 5   the United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7          That I reported on the Stenograph machine the

 8   proceedings held in open court on March 14, 2019, in the

 9   matter of JAIME H. PIZARRO et al. v. THE HOME DEPOT, INC. et

10   al., Case No. 1:18-CV-01566-WMR; that said proceedings in

11   connection with the hearing were reduced to typewritten form

12   by me; and that the foregoing transcript (Pages 1 through 111)

13   is a true and accurate record of the proceedings.

14          This the 14th day of March, 2019.

15

16

17

18                         _____

                            /s/ Wynette C. Blathers, RMR, CRR
19                              Official Court Reporter

20

21

22

23

24

25
```