**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| JAMIE H. PIZARRO, CRAIG SMITH, JERRY MURPHY, RANDALL IDEISHI, GLENDA STONE, RACHELLE NORTH, and MARIE SILVER, on behalf of themselves and other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br><br> THE HOME DEPOT, INC., THE ADMINISTRATIVE COMMITTEE OF THE HOME DEPOT FUTUREBUILDER 401(K) PLAN, THE INVESTMENT COMMITTEE OF THE HOME DEPOT FUTUREBUILDER 401 (K) PLAN, and DOES 1-30, <br><br> Defendants. | CIVIL ACTION FILE NO. 1:18-cv-01566-WMR |

## ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO COUNTS II AND VI

Plaintiffs filed suit individually and on behalf of current and former employees of The Home Depot, Inc. ("Home Depot"), all of whom participated in the Home Depot FutureBuilder 401K plan (the "Plan") after April 2012 (the "Class

Period").  Defendants include Home Depot, the Administrative Committee of the Plan, and the Investment Committee of the Plan, all of whom are fiduciaries of the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA").  As currently situated, Plaintiffs assert two types of claims against the Defendants:  (1) that certain investment options in the Plan were imprudently selected and/or retained by the Defendants despite a sustained record of poor performance (otherwise referred to as the "Challenged Fund claims"), and (2) that the Defendants imprudently selected and/or retained outside investment advisors with an agreement that allowed said advisers to charge fees to participants that were objectively excessive (otherwise referred to as the "Excessive Fee claims").

The Defendants deny these claims and have moved for summary judgment against those individual Plaintiffs who complained about the alleged unreasonable fees for investment advice.  Moreover, the Defendants contend that the Court should not certify either of these types of claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

After a review of the respective pleadings and with the benefit of oral argument, and while expressing no opinion regarding the merits of this case or whether the Plaintiffs will or should ultimately prevail, the Court finds that summary judgment is not appropriate to the Defendants on Plaintiffs' claims regarding the Excessive Fees.  Further, as to both the Challenged Fund and the Excessive Fee

Claims, the Court finds that class certification under Rule 23 is appropriate. Accordingly, the Court hereby GRANTS Plaintiff's Motion for Class Certification [Doc. 98] and DENIES Defendants' various Motions for Summary Judgment as to Counts II and VI of the Complaint [Doc. 130; Doc. 131; Doc. 132; and Doc. 133].

## I.   BACKGROUND

### A. The Plaintiffs and their Claims

The Plaintiffs, who currently seek to be appointed as Class Representatives, are  current and former participants in the Plan. [*See* Doc. 53 at ¶¶ 7-13]. Each Plaintiff is a member of one or more of the proposed classes—the Challenged Funds class, the Financial Engines ("FE") class, and the Alight Financial Advisors ("AFA") class—because they invested in one or more of the challenged funds and/or were enrolled in services provided by the Plan's investment advisers (FE and/or AFA) and allegedly paid excessive fees.[GL1]

Plaintiff Jaime Pizarro was a Plan participant and used the services provided by FE through the Plan's Professional Management program during the Class period. [*See* Doc. 53 at ¶ 7; Doc. 75 at ¶ 7[GL2]].[GL3]  Plaintiff Craig Smith was a Plan participant and invested in the BlackRock 2020 LifePath Portfolio, the BlackRock 2025 LifePath Portfolio, the JPMorgan Stable Value Fund, the TS&W Small Cap Value Fund, and the Stephens Small Cap Growth Fund during the Class period. [GL4][*See* Doc. 53 at ¶ 8; Doc. 75 at ¶ 8].  Plaintiff Jerry Murphy was a Plan

participant and used the services provided by FE and AFA through the Plan's Professional Management program ("Program"), and he also invested in the JP Morgan Stable Value Fund during the Class period. [*See* Doc. 53 at ¶ 9; Doc. 75 at ¶ 9]. Plaintiff Randall Ideishi was a Plan participant and invested in the BlackRock LifePath Portfolio during the Class period. [*See* Doc. 53 at ¶ 10; Doc. 75 at ¶ 10]. Plaintiff Glenda Stone was a Plan participant and used the services provided by FE and AFA through the Program during the Class period. [*See* Doc. 53 at ¶ 11; Doc. 75 at ¶ 11]. Plaintiff Rachelle North was a Plan participant and invested in the BlackRock 2040 LifePath Portfolio during the Class period. [*See* Doc. 53 at ¶ 12; Doc. 75 at ¶ 12].[1]

The Plan is a defined contribution plan, which offers participants and beneficiaries the opportunity to invest their retirement assets in various investment options selected by the Plan's fiduciaries, as well as to enroll in the Program. [*See* Doc. 98-1 at p. 2]. The Program was operated by FE until June 30, 2017, and by AFA starting on July 1, 2017. [*See* Doc. 53 at ¶ 20]. Plaintiffs allege that the

---

[1] Plaintiffs' Motion for Class Certification originally sought appointment of Plaintiff Garth Taylor as Class Representative of the Challenged Fund and FE Classes and Plaintiff Marie Silver as Class Representative for the FE and AFA Classes. Subsequently, Plaintiff Taylor dismissed his claims without prejudice, and Plaintiff Silver voluntarily withdrew as a class representative, but remained as a plaintiff pursuing her individual claims. [*See* Doc. 123].

Defendants are each fiduciaries to the Plan with responsibility and discretionary authority to control the operation, management, and administration of the Plan, including the selection of the Plan's investment options and service providers – FE and AFA – which run the Program. [*See* Doc. 53 at ¶¶ 15-17; Doc. 75 at ¶¶ 16-17]. As fiduciaries of the Plan, the Defendants are each subject to the strict fiduciary duties imposed by the Employee Retirement Income Security Act of 1974 ("ERISA"), which are "the highest known to law." *Herman v. NationsBank Tr. Co., (Georgia)*, 126 F.3d 1354, 1361 (11th Cir. 1997) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)).

ERISA imposes fiduciary duties that hold Plan fiduciaries to a "prudent man standard of care." 29 U.S.C. § 1104(a). Fiduciaries must act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A).[2] Further, they must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

---

[2] *See, e.g.*, *Martin v. Nationsbank of Ga., N.A.*, No. 1:92-CV-1474-HTW, 1993 WL 345606, at *3 (N.D. Ga. Apr. 6, 1993) (citations omitted) (ERISA plan fiduciaries must act "with complete and undivided loyalty to the beneficiaries." Put another way, they must act "with an eye single to the interests of the participants and the beneficiaries.").

enterprise of a like character and with like aims[.]" 29 U.S.C. §1104(a)(1)(B). These standards require fiduciaries to select a plan's investment options prudently, to monitor them on an ongoing basis, and to remove and replace options that consistently underperform in relation to their identified benchmarks and/or peers. *See, e.g.*, *Tibble v. Edison, Int'l*, 575 U.S. 523 (2015). Similarly, fiduciaries must exercise prudence in the selection and retention of third-party service providers and ensure that fees charged are reasonable in relation to the market. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798–800 (7th Cir. 2011); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1330 (N.D. Ga. 2017); *Taylor v. United Techs. Corp.*, No. 3:06-CV-1494-WWE, 2007 WL 2302284, at *3 (D. Conn. Aug. 9, 2007).

Plaintiffs allege that Defendants engaged in Plan-level conduct that breached these fiduciary duties to the Plan and its participants by:

(i)     imprudently selecting, evaluating and monitoring the Plan's investment options and failing to remove imprudent ones, in particular, the TS&W Small Cap Value Fund, the Stephens Small Cap Growth Fund, the J.P. Morgan Stable Value Fund, and the suite of BlackRock Life Path Portfolio Funds (collectively the "Challenged Funds") (Count I);

(ii)    imprudently retaining AFA, and maintaining AFA and FE, as

investment service providers for the Program, under which participants were charged excessive fees, and by failing to monitor FE and AFA to ensure the fees charged were reasonable (Count II); and

   (iii)  failing to monitor those to whom Defendants may have delegated fiduciary duties (Count VI). [*See* Doc. 53 at ¶¶ 160-86, 210-16].

29 U.S.C. §1132 (ERISA § 502) authorizes participants and beneficiaries of an ERISA plan to bring suit for these types of alleged violations.  Plaintiffs bring this action both individually and in a representative capacity on behalf of the participants of the Plan who invested in the Challenged Funds and on behalf of the participants who retained FE and/or AFA to furnish investment advisory services under the Program.  Under 29 U.S.C. §1132(a)(2), Plaintiffs seek remedies on behalf of the Plan as set forth in §1109—restoration of losses resulting from the alleged breaches along with equitable and remedial relief.  Under 29 U.S.C. §1132(a)(3), they seek to enjoin the fiduciaries' alleged Plan-wide violations and pursue other appropriate equitable relief to redress the violations.

### B. Class Certification Motion

On December 20, 2019, Plaintiffs moved for class certification and for appointment of class representatives and class counsel. [Doc. 98].  In support of their motion, Plaintiffs submitted a memorandum of law, declarations from proposed Class Representatives and proposed Class Counsel, and the Plan's Form 5500

filings and Investment Policy Statements. [Doc. 98-1 through 98-35].

Plaintiffs seek certification of the following classes:

**Challenged Fund Class**: All participants and beneficiaries of the Plan, excluding the Defendants, who invested in the Challenged Funds at any time from April 12, 2012, through the date of judgment. [*See* Doc. 98 at p. 4];

**FE Class**: All Plan participants and beneficiaries, excluding the Defendants, for whom FE performed investment advisory services through the Program at any time from April 12, 2012, through the date of judgment. [*Id.* at p. 5; *see also* Doc. 119 at p. 7 n. 6];

**AFA Class**: All Plan participants and beneficiaries, excluding the Defendants, for whom AFA performed investment advisory services through the Program at any time from April 12, 2012 through the date of judgment. [*Id.*][3]

Plaintiffs Smith, Ideishi, and North each invested in one or more of the Challenged Funds during the Class Period [*See* Doc. 53 at ¶¶ 8, 10, 12] and seek appointment as Class Representatives of the Challenged Fund Class. [*See* Doc. 98 at p. 1].  Plaintiffs Pizarro and Stone each received investment advisory services from FE through the Program at some point during the Class Period [*See* Doc. 53 at ¶¶ 7,

---

[3] Plaintiffs agreed to amend the definition of the FE and AFA Classes to include specific reference to the Program and clarify that the Classes are not challenging other services offered by FE and/or AFA. [*See* Doc. 119 at p. 7 n. 6].

11] and seek appointment as Class Representatives of the FE Class. [*See* Doc. 98 at p. 1]. Plaintiffs Murphy and Stone each received investment advisory services from AFA through the Program during the Class Period [Doc. 53 at ¶¶ 9, 11] and seek appointment as Class Representatives of the AFA Class. [*See* Doc. 98 at p. 2]. Plaintiffs seek the appointment of Sanford Heisler Sharp, LLP and Blumenthal Nordrehaug Bhowmik De Blow LLP as Class Counsel for all three Classes. [*See* Doc. 98 at p. 2]. Plaintiffs maintain that the above Classes satisfy the criteria for certification set forth in Fed. R. Civ. P. Rule 23(b)(1)(A), Rule 23(b)(1)(B), and Rule 23(b)(3). *Id.* Plaintiffs seek certification of all Classes under either or both sections of Rule 23(b)(1). *Id.* In the alternative, Plaintiffs seek certification of the Classes under Rule 23(b)(3). *Id.*

On February 21, 2020, Defendants filed a response opposing Plaintiffs' Motion on several grounds. [Doc. 118]. Defendants concede that the Challenged Funds Class meets the Rule 23(a) requirements.

## II.  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A. Standards for Class Certification

"The district court has broad discretion in determining whether to certify a class." *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 377 (N.D. Ga. 2019) (quoting *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992)). "Before a district court may grant a motion for class

certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citation omitted). "If the plaintiff's proposed class is adequately defined and clearly ascertainable, the plaintiff must then establish the four requirements listed in Federal Rule of Civil Procedure 23(a)" and "at least one of the three requirements listed in Rule 23(b)." *Id.*; *see also Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343, at *3 (N.D. Ga. Sept. 13, 2018).

Rule 23(a) requires Plaintiff to establish that:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   These four requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).

Here, Plaintiffs seek certification under Rule 23(b)(1) [*see* Doc. 98 at p. 2], which requires a showing that "prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

Fed. R. Civ. P. 23(b)(1).

In the alternative to certification under Rule 23(b)(1), Plaintiffs seek certification by Rule 23(b)(3) [*see* Doc. 98 at p. 2], which requires a showing "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Plaintiffs, as the party seeking class certification, must demonstrate by a preponderance of the evidence that the putative class meets the requirements of Rule 23." *Monroe*, 332 F.R.D. at 377. The Court is required to perform a "rigorous analysis" of the Rule 23 elements. *Id.* (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).[4]

While class actions are an exception to the norm of individual litigation, *see Brown v. Electrolux Home [Products[GL5],](#) Inc.*, 817 F.3d 1225, 1233 (11th Cir.

---

[4] Defendants' supplemental authority, *Chavez v. Plan Benefit Services, Inc.*, 957 F.3d 542 (5th Cir. 2020), also stands for this established principle.

2016), the Federal Rules explicitly authorize courts to certify classes where the applicable criteria have been satisfied. *See* Fed. R. Civ. P. 23. An ERISA action is generally the type of action that satisfies those criteria.

### B.  Plaintiffs' Proposed Classes are Ascertainable

 "[C]ourts have universally recognized that the first essential ingredient to class treatment is the ascertainability of the class." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 679 (N.D. Ga. 2016) (quoting *Grimes v. Rave Motion Pictures Birmingham*, L.L.C., 264 F.R.D. 659, 663 (N.D. Ala. 2010)). Defendants do not dispute that the proposed Classes are ascertainable. [*See* Doc. 118]. Here, the criteria for each of Plaintiffs' proposed class definitions "is objective and the identification of its members is administratively feasible via the Plans' participant account records." *Henderson*, 2018 WL 6332343, at *4. The Plan participants who invested in the Challenged Funds during the Class Period can be readily determined from the records of the Plan, as can the identity of the participants who enrolled in the Program, both when FE and AFA, respectively, were operating the Program. Accordingly, the Court finds that the proposed classes are readily ascertainable.

### C.  The FE and AFA Classes Satisfy the Requirements of Rule 23(a)

#### 1.  Nature of Plaintiffs' FE and AFA Claims

Given that Defendants acknowledge that the Challenged Fund Class satisfies

the Rule 23 requirements, the Court will focus attention on whether the FE and AFA classes do so as well.[5] Prior to the Court's analysis of the four specific Rule 23(a) requirements, the Court must first resolve the overarching dispute as to the nature of the claims asserted by the FE and AFA Classes. [*See* Doc. 118 at pp. 2-5; Doc. 119 at pp. 1-4].

Plaintiffs' theory is that the fiduciaries selected these providers imprudently

---

[5] Though Defendants do not dispute that the Challenged Fund Class satisfies the Rule 23(a) requirements, the Court independently concludes that the Challenged Fund Class satisfies the requirements of Rule 23(a). First, Plaintiffs have put undisputed evidence into the record indicating that tens-of-thousands of participants invested in the Challenged Funds each year. *See* Field Decl., Ex. 4 [Doc. 98-6]. Thus, numerosity is satisfied. Second, the Court concludes that commonality is satisfied since Defendants owed the same fiduciary duties to all Class members and made decisions about the Plan's offered investment options at the Plan level. These Plan-wide decisions necessarily affected all Class members. Accordingly, "questions of whether Defendants breached their fiduciary duties" and "whether the Plan suffered losses from those breaches are common to the claims of all class members, and, therefore, will generate answers common to all of the putative class members." *Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559, 572 (D. Minn. 2014). Next, the Court concludes that the Challenge Fund Class is seeking to recover losses to the Plan allegedly sustained in the accounts of the aggrieved class members. These claims meet the typicality requirement as they "arise from precisely the same practice and the legal issues are identical." *Piazza*, 273 F.3d at 1351. Finally, the Court concludes that proposed Class Representatives Smith, Ideishi, and North are adequate representatives. Plaintiffs seek to enforce the fiduciary duties that Defendants owed to the Plan (and thus to all participants) and to obtain appropriate relief for the Plan, and have no interests antagonistic to each other, the Classes, or any segment of the Classes. *See In re Suntrust Banks, Inc. ERISA Litig.*, No. 1:08-CV-03384-RWS, 2016 WL 4377131, at *7 (N.D. Ga. Aug. 17, 2016). For these reasons, the Court concludes that the Challenged Fund Class satisfies each of the four requirements for certification under Rule 23(a).

and allowed them to charge excessive fees.  FE and AFA did not charge participants different fee rates for the services performed for each of them.  Rather, they adopted a universal graduated fee scale with a single basis point fee for all assets under management at each asset level (e.g., for AFA, 50 basis points on the first $100,000 invested, 45 basis points on the next $100,000 and 35 basis points on any funds over $200,000).  Plaintiffs maintain that the relevant question is whether the designated fee is reasonable in relation to the market and whether the Plan trustees were obligated to at least attempt to negotiate a lower fee or replace the advisors.

Defendants, however, characterize the claims of the FE and AFA Classes as turning on "each class member's subjective impressions of the 'nature and quality' of the investment advice they received[.]" [Doc. 118 at p. 3].  Defendants base this characterization on language from Plaintiffs' pleadings describing the fees charged by FE and AFA as "excessive in light of the nature and quality of the services provided[.]" *Id.*  In other words, Defendants essentially contend that some Plan participants might have been personally satisfied with the performance of their accounts and might have been content to pay the advisers' fees.  In support, Defendants cite to products liability cases in which plaintiffs sought class certification based on proposed damages models that purported to measure injury in terms of the value class members ascribed to a product.[6]

---

[6]  The Court notes that the Plaintiffs' view of the services they received arguably

Examining the allegations and claims, particularly in the context of the ERISA statute, the Court concludes that Plaintiffs' claims are straightforward excessive fee claims, the very sort that are routinely certified. Such claims warrant class treatment with respect to the core issue of fiduciary prudence in the selection and/or retention of service providers, like FE and AFA, that allegedly charge excess fees. [*See* Doc. 119 at pp. 2-3]. The Court finds that there is no basis for the assertion that the excessive fee claim involves each participant's subjective assessment and valuation of a fee commonly charged to all of them. Rather, the role of an ERISA fiduciary is to act for the exclusive benefit of the Plan participants and to monitor carefully all fees charged to ensure that they are reasonable, regardless of what the participants—as laypeople—might believe.

Plaintiffs contend that the advisers' services have an objective market value in relation to other comparable providers (considering the type of service provided) and that the fees significantly exceeded this value. Further, Plaintiffs maintain that FE's and AFA's services were not so superior to the market that it justified their elevated fees. For purposes of class certification, the Court accepts Plaintiffs' contention that this is a single, Plan-wide exercise that should have been performed by the Defendants as ERISA fiduciaries and may be replicated by valuation experts.

---

might have been relevant to a direct action against FE and AFA for a breach of contract relative to the value of the services provided.

Such a contention seems logical, if supported by the facts.  If comparable providers indeed charged lower rates for the same or comparable services, or if lower rates were otherwise available from FE and AFA for the same services provided to similar plans, then the fees may well be too high Plan-wide for each of its participants.

Having reviewed the record, the Court concludes, consistent with its Order on Defendants' Motions to Dismiss [Doc. 74], that the claims asserted on behalf of the FE and AFA Classes are that these Defendants breached their fiduciary duties by allowing FE and AFA to charge participants objectively excessive fees for these services.  These claims do not involve any individual participant's assessment of the value of those services.[GL6] That much is demonstrated by Plaintiffs' allegations, in part, that: (1) service providers offering comparable services charged lower fees [Doc. 53 at ¶¶ 48-51]; (2) FE and AFA offered lower fees for comparable programs to participants in other 401(k) plans [*Id.* at ¶ 52]; (3) Defendants failed to conduct competitive bidding or negotiate the fees [*Id.* at ¶¶ 45-52]; and (4) the Plan's Recordkeeper received "kickbacks" (in violation of the duty of loyalty) that unreasonably increased the advisory fees that were charged to the Plan participants [*Id.* at ¶¶ 60-64; *see also* Doc. 74 - Order on Defs' Motions to Dismiss at pp. 12-13]. [GL7][GL8]These allegations turn on "the decision-making process by which the Defendants retained FE and AFA as the investment advisors through the Program, which "involves an inquiry into Home Depot's specific methods and knowledge,"

not any individual participant's opinions or valuations as to the services provided by FE and AFA. [*See* Doc. 74 at p. 13].

Unlike the damages models in the products liability cases cited by Defendants, which proposed to measure class members' subjective valuation of the product to determine injury, the damages model advanced on behalf of the FE and AFA Classes is based upon the simple proposition that the Plan "paid too much in relation to the market value of those services," as determined by the fees charged by providers of comparable services. [GL9] [*See* Doc. 119 at p. 5]. And, nothing in the proposed damages model here (the fees agreed to by the Plan's fiduciaries versus objective market value) turns on class members' individualized subjective assessments of the value of the services provided by FE [or] AFA. [*See* Doc. 119 at pp. 3-4]. The calculation of damages for members of the respective FE and AFA would be the difference between what each class member paid to FE and/or AFA under those entities' respective uniform fee schedules, less the amount those class members should have paid pursuant to the market rate, plus appropriate interest.

While Defendants complain that Plaintiffs have not identified the providers of comparable services or what such a comparison would show, those are common questions to be resolved at the merits stage. *See, e.g.*, *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60, 465-66, 470 (2013). Regardless, there is

evidence in the record that the Plan fiduciaries failed to consider other service providers who offered comparable managed account services at lower rates than those charged by FE or AFA. [*See, e.g.*, Doc. 145-1 at ¶ 16; Doc. 145-6 (St. Charles Declaration)].[GL10]  Whether those providers are actually comparable is an issue of fact for resolution on the merits.  There is also evidence in the record that FE offered its managed account program to other 401(k) plans at rates significantly lower than its fee schedule applied to the Plan in this case. [*See, e.g.*, Doc. 145-1 at ¶ 12; Doc. 145-6 (St. Charles Declaration)].[GL11]  Plaintiffs' claims test whether the Home Depot Plan fiduciaries could have and should have done better.

Defendants also contend that such evidence does not address its argument that members of the FE and AFA classes purportedly received "different" investment services.  While this might be true, each participant paid a uniform fee for the full range of available services, regardless of whether those services were provided to that participant.  The fee schedule to which all participants in the managed account programs were subject apparently considered that some participants would need more attention than others.  But, whatever level of attention a participant received, each participant paid fees pursuant to the same schedule.  For example, in the FE Class, each participant with total assets under management of $100,000 or less paid a fee calculated at 55 basis points of those assets.  That fee would be $550 per year at the $100,000 asset level.  This $550 fee would be

the same regardless of whether FE touched the account one time or many times that year.  This fee schedule can be measured against the market.  Thus, the level of services provided to any particular participant did not impact the fee the participants paid; accordingly, it is not relevant to the calculation of damages.

It is up to Plaintiffs to prove these claims on the merits, but at this point, the Court cannot say that they will be unable to do so.  The key point is that the claims are triable by common proof that should not vary by class member.

### 2.  Numerosity

Numerosity under Rule 23(a)(1) requires a movant to show that "the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Courts consider several factors in determining whether joinder is practicable, including the size of the class, the nature of the action, the size of each members' claim, and their geographical dispersion." *Henderson*, 2018 WL 6332343, at *4. "[W]hile there is no fixed numerosity rule," classes of more than forty members presumptively satisfy numerosity. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

Defendants do not contest numerosity. [*See* Doc. 118].  Further, Plaintiffs have furnished evidence demonstrating that each of the FE and AFA Classes contains thousands of members. [*See* Form 5500s filed on behalf of the Plan in Doc. 98-3 and Docs. 98-7 through 98-19[GL12]].  While the precise number of Class

members for the FE and AFA Classes is unknown, the approximate size of the
Classes may be substantial given the fees generated each year by participants in the
Program, as shown in the Plan's annual Form 5500s. [*Id.*|GL13|]  For example, in
2018, AFA generated $9,405,604 in fees from Plan participants. [*See* Doc. 98-8 at p. 7
(The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d))].  Given that AFA's
asset-based fee is never more than 0.50%, AFA by extension|GL14|managed over $1.8
billion in participant assets in 2018.  This amounts to more than |GL15|25% of the
Plan's total assets. [*See* Doc. 98-3 at p. 9 (The Home Depot FutureBuilder Trust Form
5500 - Schedule H, Part I § 1(f))].  In 2016, FE garnered $6,266,997 in fees from
Plan participants. [*See* Doc. 98-7 at p. 7 (The Home Depot FutureBuilder Trust Form
5500 at p. 3-1 § 2(d))].  Assuming a fee of no more than 0.50%, FE managed over
$1.2 billion.  This amounts to approximately 20% of the Plan's more than $6 billion
assets in 2016. [*See* Doc. 98-9 at p. 9 (The Home Depot FutureBuilder Form 5500 -
Schedule H, Part I § 1(f))].

With more than 400,000 Plan participants, there are undoubtedly far "more
than 40" members of the FE and AFA Classes during the Class Period.  Thus,
Plaintiffs have satisfied the requirement of numerosity.

### 3. Commonality

Rule 23(a)(2) requires a showing that "there are questions of law or fact that
are common to the class." Fed. R. Civ. P. 23(a)(2).  Commonality "does not require

that all the questions of law and fact raised by the dispute be common or that common questions of law or fact predominate over individual issues." *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (internal quotations and citation omitted).  The commonality requirement is satisfied when there is at least one common question, the  resolution of which "will resolve an issue that is central to the validity of each one of the claims in  one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "[F]or purposes of Rule 23(a)(2) even a single common question will do[,]" *id.* at 359 (citation omitted), which "is a 'low hurdle' to overcome." *Owens v. Metro. Life Ins. Co.*, 323 F.R.D. 411, 417-18 (N.D. Ga. 2017) (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009)).[7]

The Court finds clear common questions as to (1)  whether the Defendants were Plan fiduciaries, (2) whether the fees charged by FE and AFA were excessive in relation to the market (e.g., whether comparable advisers charged less and/or whether AFA and FE charged less in other contexts for the same services), (3) whether the Defendants' conduct violated their fiduciary duties of loyalty and prudence, (4) whether the Plan suffered resulting losses, and if so, how to calculate those damages, and (5) the proper class-wide remedies for any breach found. These

---

[7] As noted, Defendants dispute commonality only as to the FE and AFA Classes, not the Challenged Fund Class. [*See* Doc. 118 at p. 9].

questions are amenable to common answers that will drive the litigation.  In short, the Excessive Fee claim turns on whether the fees were objectively too high and whether the fiduciaries should have ensured that any fees charged by third-party investment advisers were more commensurate with the market.

As the Court discussed above, the Defendants' challenge to commonality is based on their characterization of the Excessive Fee claims.  The Defendants maintain that [GL16]adjudication of the claims requires subjective valuations of services, such as those provided by FE and AFA, which "are incompatible with classwide relief." [*See* Doc. 118 at p. 10].  The Court disagrees.

Defendants assert that Plaintiffs "cannot agree on a coherent theory of how much they allegedly overpaid [FE and AFA] and why." [*Id.*]  Defendants cite to Plaintiffs' deposition testimony regarding their responses to Defense counsel's questions as to what they thought FE and AFA's services were worth. [*See* Doc. 118 at pp. 3-4, n. 8-11].  The Court has concluded, however, that this misstates the claims advanced by members of the FE and AFA Classes. [GL17] It does not matter what each participant *believes*.  The focus here, like in any breach of fiduciary duty case, is on the conduct of the fiduciaries—in particular, whether they improperly allowed FE and AFA to charge excessive fees for the services provided.  In other words, the question is whether the Fiduciaries acted prudently.

ERISA's "prudent man" standard is an objective one that focuses on the

fiduciary, not a subjective one that focuses on the beneficiaries' beliefs. *See* 29 U.S.C. § 1104(a); *Fuller v. SunTrust Banks, Inc.*, No. 1:11-CV-784-ODE, 2019 WL 5448206, at *24 (N.D. Ga. Oct. 3, 2019) ("Courts evaluate alleged breaches of the duty of prudence using an objective standard and focusing on whether the fiduciary employed appropriate  methods to reach an investment decision under the prevailing circumstances.") (citation omitted); *Pledger*, 240 F. Supp.3d at 1326 ("Under this objective standard, whether an ERISA's fiduciary's investment decision is improvident depends on what a prudent man in like circumstances would do.") (citation omitted).[8]  Thus, the Court does not accept the premise that the focus should rest on subjective views of individual class members.  *See, e.g.*, *In re Cmty. Bank of N. Va., Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (Commonality focuses on whether defendants engaged in a "common course of conduct.") (citation omitted).

Defendants nevertheless assert that Plaintiffs and the Class members do not

---

[8] In other contexts, it is axiomatic that a reasonable person or prudent man test is an objective one. *See, e.g.*, *S. Pac. Co. v. Eades*, 449 F.2d 11, 15 (5th Cir. 1971) (referring to an "objective common-law test of the reasonably prudent man"); *Quarles v. Hamler*, No. 1:10-CV-1787-LMM, 2015 WL 11123310, at *2 (N.D. Ga. July 24, 2015) (citation omitted) ("In determining objective good faith, the Court looks at whether the employer acted as a reasonably prudent man would have acted under similar circumstances."); *Royal v. N.Y. Life Ins. Co.*, No. 6:10–cv–104, 2015 WL 339781, at *23 (S.D. Ga. Jan. 26, 2015) ("[R]easonable diligence cannot be measured by a subjective standard, but, rather, must be measured by the prudent man standard which is an objective one[.]") (citation omitted).

have the "same injury" under *Dukes*, 564 U.S. at 350 (citation omitted). The quoted language from *Dukes*, however, does not require class members to have suffered the same harm. *See id*. Class members only need to be subject to the same allegedly unlawful practices and, therefore, pursue claims based on a "common contention." *Id*.; *see also, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 810–12 (5th Cir. 2014) (Commonality is met when claims focus on the same "injurious conduct," even if the effects and harm differ).[9] Here, all members of the FE and AFA classes allege the same thing—that the Plan fiduciaries agreed to allow FE and AFA to charge fees that were excessive in light of what was available in the market for comparable services. Each class member was affected by the fiduciaries' decision because they subscribed to the services and paid the associated fee. The essence of the claim does not change if their accounts performed well, because—under Plaintiffs' actual theory of the case, as discussed above—they

---

[9] Indeed, under established law from virtually every Circuit, some class members need not have suffered any harm at all. A class may include uninjured members. *See, e.g.*, *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016); *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 427 (3d Cir. 2016); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21-22, 25 (1st Cir. 2015); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823-26 (7th Cir. 2012); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016) (certifying class despite defendants' arguments that there was no mechanism to identify *uninjured* class members who should not recover); *Cordoba v. DIRECTV, L.L.C.*, 942 F.3d 1259, 1275-77 (11th Cir. 2019) (accepting that a class may include uninjured members).

would have achieved the same results even had the fiduciaries negotiated and implemented a more reasonable market-based fee.

On that score, Plaintiffs identify a number of questions common to the Challenged Funds, FE, and AFA Classes, including: (1) whether each Defendant is a fiduciary to the Plan; (2) whether Defendants' conduct breached their fiduciary duties to the  Plan; (3) whether the Plan suffered resulting losses; (4) how to calculate the Plan's losses; and (5) what relief should be imposed to remedy the breaches and prevent future ERISA violations. [*See* Doc. 98-1 at pp. 11].  Plaintiffs also identify common questions presented specifically by the FE and AFA Classes, such as: (1) whether the investment advisory fees charged by FE and AFA were excessive; and (2) whether Defendants properly monitored the services provided by FE and AFA. [*Id.*]

The questions posed by the FE and AFA Classes lend themselves to "classwide resolution" because the "determination of truth or falsity will resolve an issue that is central to the validity of [the Classes'] claims in one stroke." *Dukes*, 564 U.S. at 350. "[T]his case involves Defendants' conduct as to all participants" enrolled in the Program administered by FE and AFA, which have traditionally satisfied Rule 23's commonality requirement. *See Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008)[GL18].

Accordingly, the Court concludes that the questions posed by the FE and

AFA Classes are common to the claims of the class members of those respective classes and, consequently, will generate answers common to all of those class members. *See Krueger*, 304 F.R.D. at 572. "These questions are capable of class-wide resolution, as other courts have found." *Henderson*, 2018 WL 6332343 at *5. Thus, the Court concludes that the FE and AFA Classes meet the commonality requirement under Rule 23(a)(2).

### 4. Typicality

Rule 23(a)(3) asks whether the claims "of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Typicality is met when the "claims 'arise from the same event or pattern or practice and are based on the same legal theory' as the claims of the class." *Belton v. Georgia*, No. 1:10-CV-0583-RWS, 2011 WL 925565, at *5 (N.D. Ga. Mar. 14, 2011) (citation omitted); *Henderson*, 2018 WL 6332343, at *5 (citation omitted). "The typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (alterations and citation omitted).

Defendants challenge typicality as to the FE and AFA Classes based on the same argument. They assert that the proposed class representatives "each ascribe

different values to the services they received, and for different reasons." [*See* Doc. 118 at p. 15]. But, again, Plaintiffs' somewhat divergent answers do not make their claims any different from each other in nature. Plaintiffs maintain, and the Court agrees, that the representatives of the FE and AFA Classes have claims typical of the members of both Classes. They each paid allegedly excessive fees for the services provided by FE and AFA "in relation to the market value of those services." [*See* Doc. 119 at p. 5]. In fact, Plaintiffs and the Class members each paid the same fees on the same fee schedule, and they pursue the same theory that the fees were excessive.

Thus, the Court concludes that Plaintiffs' claims as to the FE and AFA Classes are typical of those of the other Class members and typicality is satisfied.

### 5. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement ensures that there are no potential "conflicts of interests between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The Eleventh Circuit applies a two-prong test for adequacy: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1189 (11th Cir.

2003) (citation omitted).

Defendants challenge adequacy as to the FE and AFA Classes under the same theory on which they challenged commonality and typicality – that the proposed class representatives "each ascribe different values to the services they received, and for different reasons." [*See* Doc. 118 at p. 15]. As the Court has observed, this position is without merit. Moreover, any such variations in the Plaintiffs' deposition testimony do not create conflicts of interest or impede their ability to prosecute the action on behalf of these Classes.

Each individual representative's subjective assessment of the value of the services provided by FE and AFA is immaterial to the key inquiry as to whether there exist substantial conflicts of interest between the representatives and the class and whether the representatives will adequately prosecute the action. The "defendants do not challenge the qualifications, experience, or ability of the plaintiffs' counsel to prosecute the action. They instead argue that the named plaintiffs lack the knowledge and understanding of their claims to represent the proposed class." *Henderson*, 2018 WL 6332343, at *6.

In a complex case, such as this, which requires a "great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case[.]" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (citation

omitted). The same is true with respect to the underlying legal theories. *See Henderson*, 2018 WL 6332343, at *7 ("ERISA itself represents a highly dense regulation, and claims arising from it are equally complex. That a plaintiff might not fully understand the facts and legal theories of this complex ERISA action is understandable").[10]

Here, Plaintiffs have demonstrated their willingness and ability to serve as class representatives. They have responded to discovery requests [*see* Docs. 104, 107, 108, 109, 110, 112, 113], appeared for depositions [*see* Docs. 106, 118-2 through 118-4[GL19]], and submitted affidavits attesting to their participation in this action and their willingness to pursue the case vigorously [*see* Docs. 98-28 through 98-33[GL20]]. Further, Plaintiffs' interest in establishing Defendants' liability for the alleged breaches of duty and obtaining relief are fully aligned with the interests of absent Class members. [*See* Doc. 98-1 at pp. 15-16]. Thus, the Court finds that Plaintiffs Pizarro, Smith, Murphy, Ideishi, Stone, and North are adequate representatives of the FE and AFA Classes.

### D.  Each Class is Certifiable Under Rule 23(b)(1)

Having satisfied all the requirements under Rule 23(a), Plaintiffs need only satisfy "at least one of the alternative requirements of Rule 23(b)." *Henderson*, 2018

---

[10] *Cf., e.g.*, *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 194 n.6 (2d Cir. 2001).

WL 6332343, at *3.  Plaintiffs seek certification under Rule 23(b)(1) and, in the alternative, under Rule 23(b)(3), but express a preference for certification under Rule 23(b)(1). [*See* Doc. 98 at p. 2].  Where a case may be certified under both of those provisions, Plaintiffs argue that the case should be certified under Rule 23(b)(1).  *See, e.g.*, *Piazza*, 273 F.3d at 1352.[11]  Courts in the Eleventh Circuit, including in this district, have found certification under Rule 23(b)(1) particularly appropriate in an ERISA fiduciary breach case, like the case here.  *See id.* at 1352-53;  *Henderson*, 2018 WL 6332343, at *9-10; *Fuller v. SunTrust Banks, Inc.*, No. 1:11-CV-784-ODE, 2018 WL 3949698, at *7-8 (N.D. Ga. June 27, 2018); *In re Suntrust Banks, Inc. ERISA Litig.*, No. 1:08-CV-03384-RWS, 2016 WL 4377131, at *5-8 (N.D. Ga. Aug. 17, 2016).

### 1. Rule 23(b)(1)(A)

Certification under Rule 23(b)(1)(A) is appropriate where separate actions by individual class members creates a risk of "inconsistent or varying adjudications . . . that would establish incompatible standards of conduct for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(A).  The advisory comments to Rule 23(b)(1)(A) note that certification is appropriate where defendants owe

---

[11] The Court does not endorse such an expansive reading of *Piazza*; rather, arguably the holding in this case was based, at least in part, on the fact that it was the defendant who sought that any class certification be under Rule 23(b)(1) so that any potential plaintiff could not opt out and sue the defendant again on his or her own.  Such is not the situation in this case before the Court.

"duties toward[] numerous persons constituting a class," such that "conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern [their] conduct." Fed. R. Civ. P. 23, Advisory Comm. Note, 1966 amend., sub. (b)(1)(A).  Under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), Defendants owed fiduciary duties to all the Plan participants, which necessarily includes the members of the Challenged Funds, FE, and AFA Classes. [*See* Doc. 98-1 at pp. 19-20].

Plaintiffs identify a number of determinations common to each of the Classes that they argue require uniform treatment. [*See id.* at pp. 20-21].  For the Challenged Fund Class, the finder of fact must determine, in part: (1) whether the [D]efendants acted in the interests of Plan participants and prudently monitored Plan investments on an ongoing basis; (2) whether the Plan options[, if any,] were prudent, i.e., whether their performance measured up to the fiduciary-selected benchmarks for each fund, as well as to the appropriate comparator funds; (3) what investment options, if any, the Plan fiduciaries should have removed and replaced; (4) what associated structural and procedural changes, if any, need to be made in the Plan's policies, procedures, and protocols[GL22]; and (5) the measure of the losses sustained [by the Plan] as a result of any breach of duty.  Similarly, for the FE and AFA Classes, the finder of fact must determine, in part: (1) whether Defendants adequately monitored FE's and AFA's services; (2) whether

Defendants were prudent in the selection and retention of these entities; (3) whether the fees that FE and AFA uniformly charged all participants enrolled in the programs were impermissibly excessive; (4) what associated structural and procedural changes, if any, might be made in the Plan's policies, procedures, and protocols; and (5) the measure of the losses sustained by the Plan as a result of any breach of duty.[GL23] [*Id.*]

The Plaintiffs argue that inconsistent rulings on these issues, in what could potentially amount to "thousands of separate individual actions," would subject Defendants to "differing standards of duty and, thus, differing standards of conduct," thereby leaving Defendants "in limbo" and "making compliance impossible." *Shanehchian v. Macy's, Inc.*, No. 1:07-CV-00828, 2011 WL 883659, at *9 (S.D. Ohio Mar. 10, 2011). Similarly, Plaintiffs contend that requiring or allowing thousands of individual class members separately to pursue individual ERISA actions would risk varying results in adjudications over whether Defendants breached their fiduciary duties, how to measure the Plan losses, and what relief is warranted. *See In re Ikon Office Sols., Inc.*, 191 F.R.D. 457, 466 (E.D. Pa. 2000).

Defendants do not dispute the risk of inconsistent rulings identified by Plaintiffs. [*See* Doc. 118 at pp. 17-19]. Instead, Defendants challenge certification under Rule 23(b)(1)(A) on the theory that the "primary remedy sought" by Plaintiffs

is "monetary relief." [*Id.* at 18]. This is true.[12] Defendants' argument on this point, however, has been raised and rejected by courts in this district on multiple occasions. *See Henderson*, 2018 WL 6332343, at *10; *Fuller*, 2018 WL 3949698, at *7–8; *In re Suntrust Banks*, 2016 WL 4377131, at *7. The court in *Henderson* analyzed this argument in detail in the context of an ERISA breach of fiduciary duty class action, concluding:

> To begin, the plaintiffs do not seek "individualized monetary damages," but recovery for losses to the Plans as a whole . . . The plaintiffs seek to correct and prevent the alleged breach of fiduciary duties, and a "[s]urcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA." Therefore, the court finds that the proposed class may be certified under Rule 23(b)(1), and *Dukes* does not require a different result. 2018 WL 6332343, at *10 (citation omitted).[GL24]

Defendants cite to a Seventh Circuit case, *Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011). [*See* Doc. 118 at pp. 17-18]. As another court in this district has concluded, the opinion in *Spano* does not prevent certification of ERISA breach of fiduciary duty cases under Rule 23(b)(1). *See In re Suntrust Banks*, 2016 WL 4377131, at *8. This Court agrees. The *Spano* court found that the exceedingly broad class definition there did not satisfy Rule 23(a). 633 F.3d at 587. Plaintiffs here limit the Classes to only those participants harmed by the alleged breaches.

---

[12] At the hearing on this Motion, the Court expressed skepticism as to whether equitable relief would be needed should the Plaintiffs prevail, as damages awarded to the Plan might well suffice.

Thus, unlike the overbroad class definitions present in *Spano*, there is no risk that "the alleged conduct harmed some participants and helped others." *In re Suntrust Banks*, 2016 WL 4377131, at *8. Moreover, the *Spano* court did not preclude certification of an ERISA case under Rule 23 (b)(1), saying "[n]othing we have said should be understood as ruling out the possibility of class treatment for one or more better-defined and more-targeted classes." 633 F.3d at 588. In fact, on remand, the district court certified the redefined Class under Rule 23(b)(1)(A), and the Seventh Circuit denied Boeing's subsequent petition for leave to appeal. *See Spano v. Boeing Co.*, 294 F.R.D. 114 (S.D. Ill. 2013), *petition to appeal denied,* No. 13-8026 (7th Cir. Nov. 26, 2013).

Defendants also rely on *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009), a wage and hour case seeking damages for "past failure to compensate employees" for allegedly unpaid work. [*See* Doc. 118 at pp. 17-18]. However, in an ERISA breach of fiduciary duty case, unlike a wage and hour class action, recovery "goes to all class members alike." *Henderson*, 2018 WL 6332343, at * 9. Here, the Court concludes that Plaintiffs do not seek monetary damages distinct from the Plan, but rather seek recovery of losses *to the Plan*, which may be calculated as the aggregate losses sustained by the participants under the equitable doctrine of "surcharge." *CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011).

In short, the claims presented by each of the proposed Classes present issues

that, if prosecuted separately, risk "inconsistent or varying adjudications." Fed. R. Civ. P. 23(b)(1)(A). This would create "incompatible standards of conduct" in terms of what Defendants need to do to comply with their fiduciary duty of prudence toward the Plan. *Id*. Thus, certification under Rule 23(b)(1)(A) is appropriate.

### 2. Rule 23(b)(1)(B)

Plaintiffs also seek certification under Rule 23(b)(1)(B), which is appropriate when one participant's action over these claims would, "as a practical matter . . . be dispositive of the interests" of the other participants because they concern the same actions, damages, and fiduciary duties owed to the Plan. Fed. R. Civ. P. 23(b)(1)(B).  The Rule also applies if separate actions would "substantially impede or impair [class members'] ability to protect their interests." *Id*.  A classic case of certification under Rule 23(b)(1)(B) includes "actions charging 'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries, requiring an accounting or similar procedure 'to restore the subject of the trust.'" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999) (quoting Advisory Comm. Notes on Fed. R. Civ. P. 23, 1966).[GL25]

Defendants oppose certification under Rule 23(b)(1)(B), stating that "the proposed class includes members who suffered no injury from the alleged fiduciary breach." [*See* Doc. 118 at pp. 19-20].  However, Plaintiffs' proposed Classes are

defined to include only those participants affected by the alleged breaches—those that invested in one or more of the Challenged Funds, or received services from FE or AFA through the Program. [*See* Doc. 98 at p. 1]. Consequently, Defendants' objection is misplaced.[13]

Defendants next challenge Rule 23(b)(1)(B) certification as to the FE and AFA Classes on the theory that "members received different services from FE[.]" [*See* Doc. 118 at p. 20]. In support of this argument, Defendants again rely on deposition testimony from Plaintiffs regarding their varying subjective opinion of the value of this investment advice.

As the Court has found in its discussion of the Rule 23(a) factors (*see supra*[GL26]), individual class members' subjective valuation of damages is immaterial to the underlying question of whether Defendants engaged in a prudent selection and monitoring process with respect to FE and AFA.[GL27] And, it is also irrelevant to the damages sustained by participants of the Plan.

Defendants next challenge Rule 23(b)(1)(B) certification by citing to *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008), for the proposition "that participants in defined contribution plans are entitled to relief for their individual accounts." [*See* Doc. 118 at p. 20]. In *LaRue*, the Supreme Court "simply expanded

---

[13] Moreover, as set forth above, it is well-established that Rule 23 classes may contain uninjured members. *See supra* n. 9.

the relief available under § 502(a)(2), so that recovery can now be had when a participant demonstrates that fiduciary misconduct affected his individual account." *Jones v. NovaStar Fin., Inc.*, 257 F.R.D. 181, 190 (W.D. Mo. 2009) (citation omitted). Nothing in *LaRue* suggests that monetary recovery in a case under ERISA § 502(a)(2) is not recoverable on behalf of the Plan. *LaRue*, 552 U.S. at 256. To the contrary, the Supreme Court in *LaRue* held that "§ 502(a)(2) *does not* provide a remedy for individual injuries distinct from plan injuries[.]" *Id.* (emphasis added). In fact, any recovery in a § 502(a)(2) case goes to the Plaintiff's Plan account, not to the Plaintiff directly. *Id.* at 262 (Thomas, J., concurring). As one court has explained, "the availability of an individual account claim . . . does not alleviate the concerns cited by the numerous courts that have certified ERISA class actions pursuant to Rule 23(b)(1)(B) in situations where claims on behalf of the Plan are identical to those on behalf of an individual account . . . [thus,] certification is proper pursuant to Rule 23(b)(1)(B)." *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 (E.D. Pa. 2009). That determination is consistent with the holdings of many courts, including in this district, that have certified § 502(a)(2) breach of fiduciary duty cases under Rule 23(b)(1)(B), even after the *LaRue* decision. *See, e.g.*, *Henderson*, 2018 WL 6332343, at *9; *In re Suntrust Banks*, 2016 WL 4377131, at *8.[14]

---

[14] *See also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604-605 (3d

Accordingly, the Court concludes that Plaintiffs' ERISA breach of fiduciary claims are well-suited for class certification under Rule 23(b)(1)(B).

### 3. Rule 23(b)(3)

In the alternative to certification under Rule 23(b)(1), Plaintiffs seek certification under Rule 23(b)(3). The Court need not address Rule 23(b)(3) certification, but does so out of an abundance of caution realizing that the appellate court may review this case prior to trial. If certification under Rule 23(b)(1) is deemed inappropriate for any reason, the Court would certify the claims under Rule 23(b)(3).

Certification under Rule 23(b)(3) is warranted when

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The relevant concerns in that regard include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the

---

Cir. 2009) ("Given that it is an ERISA § 502(a)(2) claim brought on behalf of the Plan and alleging breaches of fiduciary duty on the part of defendants that will, if true, be the same with respect to every class member, Rule 23(b)(1)(B) is clearly satisfied[.]"); *Hochstadt v. Bos. Sci. Corp.*, 708 F. Supp. 2d 95, 105–106 (D. Mass. 2010); *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2018 WL 1801946, at *9 (M.D.N.C. Apr. 13, 2018); *Krueger*, 304 F.R.D. at 576–77; *Taylor v. ANB Bancshares, Inc.,* No. 08-5170, 2010 WL 4627841, at *12 (W.D. Ark. Oct. 18, 2010); *Neil v. Zell*, 275 F.R.D. 256, 268 (N.D. Ill. 2011); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 144 (S.D.N.Y. 2010).

controversy already begun by or against members;

(C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)   the likely difficulties of managing a class action. Fed. R. Civ. P. 23(b)(3). [GL28]

While this case is certifiable under either Rule 23(b)(1)(A) or 23(b)(1)(B), each of the three proposed Classes also satisfy the requirements for certification under Rule 23(b)(3).

Under Rule 23(b)(3), "predominance is a qualitative rather than a quantitative concept." *Brown*, 817 F.3d at 1239 (citation omitted); *see also Bouaphakeo*, 136 S.Ct. at 1045. "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and ... entitlement to injunctive and monetary relief." *Owens,* 323 F.R.D. at 419 (citation omitted).

Plaintiffs identify a number of issues common to the members of the proposed Classes, including: (1) Defendants' management of the Plan's investment options and contracts for service providers for the Plan as a whole, rather than on behalf of individual participants; (2) Defendants' fiduciary duty of prudence owed without variation between individual participants; (3) common evidence relevant to Plaintiffs' claims that exists at the Plan-level, which is, therefore, the same for all Class members; and (4) questions of liability which are common among all

members of the Classes. [*See* Doc. 98-1 at p. 23].

Defendants challenge predominance on the FE and AFA Classes based on the same contentions as the Excessive Fee claim—the Plaintiffs' "subjective disappointment" with FE's and AFA's services, and that Plaintiffs and the class will not be able to establish their losses. [*See* Doc. 118 at p. 22]. Again, however, the key question posed by the FE and AFA Classes is whether the Plan fiduciaries breached their duties by selecting and/or retaining FE and AFA based on whether those providers charged excessive fees to Plan participants who enrolled in the Program. [*Id.*]

Damages are measurable under this theory as follows: the difference between what participants paid to FE and AFA and what they would have paid under a prudent selection and retention process. In other words, the damages or losses sustained by members of the FE and AFA Classes would be the difference between what they paid and what other comparable service providers would have charged for those services, or the lesser amount that the Plan fiduciaries should have negotiated with FE and/or AFA for the same services. The difference in the applicable fee rate (excessive rate minus reasonable market rate) will be the same for each class member. This basis-point difference can then be plugged into a formula that also factors in the amount of money in the participant's account and the time period for which he or she has invested through the Program.

Defendants' contend that the Excessive Fees claims cannot be certified because the Class members cannot prove individual loss and harm on a class basis. However, calculating losses seemingly would be straightforward. In any case, where common liability issues predominate, even individual damages questions do not act as an obstacle to certification. There need not be any class-wide damages model. *See Brown*, 817 F.3d at 1239.[15]

Defendants oppose Rule 23(b)(3) certification of the Challenged Fund Class on the theory that the Class presents individualized questions of loss. Defs' Opp. at 23-24 [Doc. 118]. In the Court's view, this objection is foreclosed by the Eleventh Circuit's controlling opinion in *Brown*, which followed well-established law "that individual damage calculations generally do not defeat a finding that

---

[15] As *Brown* indicates, courts have many tools at their disposal to adjudicate even individual damages. 817 F.3d at 1239. Accordingly, the Court further notes that it need not resolve the details of how damages will be determined at this stage. *See, e.g.*, *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) (stating that a court may await the outcome of the class liability trial "before deciding how to provide relief to the individual class members"); *In re Suntrust Banks*, 2016 WL 4377131, at *6 ("The differences among class members will be resolved if and when the case arrives at the damages stage… arguments regarding the allocation of damages [are] premature and unpersuasive and [] the court is fully capable of structuring the damages allocation process in such a way as to account for individual differences among the class members.") (citation omitted); *Newberg on Class Actions* § 9:61, 449-50 (4th ed. 2002) (indicating that courts may resolve common issues first and then turn to the details of how to resolve any remaining issues). *See also Mullins v. Direct Digital, L.L.C.*, 795 F.3d 654, 664 (7th Cir. 2015) (indicating that courts should take wait-and-see approach to determine how serious manageability issues are following a liability judgment or settlement).

common issues predominate" under Rule 23(b)(3). 817 F.3d at 1239 (citation omitted). *See also Bouaphakeo,* 136 S. Ct. at 1045; *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Here, Plaintiffs allege that all of the Challenged Funds objectively underperformed their benchmarks and comparators and that their selection and retention by the Plan fiduciaries was imprudent and a violation of ERISA. Plaintiffs set forth arguably objective data supporting these conclusions. At this stage, however, the Court cannot make a merits determination as to whether the funds were or were not imprudently maintained on the Plan. Even if some funds were imprudent and others were not, this determination would not change the nature of the class inquiry. Plan participants are entitled to recover losses sustained in their Plan accounts because of the fiduciaries' selection of imprudent funds, even if some participants enjoyed above-market gains on other funds. Likewise, even assuming that a class proceeding results in a merits determination that some funds were imprudent for only a portion of the class period (i.e., after a certain duration of underperformance), that determination can be factored into a loss calculation. This does not undo the prevailing benefits of a class-wide proceeding.

In the Court's estimation, there is nothing inordinately difficult about calculating participants' losses once it is determined which, if any, of the Challenged Funds were imprudent and for what periods of time. Such calculations certainly do not predominate over common questions of liability, as well as the other Plan-wide equitable and injunctive remedies sought in this matter.

If there is a finding of liability as to the Fiduciaries' prudence in retaining and maintaining the Challenged Funds, calculation of damages will be a straightforward process using a common methodology. [*See* Doc. 119 at p. 15]. While the calculations of the losses attributable to each of the Challenged Funds may yield a different number for each Fund, that does not amount to an "individualized" inquiry sufficient to defeat Rule 23(b)(3) certification. *See In re Delta/AirTran*, 317 F.R.D. at 686 ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."). Instead, the focus is on whether "one or more of the central issues in the action are common to the class and can be said to predominate[.]" *Bouaphakeo*, 136 S. Ct. at 1045 (citation omitted).

Here, the Court concludes that common questions as to the underlying liability determination of the fiduciaries' prudence in retaining the Challenged Funds predominate. Plaintiffs allege that "the Plan was injured by Defendants' fiduciary breaches" and suffered quantifiable damages. [*See* Doc. 119 at p. 15]. Class

certification under Rule 23(b)(3) is not defeated simply because the calculation of damages may show that participants did not sustain identical amounts of loss. *See Brown*, 817 F.3d at 1239.

Consequently, any challenge by the Defendants' to manageability is also unavailing. Particularly given the Court's extensive case management tools, there is a well-settled presumption that courts should not decline to certify a class based on manageability alone. *See, e.g.*, *Briseno v. Conagra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017); *Mullins*, 795 F.3d at 663; *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140-41 (2d Cir. 2001); *see also Brown*, 817 F.3d at 1239, 1241. Ultimately, "the Court has a powerful arsenal from which to draw in making otherwise intractable class actions manageable[.]" *Cooper v. Pac. Life Ins. Co.*, 458 F. Supp. 2d 1368, 1376 (S.D. Ga. 2006).

Accordingly, the Court determines that certification of each proposed Class is also appropriate under Rule 23(b)(3).

### E. Class Period

Plaintiffs propose a Class Period from April 12, 2012, to the date of judgment. [*See* Doc. 53 at ¶ 6]. Defendants maintain that this Class Period as to the FE and AFA Classes is overbroad because it extends long after Plaintiffs "became aware of the allegedly overvalued nature of the services and could have simply opted out of paying for them." [*See* Doc. 118 at p. 25]. In response, Plaintiffs

pointed out that this argument ignores that the Defendants continue to allow AFA to charge allegedly excessive fees with no alternative options for those Plan participants seeking professional investment advice. [*See* Doc. 119 at p. 5]. In that regard, Plaintiffs cite to the deposition testimony of Plaintiff Stone, in which Ms. Stone explains that "if there was another option out there" for participants to receive investment advisory services through the Plan, then she "would make the choice to go with the person that's going to give [her] the best rate." [Doc. 118-3 (Stone Dep. Tr. at pp. 220:12 through 221[GL29]:14)]. However, the Plan has offered no such alternative. Because the Defendants continue to engage AFA as the exclusive provider of investment advisory services through the Program, the Court finds that Plaintiffs' requested Class Period is appropriate.

### F. Appointment of Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. Rule 23(g)(1)(A)(i)(iv). This determination takes into account counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." *Id.*

Plaintiffs request that the Court appoint Sanford Heisler Sharp, LLP and Blumenthal Nordrehaug Bhowmik De Blow LLP as Class Counsel. [*See* Doc. 98 at

p. 2].   Both firms identify specific attorneys and the credentials of each attorney who will be operating in the role as Class Counsel. [*See* Doc. 98-25 (Field Decl. Ex. 23); Doc. 98-27 (Blumenthal Decl., Ex. 1)].  Defendants do not oppose appointment of Sanford Heisler Sharp or Blumenthal Nordrehaug Bhowmik De Blow as Class Counsel. [*See* Doc. 118].

The Court finds that the attorneys identified by Sanford Heisler Sharp, LLP and Blumenthal Nordrehaug Bhowmik De Blow, LLP are well qualified to prosecute claims asserted against the Defendants on behalf of Plaintiffs and other members of each of the three putative Classes.  Both Sanford Heisler Sharp, LLP and Blumenthal Nordrehaug Bhowmik De Blouw LLP have experience handling complex class actions, including ERISA actions, and have been appointed as class counsel in many complex class actions. [*See* Doc. 98-25 (Field Decl. Ex. 23); Doc. 98-27 (Blumenthal Decl., Ex. 1)].  Plaintiffs' counsel has also devoted considerable time and resources to the investigation and prosecution of the claims and legal issues herein. [*See* Doc. 98-2 (Field Decl. at ¶ 19)].  Accordingly, Sanford Heisler Sharp, LLP and Blumenthal Nordrehaug Bhowmik De Blouw LLP fulfill the requirements of Rule 23(g) and are adequate Class Counsel.

## III.   <u>RULING ON MOTION TO CERTIFY CLASS</u>

For the foregoing reasons, the Court finds that, for each of the proposed classes, Plaintiffs have established the requirements for certification under Rule

23(a), Rule 23(b)(1), and Rule 23(b)(3).  Consequently, Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel [Doc. 98] is **GRANTED**.

The Court certifies the following classes under Rule 23(b)(1):

**Challenged Fund Class**: All participants and beneficiaries of the Plan, excluding the Defendants, who invested in the Challenged Funds at any time from April 12, 2012, through the date of judgment;

**FE Class**: All Plan participants and beneficiaries, excluding the Defendants, for whom FE performed investment advisory services through the Program at any time from April 12, 2012, through the date of judgment;

**AFA Class**: All Plan participants and beneficiaries, excluding the Defendants, for whom AFA performed investment advisory services through the Program at any time from April 12, 2012, through the date of judgment.

Plaintiffs Smith, Ideishi, and North  are  appointed as Class Representatives of the Challenged Fund Class.  Plaintiffs Pizarro and Stone are appointed as Class Representatives of the  FE Class.  Plaintiffs  Murphy  and Stone  are  appointed  as  Class  Representatives  of  the  AFA Class.    Sanford  Heisler  Sharp,  LLP  and Blumenthal Nordrehaug Bhowmik De Blow LLP are appointed as Class Counsel.


**IV.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

As previously stated, the Defendants seek summary judgment only as to

Plaintiffs' Excessive Fee claim. [Docs. 130-133].[16]  More specifically, Defendants seek summary judgment as to the allegation of "reverse churning," which it maintains is the predicate for Plaintiffs' entire Excessive Fee claim. *See id*.  In seeking summary judgment on Plaintiffs' Excessive Fee claim, the Defendants do not raise or discuss the actual fees charged by FE or AFA, or whether those fees were excessive. [Docs. 130-1, 131-1, 132-1, 133-1].  Defendants do not dispute Plaintiffs' Statement of Additional Material Facts as to the amount of fees charged by FE and AFA, or the fact that the fees charged by FE and AFA were significantly higher than the fees charged by other providers available on the market offering substantially similar services. [*Compare* Doc.145-1 at ¶¶ 5, 9-11 *with* Doc. 153-1 at ¶¶ 5, 9-11].  Similarly, Defendants do not dispute that FE charged participants in other 401(k) plans less in fees for the same services.  Nor do Defendants dispute the facts setting out what the Plaintiffs characterize as the alleged failed fiduciary processes employed by the Defendant for selecting AFA as a service provider and for the ongoing monitoring (or lack thereof) of the fees charged by FE and AFA. [*See* Doc. 145-1 at ¶¶ 7-8, 13-20].

Instead, Defendants argue that the sole determiner as to the question of

---

[16] Defendants have filed four separate motions for summary judgment against Plaintiffs Murphy, Pizarro, Stone, and Silver. Each motion, however, is based on the same challenge to the Excessive Fee claim advanced by those Plaintiffs, who, except for Plaintiff Silver, are the proposed class representatives of the FE and AFA Classes.

whether Defendants allowed FE and AFA to charge excessive fees is not whether the fees were excessive, but whether FE and/or AFA "actively" managed participants' accounts, i.e., did not engage in "reverse churning." [*See generally* Docs. 130-1, 131-1, 132-1, 133-1]. Defendants in essence argue that the actual fees charged to, or paid by, Plan participants are not material to the disposition of Plaintiffs' Excessive Fee claim so long as FE and AFA did not engage in reverse churning.

For the reasons more fully set forth below, Defendants' Motions for Summary Judgment are DENIED.

### A. Plaintiffs' Allegations in the Amended Complaint

Plaintiffs' allege in Count II of the Amended Complaint, which sets out the principal Excessive Fee claim against the Defendants, that "Defendants failed to engage in a prudent and loyal process for selecting and retaining an investment advisor to construct asset allocation portfolios for participants." [Doc. 53 at ¶ 177]. The Amended Complaint also alleges in Count VI a secondary, and as yet only potential, breach of Defendants' duty to monitor other fiduciaries to whom they may have delegated any duties related to the selection and monitoring of FE and AFA. [*Id*. at ¶¶ 211-214]. As the Defendants' motions do not maintain that they delegated any fiduciary responsibility related to the Excessive Fee claim, that issue is not relevant to the disposition of the motions *subjudice*.

### B. Defendants' Prior Motion to Dismiss the Excessive Fee Claim

On August 27, 2018, Defendants moved to Dismiss the Amended Complaint, including the Excessive Fee claim. [*See* Doc. 59]. As grounds for dismissal of the Excessive Fee claim, Defendants asserted that "a prudence claim must plausibly allege that the *process* leading to a challenged outcome was flawed." [Doc. 59-1 at p. 16; *see also id*. at pp. 16-21]. As to "Plaintiffs' allegation that there were cheaper investment advisement service alternatives readily available," Defendants argued that this alone was "insufficient to state an ERISA claim for breach of the duty of prudence, absent any allegations showing an abuse of discretion in [Defendants'] decision-making process." [*See* Doc. 74 - Order at p. 11]. In other words, Defendants argued that Plaintiffs must allege procedural imprudence on the part of the fiduciaries and that the Defendants were substantively imprudent in allowing FE and AFA to charge far above the market rate for the services provided.

The Court denied Defendants' Motion to Dismiss Count II, finding that "Plaintiffs do not rely solely upon the allegation of cheaper investment options to show that Home Depot's decision-making process was imprudent." [*Id.* at p. 12]. Rather, as this Court found, Plaintiffs rely on the following allegations in support of the excessive fee claims:

(1)     comparable firms charged lower fees,

(2)    lower fees were offered to participants in other comparable plans,

(3)    Home Depot failed to conduct competitive bidding,

(4)    the investment options provided imposed duplicative advisory fees,

(5)    the Plan's Recordkeeper received kick-backs that unreasonably increased the advisory fees that were charged to the Plan participants, and

(6)    Home Depot allowed FEA and AFA to engage in a self-dealing, reverse churning scheme which neglected the basic needs of the Plan participants and benefitted Home Depot by defraying the expenses of administering the Plan. [*Id.* at pp. 12-13].

## C. Home Depot's Motions for Summary Judgment

On April 10, 2020, Defendants filed four Motions for Summary Judgment regarding the Excessive Fee Claim along with supporting documents. [Doc. 130 through 130-14; Doc. 131 through 131-19; Doc. 132 through 132-10; Doc. 133 through 133-26].   Nowhere in their Motions or supporting documents do Defendants discuss the process they employed for monitoring the fees of FE and AFA or the process for retaining AFA.   Nor do the Defendants discuss any of the distinct elements identified by the Court as comprising Plaintiffs' Excessive Fee claim, except for the piece of the sixth element alleging that FE and AFA engaged in a reverse churning scheme. *See* Defs' Briefs [Doc. 130-1, 131-1, 132-1, 133-1].   Instead, Defendants assert that "reverse churning" is  the "necessary factual predicate" for the respective Excessive Fee claims. [*See* Doc. 130-1 at pp. 2, 6, 8-

9; Doc. 131-1 at pp. 2, 7, 9-10; Doc. 132-1 at pp. 2, 8, 10-11; Doc. 133-1 at pp. 2, 10, 12]. According to the Defendants, if the undisputed material facts show that FE and AFA did not engage in "reverse churning," the Excessive Fee claim fails in its entirety.

In that regard, Defendants assert that summary judgment is warranted on all four motions because testimony from Plaintiffs Murphy, Pizarro, Stone, and Silver shows that FE and AFA "actively managed" their accounts as opposed to leaving them "largely inactive," placing them on "auto pilot," "neglect[ing] the needs of participants," and "ignor[ing] participants' instructions." [*See* Doc. 130-1 at pp. 2, 4; Doc. 131-1 at pp. 2, 9; Doc. 132-1 at pp. 2, 9; Doc. 133-1 at pp. 2, 6, 12].[GL30]

In opposition, Plaintiffs take issue with the characterization of their Excessive Fee claim. Plaintiffs argue that by failing to address the entirety of the Excessive Fee claim and instead focusing on only one of six elements, Home Depot fundamentally failed to meet the threshold required under Rule 56. [*See* Doc. 145 at pp. 3-4, 15-16].

Additionally, Home Depot argues that Plaintiff Silver's claims are barred by ERISA's three-year statute of limitations, 29 U.S.C. § 1113 (2), on the theory that Plaintiff Silver had "actual knowledge" of the facts underlying the Excessive Fee claim more than three years prior to filing the present lawsuit. [*See* Doc. 133-1 at p. 15]. In response, Plaintiff Silver makes three points. First, Ms. Silver noted

that AFA did not begin providing services to the Plan until July 2017, and that her challenge to the imprudence of retaining AFA was filed just over a year later in July 2018, thus making her claims against AFA timely. [*See* Doc. 145 at p. 33]. Second, Ms. Silver argues that Home Depot has not shown that she had actual knowledge of underlying fiduciary conduct and failed fiduciary process giving rise to the Excessive Fee claim. [*Id.* at pp. 33-34]. Finally, Plaintiff Silver argues that even if she had "actual knowledge" of the underlying imprudent fiduciary process with respect to FE, each time Defendants failed to remove FE as a service provider or negotiate a lower fee, they engaged in a new breach of their continuing duty to correct imprudent decisions, thereby instituting a new statute of limitations. [*Id.* at pp. 34-35].

### D.   MATERIAL FACTS BEARING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

#### 1. Scope of Plaintiffs' Excessive Fee Claim as Alleged in the Amended Complaint

The Court finds that the factual allegations asserted against Defendants in the Amended Complaint are controlling in determining the nature and scope of the Excessive Fee claim.  The allegation of "reverse churning" is just one factual piece of such claim. [*See* Doc. 153 – Defs' Reply at p. 3 n.7 (citing Am. Compl. ¶¶ 5, 189-193, 198-202, 208)].[17]

---

[17] The Court does not credit Defendants' citations to factual allegations raised

At the outset of Count II of the Amended Complaint, Plaintiffs allege that "Defendants failed to engage in a prudent and loyal process for selecting and retaining an investment advisor to construct asset allocation portfolios for participants." [Doc. 53 at ¶ 177].  Plaintiffs challenged the adequacy of the Defendants' fiduciary process for retaining AFA because "Home Depot Defendants failed to consider, or to solicit competitive bids from, other 'robo advisers' who offered comparable asset allocation services for a cheaper price." [*Id.* at ¶ 179].  In addition to Plaintiffs' challenge to the fiduciaries' procedural imprudence in the selection of AFA and the ongoing retention of FE and AFA, Plaintiffs alleged that these decisions were also substantively imprudent because they resulted in Plan participants paying FE and AFA excessive fees.  Specifically, Plaintiffs contend that "Home Depot's selection and retention of [FE] and AFA caused the participants to pay significantly excessive investment advisory fees" for the services provided. [*Id.* at ¶ 178].

Plaintiffs further allege that the services FE and AFA provided to Plan participants did not justify the higher fees because: (1) "[a]s the amount of assets grew, the investment advisory fees paid to [FE] and AFA grew, even though the

---

exclusively against former Defendants FE and AFA, such as those alleged in Counts III-V, as those allegations go to claims that: (1) were not raised against these Defendants, (2) are no longer active, and (3) do not fall within the scope of Counts II, which is the operative Count for the purposes of Home Depot's summary judgment motions.

services provided by [FE] and AFA remained the same"[Doc. 53 at ¶ 180]; (2) the Plan's Recordkeeper received "kick-backs" that unreasonably increased the advisory fees that were charged to the Plan participants [*id*. at ¶¶ 60-64)]; and (3) the Defendants' failure to monitor the services provided by FE and AFA allowed both "to engage in an unlawful reverse churning scheme, neglect the needs of participants, and ignore participants' instructions" [*id*. at ¶ 180].

In its motions, Defendants characterize the Excessive Fee claim as alleging that the fees charged by FE and AFA were excessive based exclusively on the grounds FE and AFA engaged in reverse churning. [*See* |GL31]Docs. 130-1, 131-1, 132-1, 133-1, respectively at p. 2 (arguing that reverse churning is the factual predicate to Plaintiffs' Excessive Fee claim); *see also* Doc. 153 at p. 9 (asserting reverse churning as "the underlying reason *why* the fees charged by Financial Engines and AFA were purportedly 'duplicative' and 'excessive' as compared to" alternative service providers)].  In the Defendants' view, "comparative products" (i.e., alternative service providers offering comparable services at lower rates)|GL32] only become relevant upon a showing that the actual services offered by FE and AFA were "substantively imprudent." [See Doc. 153 at pp. 8-9].  According to the Defendants, as long as FE's and AFA's management of the Plaintiffs' overall portfolios' achieved a positive result, the Defendants could not have liability for any fiduciary breach.  But that is not how the Court interprets what compromises

Plaintiffs' claim in Count II nor the law under ERISA.[18] [GL33]

On the question of substantive imprudence, Plaintiffs do not claim that the fees charged by FE and AFA were excessive *because of* the underperformance of participants' portfolios. Rather, Plaintiffs claim that the fees were excessive because they were significantly higher than the fees charged by other comparable services providers providing the same or substantially similar services or even the fees that FE and AFA charged other plans for identical services. [*See* Doc. 53 at ¶¶178-179]. The issues with the quality of the services provided by FE and AFA were raised in the context of Plaintiffs' allegations that the higher fees charged by FE and AFA were not justified by any additional or exceptional services offered to participants beyond that of other comparable service providers. [*See id.* at ¶ 53 ("Unfortunately, Financial Engines and AFA did not provide a level of advisory services that would justify their exorbitant fees. Instead they engaged in 'reverse churning'—i.e. they charged ongoing advisory fees while doing very little to earn them")]. It is in support of *this* subsidiary point—as opposed to the underlying principal contention that FE and AFA charged significantly higher fees than

---

[18] That FE and/or AFA management produced a positive outcome in their accounts is an expected result and would not negate any breach by the Defendant in permitting FE and AFA to charge excessive fees. *Pledger*, 240 F. Supp. 3d at 1330 ("[I]t can be a breach of [the fiduciary's] duty to fail to monitor the fees and rein in excessive compensation."). The Court discusses that as the rule under ERISA in more detail. *See infra* at Sec. IV. E. 4. of this Order.

comparable service providers—that Plaintiffs point to the alleged reverse churning. Plaintiffs explain that reverse churning is the practice of leaving participant accounts "largely inactive," "providing minimal investment advice" and "making only limited changes to Plaintiffs' portfolios." [[GL34]*Id.*  ¶¶ 53-54].

While the alleged failure of FE and AFA to provide the promised services may be an aggravating factor, the premise of any excessive fee claim is that the charges for the services provided are unreasonable[GL35] under the circumstances.  In other words, even if FE and AFA provided all of the services that they promised to provide participants, Plaintiffs maintain that the fees FE and AFA charged were still excessive. So, even if there is no "reverse churning," Plaintiffs have stated an actionable claim under ERISA for excessive fees.

### 2.  Undisputed Facts and Evidence in Plaintiffs' Favor Support Denial of Defendants' Motions for Summary Judgment on Plaintiffs' Excessive Fee Claim

Having reviewed the evidence on the record, the Court finds that the following facts are both material to the disposition of Plaintiffs' Excessive Fee claim and are not currently contested by Defendants, despite certain objections solely on the grounds of materiality.

### (a)  Financial Engines is Retained to Provide Investment Advisory Services Under the Program

In 2011, the Plan engaged FE to provide investment advisory services to Plan participants through the Program. [*See* Doc. 145-1 at ¶ 1].  FE provided investment

advisory services to Plan participants enrolled in the Program from the beginning of the class period until June 30, 2017. [*Id*. at ¶ 2]. Beginning July 1, 2017, FE began to offer sub-advisory services to Plan participants. [*Id*. at ¶¶ 18-19]. FE charged Plan participants under the following fee structure: "a fee of 0.55% of participants' assets for the first $100,000, 0.45% for the next $150,000, and 0.30% for account balances above $250,000." [*Id.* at ¶ 2]. The accounts of most participants enrolled in the Program operated by FE had assets of $100,000 or less, which put those accounts in the first and highest priced tier. [*Id.* at ¶ 3].

In 2010, FE publicly identified Morningstar, Inc., GuidedChoice Asset Management, Inc., and ProManage LLC as "direct competitors that offer independent portfolio management and investment advisory services to plan participants in the workplace[.]" [*See* Doc. 145-1 at ¶ 9]. "Fees for GuidedChoice Asset Management, Inc. managed account services are [publicly] identified in its Form ADV Part 2A as usually less than 0.45%." [*Id*. at ¶ 10]. "Fees for ProManage LLC managed account services for assets exceeding $100,000,000 are [publicly] identified in its Form ADV Part 2A as typically 0.10%." [*Id*. at ¶ 11].

"Publicly available documents reflect that FE, either as a direct investment advisory services provider or in a subadvisor role, provided its investment advisory services to [other] 401(k) plans at an asset based fee rate materially lower than the rate that FE charged participants in the Program." [*See* Doc. 145-1 at ¶ 12]. For

example, publicly available documents indicate FE's highest-tier fee for participants in Boeing's and the State of Michigan's 401(K) plan was 0.30%. [*See* Doc. 145 at p. 20; *see also* Docs. 145-16 through 145-19]. Additionally, Motorola's equivalent plan was at 0.35%. [*See* Doc. 145 at p. 20]. Publicly available documents also indicate that AFA, relying on FE as a subadvisor, charged Caterpillar plan participants a highest-tier fee of 0.40%. [*See* Doc. 145 at pp. 20-21; Doc. 145-18 at p. 28]. Publicly available information indicated the average fee FE charged to Plan participants for its Program is no more than 0.40% of the assets under management, or approximately 25% lower than the first-tier rate of .55% that FE charged Program participants. [[GL36]*See* Doc. 145-1 at ¶ 12]. A 2014 article published by Forbes reported that FE charged fees ranging from 0.20% to 0.60%. [*See* Doc. 145-21 at pp. 2-3;]. As the provider under the Program until June 30, 2017, FE charged a fee of 0.55% to Plan participants with $100,000 or less under management (FE's highest tier of asset-based pricing). [*See* Doc. 145-1 at ¶ 2].

There is no evidence in the record indicating that the Defendants ever investigated or questioned whether FE was charging Plan participants rates higher than those FE charged other plans. Defendants have not pointed to any evidence that the Defendants ever investigated FE's typical range of fees to ensure that participants in its Plan were not paying at or above the average fee FE charged for its services. [*See generally* Docs. 130-2; 131-2; 132-2; 133-2; 145-1; 153-1].

Of the asset-based fees that Plan participants paid to FE for its advisory services under the Program, it is undisputed that FE passed on a significant portion of the participants' fees to Aon Hewitt, the Plan's recordkeeper. [Doc. 145-1 at ¶¶ 4-5; Doc. 153-1 at ¶¶ 4-5].[GL37]   This supposedly allowed FE to connect electronically to an enrolled participants' account. [Doc. 145-2 at ¶ 6].   The percentage of participants' fees that FE remitted each year to Aon Hewitt were:

(i) **2012**: FE remitted 20% of the participant fees to Aon Hewitt;

(ii) **2013**: FE remitted between 20% and 25% of the participant fees to Aon Hewitt;

(iii) **2014 – 2015**: FE remitted 35% of the participant fees to Aon Hewitt;

(iv) **2016**: FE remitted between 30% and 35% of the participant fees to Aon Hewitt. [*Id.* at ¶ 4].

Of the $22,190,121 in total fees FE received for its services from 2012 to 2016, FE paid between $6,568,000 and $7,060,000 to Aon Hewitt. [*See* Doc.145-1 at¶ 5].[19]

That means that between 29.6% and 31.8% of the fees participants paid to FE for investment advisory services were paid back to Hewitt.

---

[19] *See also* [Doc. 145-26] at ECF p. 6 (The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d) showing FE received $2,329,284 in 2012); [Doc. 145-27] at ECF p. 6 (The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d) showing FE received $3,570,557 in 2013); [Doc. 145-28] at ECF p. 7 (The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d) showing FE received $4,384,818 in 2014); [Doc. 145-29] at ECF p. 7 (The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d) showing FE received $5,638,465 in 2015); [Doc. 145-30] at ECF p. 7 (The Home Depot FutureBuilder Form 5500 at p. 3-1 § 2(d) showing FE received $6,266,997 in 2016).

Defendants were put on notice of the issues surrounding the fee sharing between FE and the Aon Hewitt as early as 2013.  The record shows that a neutral outside consultant provided a benchmarking assessment of the Plan during a quarterly meeting of the Plan's Investment Committee on August 23, 2013. [*See* Doc. 146-3 at ¶ 7].[GL38]  In this assessment, the neutral consultant stated: "The revenue that Aon Hewitt receives from [FE] should be disclosed on Aon Hewitt's 408(b)(2) fee disclosure and monitored closely. There have been examples where the revenue retained by Providers (including Aon Hewitt) using a similar arrangement with Financial Engines is unreasonably high. The Home Depot should understand the cost for the services Aon Hewitt is providing (annual [FE] statements and financial advisors) relative to this revenue and monitor at least annually." [*Id.*[GL39]]

The pass-through of fees from FE to Aon Hewitt was disclosed to the Defendants on Aon Hewitt's annual 408(b)(2) fee disclosure. [*See* Doc. 146-24 at ECF p. 3]. [GL40]In the disclosure, FE characterized the payments as "charged directly to accounts of enrolled participants on a quarterly basis and remitted [to Aon Hewitt] by [FE]." [*Id.* at ECF p. 4].[GL41]  However, there is no record evidence that the Home Depot fiduciaries ever questioned (1) whether the fee paid to Aon Hewitt was reasonable, (2) whether it should have been part of Aon Hewitt's services as the Plan's recordkeeper, or (3) what impact the fee had on the

fee FE charged Plan participants. [*See* Doc. 145-1 at ¶ 8].   The Investment Committee is a named fiduciary of the Plan charged by ERISA with the responsibility of defraying Plan and participant expenses. 29 U.S.C. § 1104(a)(1)(A)(ii).

      **(b)**    **Defendant Fiduciaries Replace Financial Engines with Alight Financial Advisors at the Request of and for the Benefit of the Plan's Recordkeeper, Aon Hewitt.**

In July of 2015, the Plan's Administrative Committee, also a named fiduciary of the Plan, began negotiations with Aon Hewitt to renew its contract as a recordkeeper to the 401(k) Plan. [*See* Doc. 146-3 at ¶ 13]. [GL42]During those negotiations, Aon Hewitt recommended that the Plan replace FE with one of its affiliates, now known as Alight Financial Advisors, LLC ("AFA"). [*Id.*][GL43]   On April 26, 2016, the Administrative Committee, along with the Administrative Committees of Home Depot's other benefit plans, met to discuss and decide on a new proposed recordkeeping arrangement with Aon Hewitt, which included replacing FE with AFA as the investment advisor under the Program. At that meeting, the Administrative Committee resolved to engage AFA to provide managed account services for Plan participants. [*Id.* at ¶ 14].[GL44]  AFA was retained as part of the negotiations around the renewal of the Plan's recordkeeping agreement with Aon Hewitt. [*Id.* at ¶ 18].[GL45]

The minutes of the April 2016 Administrative Committee meeting indicate that during the discussion of the transition from FE to AFA, only a single document, titled "*FutureBuilder and H&W Administration Renewal*," is mentioned in support of replacing FE with AFA. [*See* Doc. 146-3 at ¶ 15].  Nothing in the minutes of the meeting or the *FutureBuilder and H&W Administration Renewal* indicates that any consideration was given to retaining a service provider for the Program other than AFA.  There also was no discussion or inquiry regarding the reasonableness of the fees that AFA would charge or any inquiry as to the fees that other providers of comparable managed account services were charging other plans. Nor do the minutes indicate that the Plan fiduciaries ever considered engaging in a formal request for proposal process seeking competitive bids from other investment advisory services providers or conducting a survey of the market to identify the going rate charged by companies that provided comparable investment advisory services. [*Id.* at ¶¶ 16-17].

The transition from FE to AFA occurred in July of 2017, at which point AFA became the service provider that had the principal responsibility to operate the Program. [*See* Doc. 146-3 at ¶ 18].  AFA did not itself, however, provide the substantive investment advisory services.  Instead, it retained FE as sub-advisor to provide substantive investment advisory service to Plan participants enrolled in the Program.  AFA paid FE 35% of the fees it received from Plan participants, keeping

65% for itself. [*Id*. at ¶ 19]. In short, FE provided the same substantive advisory services that it previously had provided to participants enrolled in the program, though at a substantially lower fraction of the fees it previously charged.[20] This situation begs the question as to why the higher fee was ever charged to start with.

## E.   ANALYSIS

### 1. Legal Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, the entry of summary judgment is warranted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there exists a genuine question of material fact, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "If one or more of the essential elements [of the claim or defense] is in doubt, then summary judgment must not be granted." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986). As the moving party, Defendants have "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S.

---

[20] When AFA began providing managed account services to the Plan, it was not required to pass through any portion of participants' fees to the Plan's recordkeeper for data connectivity, such as the fees FE had remitted to Aon Hewitt. [*See* Doc. 146-3 at ¶ 20].

144, 157 (1970).[21] Thus, Defendants must "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008).

In considering a motion for summary judgment, "the correct procedure is for the district court to determine if the moving party has met its initial burden of demonstrating the absence of any disputes of material fact and its entitlement to judgment as a matter of law." *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 254 (11th Cir. 1997). "[B]efore determining whether the plaintiffs could meet their burden at trial, [the Court] must determine whether the [moving party] met its burden of *showing* the district court there were no issues of material fact to be determined at trial." *Mullins*, 228 F.3d at 1314. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark*, Inc., 929 F. 2d 604, 608 (11th Cir. 1991).

## 2. ERISA Duty of Prudence in Excessive Fee Claims

---

[21] *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (stating that the moving party "bears the initial responsibility of informing the district court of the basis for its motion"); *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (stating that the "moving party bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact to be determined at trial").

ERISA's duty of prudence requires fiduciaries to discharge their duties with "'the care, skill, prudence, and diligence'" of a person "'acting in a like capacity and familiar with such matters.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting 29 U.S.C. §1104(a)(1)(B))[GL46]. When addressing ERISA fiduciary breach claims like those at issue here, courts must "examine the totality of the circumstances," focusing "not only on the merits of a transaction, but also on the thoroughness of the investigation into the merits of that transaction." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (citation omitted). An ERISA fiduciary must take appropriate steps to ensure that the plan and its participants "'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (quoting Restatement (Third) of Trusts § 90 (c) (3)).[GL47]

### 3. Reverse Churning Is Not a Necessary Predicate to Plaintiffs' Excessive Fee Claim

Defendants move for summary judgment as to the entirety of Plaintiffs' Excessive Fee claim, yet they do not address the issue of whether the investment fees were excessive. Instead, Defendants seek summary judgment based exclusively on the argument that Plaintiffs cannot prove that FE and AFA engaged in reverse churning. [*See* Docs. 130-1, 131-1, 132-1, 133-1 respectively at p. 2 (arguing that reverse churning is the factual predicate to Plaintiffs' Excessive Fee claim); Doc. 153 at p. 9 (asserting reverse churning as "the underlying reason *why*

the fees charged by Financial Engines and AFA were purportedly 'duplicative' and 'excessive' as compared to" alternative service providers)].   However, a determination of whether FE and AFA actively managed participants' accounts would not dispose of the Excessive Fee claim. *See* Fed. R. Civ. P. 56(a) ("a party may move for summary judgment identifying *each claim* or defense—or the *part of each claim* or defense—on which summary judgment is sought.") (emphasis added).

Notwithstanding Plaintiffs' claims that FE and AFA left participants' accounts largely inactive and neglected the needs and instructions of participants (e.g. reverse churning)[GL48], Plaintiffs' Excessive Fee claim would still consist of the following key allegations: (1) comparable firms charged lower fees; (2) lower fees were offered to participants in other comparable plans; (3) Defendants failed to conduct competitive bidding; and (4) the Plan's Recordkeeper received "kick-backs" that unreasonably increased the advisory fees that were charged to the Plan participants. [*See* Doc. 74 - Order at pp. 12-13].  In opposition to Defendants' motions, Plaintiffs have offered sufficient evidence to raise a factual dispute with respect to each allegation.  Certainly, those allegations and the record evidence set forth a sufficient claim of excessive fees when combined with the facts that the Plan's fiduciaries seemingly never examined or considered the reasonableness of the fees that first FE and then AFA charged Plan participants.

4. **To Succeed on an Excessive Fee Claim, Plaintiffs Are Not Required to Show That the Service Provider Charging the Allegedly Excessive Fee Also Provided Substantively Imprudent Services**

To establish liability, Defendants argue that it is not enough for the Plaintiffs to just prove that the fiduciaries employed imprudent procedures and Plan participants suffered corresponding losses as a result of the excessive fees charged.  According to Defendants, Plaintiffs must also prove "that FE/AFA's services were imprudent." [Doc. 153 at pp. 7-8].  In support, Defendants cite to the opinion issued in *Lanfear v. Home Depot, Inc.,* 718 F. Supp. 2d 1364, 1382 (N.D. Ga. 2010), which was subsequently reviewed by the Eleventh Circuit in *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267 (11th Cir. 2012).[22]

In *Lanfear*, the plaintiffs alleged a principal claim against fiduciaries for breach of the duty of prudence, as well as a separate derivative claim against monitoring defendants for failure to monitor and report the underlying imprudent conduct. *See id.* at 1376-77, 1381-82.  Having dismissed plaintiffs' principal claim of fiduciary breach, the court concluded that plaintiffs could not sustain their

---

[22] As an initial matter, the Court notes the procedural posture of *Lanfear*, brought on a motion to dismiss (*see* 718 F. Supp. 2d at 1366-67), is different than in this case, which is before the Court on motions for summary judgment.

derivative duty to monitor claim. *See id.* at 1379 (dismissing plaintiffs' duty of prudence claim); 1382 (dismissing failure to monitor claim for failure to state a claim).  As the Eleventh Circuit succinctly explained in its review of the opinion, "plaintiffs do not deny that those claims are derivative, and our decision to affirm the dismissal of the primary claims means that the dismissal of those [derivative] claims is also due to be affirmed." *Lanfear*, 679 F.3d at 1286 n.20.

Here, unlike *Lanfear*, this Court has already found that Plaintiffs' underlying Excessive Fee claim, if proven, states a valid claim for fiduciary breach of the duty of prudence. [*See* Doc. 74 - Order at p. 13].  Certainly, nothing in *Lanfear* stands for Defendants' proposition that fiduciaries are free to allow service providers to charge Plan participants unreasonably high fees so long as the underlying services provided are adequate.

Moreover, Defendants do not cite any authority for their proposition that, when plan service providers render adequate services, plan participants are estopped from bringing a claim under ERISA alleging that the plan fiduciaries allowed the service providers to charge excessive fees.  Indeed, payment of unreasonable compensation to a service provider is a prohibited transaction under ERISA. *See* 29  U.S.C. § 1106(a)(1)(C), 1108(b)(2).

Allowing service providers to charge excessive fees is, in fact, a well-established fiduciary breach.  ERISA "forbid[s] a fiduciary from causing a plan to

enter into a contract to obtain services from a service provider if the fiduciary knows or should know that the arrangement will enable the service provider to receive unreasonable compensation." *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2007 WL 2302284, at *3 (D. Conn. Aug. 9, 2007). "Wasting beneficiaries' money is imprudent [and] . . . trustees are obliged to minimize costs." *Tibble*, 843 F.3d at 1198 (quoting Unif. Prudent Investor Act § 7). Thus, a fiduciary must take appropriate steps to ensure that the plan and its participants "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Id.* at 1197 (quoting Restatement (Third) of Trusts § 90(c)(3)). This is true even where plaintiffs do not challenge the adequacy of the underlying services for which they are being charged excessive fees.

For example, in *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011), the Seventh Circuit reversed a grant of summary judgment for defendants as to plaintiffs' claim of excessive recordkeeping fees because "a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that Hewitt's [recordkeeping] fees were reasonable." *Id.* at 800. The plaintiffs in *George* did not allege that the underlying services provided by the recordkeeper were poor or independently imprudent. *See id.* at 798-99. Instead, the court focused solely on the fiduciary process for agreeing to the fees charged by the service

provider, and whether the fees charged were excessive. *See id.*[23]

This Court, accordingly, concludes that Plaintiffs' Excessive Fee claim is not premised solely on the issue of reverse churning. Thus, in moving for summary judgment, it is the Defendants' burden in the first instance to show "the absence of any disputes of material fact and its entitlement to judgment as a matter of law" as to each of the elements of Plaintiffs' Excessive Fee claim. *Jones*, 120 F.3d at 254; *accord Mullins*, 228 F.3d at 1313-14; *Clark*, 929 F. 2d at 609. Defendants' failure to do so is a sufficient basis to deny its Motions.

### 5. Home Depot Has Failed to Establish Undisputed Facts Material to the Disposition of Plaintiffs' Excessive Fee Claim in its Entirety

In opposition to the Defendants' motions for summary judgment, Plaintiffs point to evidence on the record demonstrating genuine issues of material fact as to the elements of Plaintiffs' Excessive Fee claim.

As to Defendants' ongoing process for monitoring the fees charged by FE and AFA, Plaintiffs point to minutes of the key fiduciary committee meetings indicating that the fiduciaries did not investigate or discuss whether the asset-based fee rate was reasonable for the actual services performed by FE and/or AFA. [*See* Doc. 146-3 at ¶¶ 7-8, 16-17]. [GL49]Plaintiffs also point to evidence that Defendants

---

[23] Consistent with this guidance, this district has found that where fees are charged "as a percentage of assets, it can be a breach of its fiduciary duty to fail to monitor the fees and rein in excessive compensation." *Pledger*, 240 F. Supp. 3d at 1330.

neither engaged in a formal "request for proposal" process, nor commissioned a less formal survey of the market of companies providing comparable investment advisory services. [*Id.*]₍GL50₎

As to the reasonableness of the fees charged by FE and AFA, Plaintiffs point to readily available public documents stating that FE and AFA operate in a highly competitive market, and that other service providers were offering comparable investment advisory services at rates significantly lower than those charged by FE and AFA. [*Id.* at ¶¶ 9-11]. Also, Plaintiffs allege that FE and AFA charged other plans lower fees. [*Id.* at ¶ 12].

As to the alleged kick-back arrangement between FE and the Plan's recordkeeper, Plaintiffs point to evidence that Defendants were on notice that this arrangement should be monitored closely to ensure this revenue sharing scheme was not "unreasonably high." [*Id.* at ¶ 7].₍GL51₎

Regarding the retention of AFA, Plaintiffs point to evidence that Defendants did not engage in a competitive bidding process, conduct a market survey of fees, or inquire into whether the fees charged by AFA were reasonable given the elimination of the "kick-back" scheme requiring revenue sharing with the Plan's recordkeeper. [*Id.* at ¶¶ 13₍GL52₎-14, 16-17, 20].

The Court concludes that Home Depot has failed to shoulder its initial

burden to show "the absence of any disputes of material fact and its entitlement to judgment as a matter of law" as to these elements of Plaintiffs' Excessive Fee claim. *Jones*, 120 F.3d at 254.

### 6.  Plaintiff Silver's Claims Were Timely Filed

Section 413 of ERISA, 29 U.S.C. §1113, sets forth two separate time periods—six and three years—during which actions for breach of fiduciary duty must be brought.

Under the six-year component, an action for breach of fiduciary duty is timely if it is filed no more than six years after the date of the last action that constituted the breach or violation of ERISA, or "in the case of an omission the latest date on which the fiduciary could have cured the breach[.]" 29 U.S.C. §1113(1). However, where a plaintiff has "actual knowledge" of the alleged fiduciary breach, the three-year component specifies that the suit must be brought within three-years from the earliest date on which the plaintiff first obtained such actual knowledge. 29 U.S.C. §1113(2).  Actual knowledge means "what it says: knowledge that is actual, not merely a possible inference from ambiguous circumstances." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 775 (2020).

Defendants argue that Plaintiff Silver's claims are barred by ERISA's three-year statute of limitations under §1113 (2), arguing that Plaintiff Silver had "actual

knowledge" of the facts underlying the Excessive Fee claim more than three years prior to filing the present lawsuit. [*See* Doc. 133-1 at pp. 15-18].

Plaintiffs dispute this on a number of grounds. First, as to the claim relating to the retention of AFA, Plaintiffs point out that Ms. Silver asserted her claims on July 11, 2018 [Doc. 53], and AFA only began providing services to the Plan (and to Ms. Silver) in July of 2017, just one year before. [*See* Doc.145-1 at ¶18]. The Court agrees and, thus, concludes that Ms. Silver's claims relating to AFA were timely brought, regardless of whether the three or six-year statute of limitations applies.

Next, Plaintiffs contend that Defendants cannot establish that Ms. Silver had "actual knowledge" of the underlying fiduciary conduct giving rise to the claims regarding FE. "[W]hen a fiduciary's investment decision is challenged as a breach of an ERISA duty, the nature of the alleged breach is critical to the actual knowledge issue." *Brown v. Am. Life Holdings*, 190 F.3d 856, 859 (8th Cir. 1999). Thus, Defendants must show that Ms. Silver had "actual knowledge" of a failed fiduciary process through which the fiduciaries monitored FE and the reasonableness of the fees FE charged, not just the result of that process. *See id.*

Defendants argue that Ms. Silver's comments from her deposition testimony when she expressed she was "concerned about fees" and "thought Financial Engines' fees were too high" for more than three years are sufficient to

show actual knowledge. [Doc. 133-1 at pp. 16-17; Doc. 133-2 at ¶ 54]. Defendants also point to testimony that Ms. Silver felt Home Depot did not have "the back of their employees or their interests at heart[.]" [Doc. 133-1 at p. 16]. However, the Court concludes that Ms. Silver's generic concerns are not evidence that she had actual knowledge of the underlying fiduciary conduct at issue, *i.e.*, Defendants' processes for negotiating and monitoring the reasonableness of the fees charged by FE. She might have thought she was paying too much for the services she received, but her personal beliefs in no way demonstrate knowledge of the details, specifically that the fees charged were allegedly above the market price and/or above what FE charged other companies, and particularly that fees might have even been inflated due to the alleged kickback scheme.

Accordingly, the Court concludes that Ms. Silver's claims were timely filed and are not barred under either of ERISA's three or six-year statute of limitations.

## V.  **RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

As genuine issues of material fact remain for resolution, the Court finds that Defendants' Motions for Summary Judgment as to Counts II and VI are **DENIED**.

## VI.  **CONCLUSION**

For the above reasons, Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel [Doc.

98] is **GRANTED**.  The Court hereby certifies the following classes under Rule

23(b)(1):

> <u>Challenged Fund Class</u>: All participants and beneficiaries of the Plan, excluding the Defendants, who invested in the Challenged Funds at any time from April 12, 2012, through the date of judgment;

> <u>FE Class</u>: All Plan participants and beneficiaries, excluding the Defendants, for whom FE performed investment advisory services through the Program at any time from April 12, 2012, through the date of judgment;

> <u>AFA Class</u>: All Plan participants and beneficiaries, excluding the Defendants, for whom AFA performed investment advisory services through the Program at any time from April 12, 2012, through the date of judgment.

The Court appoints Plaintiffs Smith, Ideishi, and North  as Class

Representatives of the Challenged Fund Class; Plaintiffs Pizarro and Stone as

Class Representatives of the FE Class; and Plaintiffs Murphy and Stone as Class

Representatives of the AFA Class.  The Court appoints Sanford Heisler Sharp, LLP

and Blumenthal Nordrehaug Bhowmik De Blow LLP as Class Counsel.

Defendants' Motions for Summary Judgment as to Counts II and VI of the

Complaint [Doc. 130; Doc. 131; Doc. 132; and Doc. 133] are DENIED.


So ORDERED this 21st day of September, 2020.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE