## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

———————————————————

|  |  |  |
|---|---|---|
| JAIME H. PIZARRO, CRAIG SMITH, JERRY MURPHY, RANDALL IDEISHI, GLENDA STONE, RACHELLE NORTH, MARIE SILVER, and GARTH TAYLOR, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | CIVIL ACTION FILE No. 1:18-cv-01566-WMR |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE HOME DEPOT, INC.; THE ADMINISTRATIVE COMMITTEE OF THE HOME DEPOT FUTUREBUILDER 401(K) PLAN; THE INVESTMENT COMMITTEE OF THE HOME DEPOT FUTUREBUILDER 401(K) PLAN; AND DOES 1-30, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

———————————————————

### BRIEF IN SUPPORT OF THE HOME DEPOT DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. GERALD BUETOW

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................1

LEGAL STANDARD............................................................................................5

ARGUMENT .......................................................................................................6

I.    Dr. Buetow's Damages Calculations for the Challenged Funds Are
      Unreliable and Unhelpful. ........................................................................6

      A.    The Calculations Rely on Dr. Laffer's Unreliable Removal Dates. .....6

      B.    The Calculations for the Challenged Funds Removed During the
            Class Period Make a Critical Error that Substantially Inflates
            Damages. ..........................................................................................6

      C.    Dr. Buetow's Hypothetical "Universe Average" Is Neither Helpful
            Nor Reliable as a Measure of Damages. ...............................................9

      D.    Dr. Buetow's "Best Performing Fund" Method Is Contrary to
            ERISA Law and Would Always Result in Damages...........................12

II.   Dr. Buetow Does Not Offer a Reliable Basis for His Damages
      Comparators for Professional Management. .................................................13

      A.    Dr. Buetow's Experience Running Investment Portfolios Is Not the
            Same as Running a Service Like Professional Management..............14

      B.    Dr. Buetow Fails to Explain Why His Inapposite Experience Supports
            His Selection of Comparators. ...........................................................16

III.  Dr. Buetow's Regression Analyses Are Not Reliable or Helpful to the
      Finder of Fact...........................................................................................19

      A.    Dr. Buetow's Regression Analysis to Calculate Damages for
            Professional Management Is Not Reliable or Helpful to the Trier of
            Fact. ...................................................................................................19

B.      The Regression Analysis Contained in Dr. Buetow's Rebuttal Report
        Should Be Excluded Because It Cannot be Verified. .........................23

CONCLUSION ..................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barnette v. Grizzly Processing, LLC*,
No. 10-77-ART, 2012 WL 293305 (E.D. Ky. Jan. 31, 2012) ...........................25

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ..................................................................................*passim*

*Davis v. Washington Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ...........................................................................12

*Eastland v. Tenn. Valley Auth.*,
704 F.2d 613 (11th Cir. 1983) .........................................................................19

*Est. of Hill v. ConAgra Poultry Co.*,
No. CIV.A 4:94CV0198-HLM, 1997 WL 538887 (N.D. Ga. Aug.
25, 1997) ...........................................................................................................22

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) .....................................................................22

*George v. Kraft Foods Global, Inc.*,
800 F. Supp. 2d 928 (N.D. Ill. 2011)................................................................13

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)......................................................................................9, 12

*Lewis v. FMC Corp.*,
786 F. Supp. 2d 690 (W.D.N.Y. 2011)...............................................................8

*Lexington Ins. Co. v. Newborn Fabricating, Inc.*,
No. 14-CV-610, 2016 WL 6652796 (N.D. Okla. Aug. 29, 2016).....................25

*Lippe v. Bairnco Corp.*,
288 B.R. 678 (S.D.N.Y. 2003) .......................................................................8, 9

*Marshall v. Northrop Grumman Corp.*,
   No. 2:16-cv-06794-AB, 2019 WL 4058583 (C.D. Cal. Aug. 14,
   2019) ...................................................................................................14

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) .........................................................25

*Pledger v. Reliance Tr. Co.*,
   No. 1:15-CV-4444-MHC, 2019 WL 4439606 (N.D. Ga. Feb. 25,
   2019) ...................................................................................................13

*Ramos v. Banner Health*,
   461 F. Supp. 3d 1069 (D. Colo. 2020)................................................24

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret.
   Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ...............................................................12

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
   No. 95 CIV. 8136 (RCC), 2001 WL 1602976 (S.D.N.Y. Dec. 14,
   2001) .....................................................................................................9

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ..........................................5, 16, 17, 25

*Graves ex rel. W.A.G. v. Toyota Motor Corp.*,
   No. 2:09-CV-169-MTP, 2012 WL 1596723 (S.D. Miss. May 4,
   2012) .....................................................................................................9

*Wildman v. Am. Century Servs., LLC*,
   362 F. Supp. 3d 685 (W.D. Mo. 2019) ................................................10

**Statutes**

29 U.S.C. 1109(a) .......................................................................................10

**Other Authorities**

29 C.F.R. § 2550.404c-5 (Apr. 30, 2008)..................................................16

Federal Rule of Evidence 702 ......................................................................5

iv

John Sullivan, *Spotlight: The Value of Managed Accounts in 401k Plans*, 401k Specialist (Mar. 15, 2021), https://401kspecialistmag.com/spotlight-the-value-of-managed-accounts-in-401k-plans/ ...................................................................................2

Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016), *available at* https://morningstardirect.morningstar.com/clientcomm/Morningstar_categories_US_April_2016.pdf ......................................................................10

## INTRODUCTION

Plaintiffs' expert Gerald W. Buetow, Ph.D. offers potential damages calculations for the losses allegedly caused to The Home Depot FutureBuilder [401(k) Plan] (the "Plan") by Defendants' purported fiduciary breaches. Instead of providing guidance on an appropriate measure of damages in this ERISA case, Dr. Buetow offers arbitrary and idiosyncratic calculations and asks the Court to take his word for it that his methodologies make sense. The Court should decline his offer and exclude his reports and testimony.

## BACKGROUND

Dr. Buetow is a consultant who previously worked as an investment portfolio manager.[1] He developed, managed, and sold portfolios of exchange-traded funds ("ETFs") and other "fund-of-fund" solutions, like target date funds ("TDFs").[2] He has also advised 401(k) plans on their investment menus.[3] Dr. Buetow does not, however, have material experience with any "managed account" individualized investment advisory service, like the ones at issue here.[4]

---

[1] Amended Expert Report of Gerald W. Buetow, Jr. ("Buetow Rep.") (Doc. 233-26) ¶¶ 6–17.

[2] Deposition of Gerald Buetow ("Buetow Dep.") (Ex. A) at 25:04–26:18; Buetow Rep. ¶¶ 8–11.

[3] *See* Buetow Dep. at 28:24–30:05.

[4] *See* Buetow Rep. ¶¶ 6–22. "In a managed account program, an advisor, assuming fiduciary responsibility under ERISA, constructs or recommends a customized

Plaintiffs offer Dr. Buetow to "provide expert analysis and opinions on the damages suffered by" Plan participants who either (1) invested in the Challenged Funds[5] or (2) enrolled in Professional Management.[6]  Dr. Buetow also opines that Professional Management is comparable—for purposes of calculating appropriate fees—to other types of investments or investment services, such as TDFs.[7]

***Challenged Funds.***   Dr. Buetow offers alternative damages calculations comparing the Challenged Funds's returns against his "replacement funds":

1. **"Passive Replacement"** compares the actively managed Stephens, TS&W, and BlackRock Funds to certain passively managed funds.[8]

2. **"Universe Average"** compares the Stephens, TS&W, and BlackRock Funds against a hypothetical fund with hypothetical returns matching the "average" of each Fund's "peer universe."[9]

---

portfolio for an individual [defined contribution plan] participant tailored to the participant's age, financial circumstances, . . . and other information unique to the individual."   John Sullivan, *Spotlight: The Value of Managed Accounts in 401k Plans*, 401k Specialist (Mar. 15, 2021), https://401kspecialistmag.com/spotlight-the-value-of-managed-accounts-in-401k-plans/.

[5] The "Challenged Funds" are the Stephens Small Cap Growth Fund, TS&W Small Cap Value Fund, JPM Stable Value Fund, and BlackRock LifePath Indices.

[6] Buetow Rep. ¶ 2.

[7] *Id.*

[8] *Id.* ¶¶ 94, 109, 123–25.

[9] *Id.* ¶¶ 95–98, 110–13, 126–29.  Dr. Buetow notably did *not* apply this method to the JPM Stable Value Fund, instead using only his "Best Performing Fund" method. *See id.*  Applying the "Universe Average" method to the JPM Stable Value Fund results in negative damages. *See* Expert Rebuttal Report of Russell R. Wermers, Ph.D. ("Wermers Rebuttal") (Doc. 233-27) ¶¶ 43–44.

3. **"Best Performing Fund"** compares each Challenged Fund against the "best performing" fund chosen, with perfect hindsight, from each Fund's "peer universe." To find the "best" funds, Dr. Buetow (1) identified the top 20% of funds based on their *post hoc* information ratios,[10] (2) removed funds with managers who Dr. Buetow subjectively determined lack a "long" and "rich" history as investment managers,[11] and then (3) picked the remaining fund with the highest *post hoc* returns.[12]

Dr. Buetow relied on a software program called "MPI Stylus" to identify his "peer universe" and return data for both the "Universe Average" and "Best Performing Fund" methods.[13] He failed to document his calculations, however, because "[y]ou've got to recompute it every time you open up the software."[14]

***Professional Management.*** Dr. Buetow also offers various damages calculations for Professional Management, by comparing the fees that Plan participants paid to the two companies that provided Professional Management— Financial Engines and later Alight Financial Advisors ("AFA")—against the fees charged by: (1) a target-date fund, (2) another managed account provider, ProManage, and (3) the fees Financial Engines began charging AFA in 2017 when

---

[10] An "information ratio" measures the ratio of an investment's excess return (that is, return over its benchmark) to its tracking error (that is, volatility relative to benchmark), to assess risk-adjusted performance. *See id.* ¶ 100.

[11] *Id.*

[12] *Id.* ¶¶ 99–102, 114–17, 130–33, 139–45.

[13] *See id.* ¶¶ 97, 112, 115, 128, 131; Buetow Dep. at 19:24–20:4, 161:1–25, 170:14–172:3, 177:4–178:20.

[14] *Id.* at 171:23–24.

AFA replaced Financial Engines as the Plan's Professional Management provider and hired Financial Engines to perform sub-advisory services.[15]

To justify the premise underlying these Professional Management fee comparisons, Dr. Buetow relied upon his experience designing and managing investment portfolios, like TDFs.[16] According to Dr. Buetow, these portfolios offered the same "automated" and "algorithmic" investment advice as Professional Management.[17] Dr. Buetow then invoked this experience to opine on, among other things, the pricing of Professional Management as compared to TDFs[18] and ProManage,[19] and the connectivity fees the Plan's recordkeeper charged Financial Engines to permit secure access to participants' accounts.[20]

Dr. Buetow also conducted two regression analyses to offer additional conclusions. The first analysis, in Dr. Buetow's Supplemental Report, purports to

---

[15] Buetow Rep. ¶¶ 62–86.

[16] *See id*. ¶ 3 (noting opinions are based "on my review of the documents produced in the case, the calculations I conducted, and my experience in the retirement plan industry"), ¶ 55 (citing "experience operating the investment area in two firms"); ¶ 58 (stating ProManage "prices their services in a manner consistent with my experience").

[17] *See id*. ¶ 55; Buetow Dep. at 44:6–21; 49:13–50:2.

[18] *See* Buetow Rep. ¶ 55.

[19] *See id*. ¶ 58.

[20] *See* Rebuttal Expert Report of Gerald W. Buetow, Jr. ("Buetow Rebuttal") (Doc. 233-24) ¶ 52 (citing own "experience with connectivity fees" to support opinion that fee charged by Aon to Financial Engines was too high).

calculate the "implied fee" Home Depot supposedly should have paid based on the fees paid by Financial Engines and AFA's other clients.[21]   The second analysis, in his Rebuttal Report, tries to compare the performance of participants who enrolled in Professional Management versus those who did not.[22]

## LEGAL STANDARD

"[I]n determining the admissibility of expert testimony under Rule 702, [courts] engage in a rigorous three-part inquiry" to determine whether (1) an expert is qualified, (2) his methodology is reliable, and (3) his opinions will assist the trier of fact "through the application of scientific, technical, or specialized expertise."[23] The burden to satisfy each of these elements "always" rests with "[t]he proponent of [the proposed] expert testimony."[24]   And "[w]hile there is inevitably some overlap among" these three elements, "they remain distinct concepts and the courts must take care not to conflate them."[25]

---

[21] Supplemental Expert Report of Gerald W. Buetow, Jr. ("Buetow Supp. Rep.") (Ex. B).

[22] Buetow Rebuttal ¶¶ 53–73.

[23] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotations omitted).

[24] *Id.*

[25] *Id.*

## **ARGUMENT**

### I.   **Dr. Buetow's Damages Calculations for the Challenged Funds Are Unreliable and Unhelpful.**

#### A.   **The Calculations Rely on Dr. Laffer's Unreliable Removal Dates.**

Dr. Buetow's calculations for the Challenged Funds necessarily run from a start date (*i.e.*, when the Challenged Funds should have replaced).  Dr. Buetow admits he did no independent analysis to confirm the validity of those start dates, and simply plugged in the replacement dates chosen by Plaintiffs' other expert, Dr. Laffer.[26]  As explained in Defendants' motion to exclude Dr. Laffer's opinions, the methodology Dr. Laffer used to pick these dates is unreliable and contrary to settled ERISA law.[27]  Because Dr. Buetow's calculations completely depend on those unreliable "inputs," his "outputs" lack a "reliable foundation."[28]

#### B.   **The Calculations for the Challenged Funds Removed During the Class Period Make a Critical Error that Substantially Inflates Damages.**

Dr. Buetow's calculations are not reliable because of an elementary mistake that substantially inflates the alleged "damages":  Even though the four Challenged Funds that were removed from the Plan during the Class Period—the TS&W Fund, Stephens Fund, and BlackRock 2015 and 2020 LifePath Indices—each earned

---

[26] Buetow Dep. at 90:1–13.
[27] *See* Mot. to Exclude Opinions and Testimony of Arthur Laffer (Doc. 234-1).
[28] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

positive returns during their last quarter in the Plan, he assigned *zero* value to those returns.[29]  Yet, he also gave his replacement funds full credit for their returns earned during the same quarter.[30]  This error inflates the delta—and thereby the damages— by artificially reducing the Challenged Funds' returns, without any corresponding reduction for his replacement funds.  In the case of the Stephens Fund, for example, Dr. Buetow's error triples the alleged damages (using his "universe average" approach), ██████████████████████████████████████████.[31]

 The inflation of the Stephens Fund's alleged damages is not an aberration.[32] The damages for each Challenged Fund spiked during this last critical quarter.  For example, the damages Dr. Buetow calculated for the BlackRock 2015 TDF under his "passive replacement" ████████████████████████████████████████ ██████████████████████████████[33]:

---

[29] Exhibit 3 to Buetow Rep., "Returns" Tab (Ex. C, pp. 1–2). The TS&W and Stephens Funds were removed in Q4 2017, but still earned returns in October 2017, the first month of that quarter.  The BlackRock 2015 LifePath Index was removed in Q4 2014 but still earned returns in October 2014, and the BlackRock 2020 LifePath Index was removed in Q4 2019 but still earned returns in October 2019. *See* Wermers Rebuttal ¶ 24.
[30] *See id.*, "ReplReturns" Tab (Ex. C, pp. 3–4).
[31] *See* Wermers Rebuttal, Ex. 2.
[32] *See id.* ████████████████████████████████████████████████ ██████████████████████████████ ; *id.*, Ex. 3 ████████████████████████████████████████████████ ████████████████████ ).
[33] Wermers Rebuttal App. B–C.



These extreme swings in damages, during the quarter Dr. Buetow intentionally omitted the Challenged Fund's actualized returns, do not pass the common-sense test, much less *Daubert*.  Rather, these damages—and the error that caused them—demonstrate that Dr. Buetow's opinion lacks the "indicia of reliability" needed for admission under *Daubert*.[34]  Simply put, Dr. Buetow is using two different sets of return data—one ending a quarter early, and one not—to compare Challenged Funds

---

[34] *See, e.g.*, *Lippe v. Bairnco Corp.*, 288 B.R. 678, 694 (S.D.N.Y. 2003) (Chin, J.); *see also Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 703 (W.D.N.Y. 2011) (holding that where an expert's "errors" demonstrate that he "has not applied principles and methods reliably to the facts of [the] case," his opinions should be excluded).

with his replacement funds.  Such "apples and oranges" comparisons show a lack of "intellectual rigor" that makes the creator's opinions unreliable and inadmissible.[35]

Dr. Buetow does not dispute that he performed his calculations this way but defends attributing a zero return to the Challenged Funds as a reasonable assumption because "it takes time to transition assets."[36]  But this is demonstrably false: other documents (all produced to Plaintiffs) show that the transition to new funds took days, not months.[37]  Dr. Buetow may make reasonable assumptions in reaching his opinions, but his assumptions cannot be counterfactual.[38]

### C.   Dr. Buetow's Hypothetical "Universe Average" Is Neither Helpful Nor Reliable as a Measure of Damages.

In addition, Dr. Buetow's "universe average" method is not helpful because it does not provide a measure of damages permitted under ERISA, which allows

---

[35] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Lippe*, 288 B.R. at 694 (valuation expert uses different earnings figures to compare target company and comparator companies).

[36] Buetow Dep. at 229:7–230:19.

[37] *See* Ex. D (Nov. 15, 2017 Email) (noting ████████████████████████████████ ████████████████████████████████████████████████████████).

[38] *See Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09-CV-169-MTP, 2012 WL 1596723, at *9 (S.D. Miss. May 4, 2012) ("If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is unreliable.") (citation omitted); *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 CIV. 8136 (RCC), 2001 WL 1602976, at *5 (S.D.N.Y. Dec. 14, 2001) (excluding expert testimony that is based on assumptions "contradicted by other data available to" the expert).

recovery of "any losses to the plan" caused by fiduciary breaches.[39]  Courts typically construe this to mean the difference between the plan's actual profit and the "potential profit that could have been realized in the absence of breach."[40]  But Dr. Buetow's "universe average" method does not provide a measure of "potential profit."  It measures a "profit" that could not have been realized, from a hypothetical investment return created by Dr. Buetow.  As such, it is not "sufficiently tied to the facts of the case that it will aid [the factfinder] in resolving a factual dispute."[41]

Dr. Buetow's "universe average" method is also unreliable because it reflects an idiosyncratic calculation by Dr. Buetow rather than any accepted benchmark for fund performance.  Dr. Buetow explained at his deposition that his "peer universes" consist of funds in the same Morningstar category as a Challenged Fund "as of the end of 2020."[42]  But Morningstar categories change over time,[43] and funds can switch categories, which Dr. Buetow appeared to learn for the first time during his

---

[39] 29 U.S.C. 1109(a).

[40] *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 710 (W.D. Mo. 2019) (citing *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 604 (8th Cir. 1995)).

[41] *Daubert*, 509 U.S. at 591 (citation omitted).

[42] *See* Buetow Dep. at 161:12–162:23.

[43] Morningstar "categories" identify funds with similar holdings.  *See* Morningstar, *The Morningstar Category Classifications* (Apr. 29, 2016), *available at* https://morningstardirect.morningstar.com/clientcomm/Morningstar_categories_U S_April_2016.pdf, at 8 (noting Morningstar "engages in a formal category review process twice each year" that may result in proposing "a change to a fund's category").

deposition.[44]   Consequently, Dr. Buetow's "universe averages" measure, in effect, how a Challenged Fund's peer funds *in 2020* performed over the Class Period (which starts in 2012).   This is materially different than calculating the performance of a Challenged Fund's peer funds dynamically *during the Class Period*.   For example, several funds in Dr. Buetow's peer groups for the Small Cap funds were, during the relevant time period, categorized as mid-cap or international funds.[45]   These non-small-cap funds say little, if anything, about how the Small Cap Funds performed against their actual small-cap peers during the Class Period.

Dr. Buetow says that he used data available to him through the MPI Stylus software (for which he has no documentation).[46]   But as Defendants' expert, Russell Wermers, Ph.D., showed, historical lists of Morningstar peer funds are also available to compare a Fund's performance against what its peer group actually was at the relevant time.[47]   Dr. Buetow does not explain why he did not use the correct data or attempt a similar calculation.   Moreover, it is unclear how Dr. Buetow even did his own calculation: over half the "peer universe" funds he lists for the Stephens and

_____

[44] For example, the TS&W Fund's Morningstar category changed from Small Cap Value to Small Cap Blend in 2014.  *See* Expert Report of Russell R. Wermers (Doc. 233-22) ("Wermers Report"), Ex. 11 n.2; Buetow Dep. at 163:18–165:16.

[45] *See* Buetow Dep. at 164:13–165:16; Buetow Dep. Exhibit 7 (Ex. E) (comparison of certain "peer universe" funds by 2016 and 2020 Morningstar categories).

[46] *See* Buetow Dep. at 168:3–169:3.

[47] *See* Wermers Rep., Exs. 5 & 11.

TS&W Funds were discontinued prior to 2020—some as early as 2013.[48] Dr. Buetow has provided no documentation of how he accounted for these funds or otherwise calculated his average returns.[49]

In short, while it may be customary to measure an investment against its *contemporary* peers, that is not what Dr. Buetow's method does. And he has offered no evidence that his own anachronistic calculation is "generally accepted in the relevant . . . community" of investment analysts.[50]

### D. Dr. Buetow's "Best Performing Fund" Method Is Contrary to ERISA Law and Would Always Result in Damages.

Dr. Buetow's "best performing fund" method offers a damages calculation at odds with ERISA law. This method relies on the benefit of hindsight to retroactively select as a comparator the fund with the "best" performance over the relevant time period. The law is clear that "fiduciaries are not required to pick 'the *best* performing fund,'"[51] nor are their investment decisions to be judged "from the vantage point of hindsight."[52] As this court has recognized, "[e]xpert opinions that conflict with

---

[48] *See* Exs. F, G (list of Morningstar categories for funds in peer universes used to calculate "universe average" damages for Stephens and TS&W Funds).

[49] *See* Buetow Dep. at 170:14–172:23.

[50] *Kumho*, 526 U.S. at 151.

[51] *See, e.g.*, *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 486 (8th Cir. 2020) (internal citation omitted).

[52] *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (citation omitted).

controlling law are unreliable" and thus inadmissible.[53]   Dr. Buetow's "best performing fund" method penalizes fiduciaries for failing to predict the best performing investment, a feat ERISA law clearly states is *not* the standard to which fiduciaries are held.[54]   After all, it would *always* result in damages for *all* plan fiduciaries, save the extremely lucky (or prophetic).

Dr. Buetow's method also cannot be tested objectively:  his selection of the "best" fund relies on his own subjective assessment of what fund managers pass, in his words, the "sniff test,"[55] and his calculations were performed through MPI Stylus, and thus not replicable.[56]

## II.   Dr. Buetow Does Not Offer a Reliable Basis for His Damages Comparators for Professional Management.

Dr. Buetow compares Professional Management fees against those of: (1) a target date fund; (2) ProManage; and (3) the fees paid by AFA to Financial Engines for sub-advisory services.[57]   To explain why these comparators are appropriate,

---

[53] *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *8 (N.D. Ga. Feb. 25, 2019).

[54] *See, e.g.*, *George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928, 934 (N.D. Ill. 2011) (ERISA's prudence "standard is objective" and "to the extent [that an expert] relies upon an improper statement of ERISA's prudence requirement," his testimony is "inadmissible").

[55] Buetow Dep. at 180:25–181:23.

[56] *Id*. at 189:13–190:1.

[57] Buetow Rep. ¶¶ 72–86.

Dr. Buetow relies on his experience designing and selling plan-wide investment portfolios.[58]  But Dr. Buetow's appeal to experience relies on a facile comparison between the plan-wide investment *funds* he has managed and the individualized investment *service* that Professional Management offers.   While Dr. Buetow's experience may be relevant to analyzing the investment *methodology* of the Professional Management service, it is not a sound basis to opine on the *cost* of operating customized advisory services, nor the *appropriate pricing* for the same.

### A.   Dr. Buetow's Experience Running Investment Portfolios Is Not the Same as Running a Service Like Professional Management.

As at least one court has recognized, an expert who seeks to opine on managed account fees must demonstrate *specific* expertise with those fees.[59]   By contrast, Dr. Buetow supports his damages opinions by arguing that the types of "funds-of-funds" (like TDFs) that he has managed over his career are "conceptually" the same as Professional Management.[60]   Dr. Buetow bases this opinion on his belief that Professional Management derives its investment advice from an "algorithmic" model that, on average, produces investment allocations similar to those found in a

---

[58] *See supra* n.16.

[59] *See Marshall v. Northrop Grumman Corp.*, No. 2:16-cv-06794-AB, 2019 WL 4058583, at *7 (C.D. Cal. Aug. 14, 2019) (finding proposed expert's experience with other types of fees "not germane" to proposed testimony regarding fees charged by recordkeeper to Financial Engines).

[60] Buetow Rep. ¶ 55.

TDF.[61]  From this starting premise, Dr. Buetow extrapolates opinions about how Professional Management should be priced.[62]

But Dr. Buetow glosses over important differences between investment funds and managed account services like Professional Management.  Most fundamentally, a managed account service allows participants to get *customized* investment advice based on personal information.  Investment funds do not.  Dr. Buetow concedes this difference, and instead argues that the customization offered by managed accounts is an illusory benefit because participants could achieve similar results by investing in different funds themselves.[63]  But it is a truism to say that a participant could invest in the same funds that his or her advisor recommends.  What the participant is paying for—and what Dr. Buetow's argument ignores—is the *advice* on what funds to select.  Indeed, Dr. Buetow acknowledged that participants in plans that used his funds-of-funds solutions often received separate advice about which funds to select.[64]

Despite Dr. Buetow's claims, multi-fund investments like TDFs are *not* the same as managed account services like Professional Management.  In fact, the

---

[61] *Id*. ¶¶ 35–57.
[62] *Id*. ¶ 55.
[63] *See id*. ¶¶ 47–49; Buetow Dep. at 102:1–16.
[64] Buetow Dep. at 45:14–47:7.

Department of Labor recognizes that "funds-of-funds" like TDFs and managed account services are distinct alternatives.[65]    Dr. Buetow's experience running investment portfolios is thus not the same as having specific experience with pricing managed account services.

### B.    Dr. Buetow Fails to Explain Why His Inapposite Experience Supports His Selection of Comparators.

Under Eleventh Circuit precedent, an expert who relies upon experience in forming his or her opinions must explain: (1) how the experience leads to the conclusion reached; (2) why that experience is a sufficient basis for the opinion, and (3) how the experience is reliably applied to the facts.[66]  Dr. Buetow fails to do this for any of his three damages comparators.

***Target date funds***.    Dr. Buetow does not show how his professional experience is a sufficient basis for his opinion that Professional Management "is comparable to a target date fund and should be priced accordingly."[67]  Again, none of Dr. Buetow's experience managing inapposite investment portfolios is relevant to how managed account services should be priced appropriately.  While Dr. Buetow

---

[65] *See* 29 C.F.R. § 2550.404c-5(e)(4)(i) & (iii) (Apr. 30, 2008) (listing "targeted-retirement-date" funds and "managed account" services as distinct options for a plan's qualified default investment alternative).

[66] *Frazier*, 387 F.3d at 1261.

[67] Buetow Rep. ¶ 55.

argues that various sources support his opinion,[68] his recitation of evidence is not helpful to the trier of fact.[69]

*ProManage*.  Dr. Buetow states that ProManage "prices their [*sic*] services in a manner consistent with my experience,"[70] and also that, "[i]n [his] experience," ProManage's services "are quantitative and largely automated" and thus should be capable of servicing a large plan like Home Depot's.[71]  But again, the "experience" to which Dr. Buetow refers is his experience managing investment funds.  And he does not explain how this experience supports his opinion—which, as noted by Defendants' experts, ignores key differences between ProManage and Financial Engines[72]—other than asserting that both are "algorithmic."

*Financial Engines' Sub-advisory Fees*.   The most extreme illustration of Dr. Buetow's false equivalence between an investment fund and a managed accounts service is his opinion that Financial Engines should have charged to participants as a *direct* advisor the same fee it charged to AFA as a *subadvisor*.[73]  As Defendants'

---

[68] Buetow Rep. ¶¶ 35–54.

[69] *See Frazier*, 387 F.3d at 1262–63 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

[70] Buetow Rep. ¶ 58.

[71] Buetow Rebuttal ¶ 18.

[72] *See* Rebuttal Report of Steven K. Gissiner (Ex. H) ("Gissiner Rebuttal") ¶ 30.

[73] *See* Buetow Rep. ¶¶ 60–61.

expert Steven Gissiner explained, a subadvisor simply develops investment advice, while a direct advisor both develops the advice and delivers it to the plan participants.[74]   Indeed, Dr. Buetow's comparison ignores that when Financial Engines was a direct advisor to the Plan, it paid the Plan's recordkeeper a connectivity fee to help deliver its advice to participants.[75]

Dr. Buetow does not engage with this point other than to dismissively equate the roles of advisor and subadvisor as "conceptually no differen[t]."[76]   Again, Dr. Buetow claims that he is qualified to offer this opinion because he spent eight years developing "investment solutions" like his ETF portfolios, and has experience with "connectivity fees" for those portfolios.[77]   But as the court in *Northrop Grumman* held, an expert's general experience with one type of recordkeeping fee is not the same as experience with a connectivity fee for a managed account provider.[78]

---

[74] *See* Gissiner Rebuttal ¶ 43.

[75] *Id.* ¶ 44.

[76] *See* Buetow Dep. at 139:14–141:01.

[77] *Id.* at 246:05–248:15; Buetow Rebuttal ¶ 52.

[78] *See* 2019 WL 4058583, at *7.

**III.**   **Dr. Buetow's Regression Analyses Are Not Reliable or Helpful to the Finder of Fact.**

    **A.**   **Dr. Buetow's Regression Analysis to Calculate Damages for Professional Management Is Not Reliable or Helpful to the Trier of Fact.**

Using confidential client fee data that Financial Engines and AFA were ordered to produce in this litigation (and that was not available to Home Depot when it negotiated its agreements with Financial Engines and AFA), Dr. Buetow performs a regression analysis to estimate what Home Depot supposedly "should" have paid.[79] Dr. Buetow's regression analysis suffers from numerous conceptual flaws that render it unreliable and unhelpful.

    1.   <u>Dr. Buetow's Regression Analysis Uses the Wrong Dependent Variable.</u>

Regression analysis is a statistical model that can be used to measure the effect of one or more variables (the "independent" variables) on a variable of interest (the "dependent" variable).[80]  Here, Dr. Buetow runs a regression analysis to determine the effect of two variables—(1) the total assets managed by Financial Engines or AFA in a given 401(k) plan ("Total Managed Assets") and (2) the average member balance of that plan ("Average Member Balance")—on the total fees paid by the

---

[79] Buetow Supp. Rep. ¶¶ 48–51.
[80] *See, e.g.*, *Eastland v. Tenn. Valley Auth.*, 704 F.2d 613, 622 (11th Cir. 1983).

plan to Financial Engines and AFA ("Total Fees Paid").  Total Managed Assets and Average Member Balance are the independent variables, and Total Fees Paid is the dependent variable.[81]

While regression analysis can be a helpful tool, it is only useful if measuring the right variables.  For example, in *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, the district court excluded under *Daubert* a regression analysis offered to measure damages Winn-Dixie suffered from competing stores' violations of restrictive lease covenants because it used the wrong independent variable: instead of analyzing the effect of the competing stores' lease violations on Winn-Dixie's revenue, it analyzed the effect of the stores *generally* on Winn-Dixie's revenue.[82]  In affirming the district court, the Eleventh Circuit noted this lack of "fit" between what the regression purported to measure and what it actually measured supported the conclusion that it was neither reliable nor helpful to the finder of fact.[83]

As in *Winn-Dixie*, Dr. Buetow's regression analysis uses an overly broad variable that undermines its usefulness and reliability.  In this case, it is the *dependent* variable of Total Fees Paid, which includes the two different types of fees that Financial Engines and AFA charged:  (1) a flat fee charged to every active

[81] Buetow Supp. Rep. ¶¶ 25–42.
[82] 746 F.3d 1008, 1027–28 (11th Cir. 2014).
[83] *Id.* at 1028–29.

participant for Financial Engines' "Online Advice" service—which is *not* being

challenged in this case—and (2) an asset-based fee charged to those participants who

elected to enroll in Professional Management.

This overbroad dependent variable does more than make Dr. Buetow's

regression analysis a bad "fit"; it renders his work useless.  Despite not being part of

Plaintiffs' claim, the flat Online Advice fee constitutes a significant portion of the

overall fees paid by Home Depot during the Class Period.  For example, the Online

Advice fee constituted over ███████████████ of the total fees paid in 2014.[84]

Dr. Buetow's regression provides no insight into how much of the difference

between his "implied" fee and the fee Home Depot actually paid is due to the Online

Advice fee.  Put simply, Plaintiffs' claim in this case is that Home Depot caused Plan

participants to overpay *Professional Management* fees, but Dr. Buetow's regression

analysis measures something completely different:  Total Fees Paid (much of which

are <u>not</u> Professional Management fees).  Dr. Buetow's analysis does not measure

Plaintiffs' claim, obscures more than it illuminates, and is unhelpful as a measure of

damages for the claim that is before this Court.

---

[84] *See* Ex. I (July 1, 2013 Financial Engines Invoice) & Ex. J (July 1, 2014 Financial
Engines Invoice) (████████████████████████████); Ex. K (Annual
Return/Report of Employee Benefit Plan (Form 5500) for the Home Depot
FutureBuilder (2014)) at 3 (approximately $4,385,000 million total fees paid).

  2. <u>Dr. Buetow's Regression Analysis Omits a Crucial Independent Variable.</u>

In addition to using the wrong dependent variable, Dr. Buetow's regression analysis also omits at least one critical *independent* variable:  the total number of participants in Professional Management.  A regression analysis is unreliable if it fails to include all variables that are "likely to affect" the results of the regression.[85] If the moving party can (1) identify at least one omitted variable and (2) demonstrate that the omitted variable would likely alter the results of the regression analysis, then the court should exclude it.[86]  Dr. Buetow's regression analysis does not even consider the effect that the total number of Professional Management Members has on the dependent variable.[87]  But as shown by Dr. Wermers, this independent variable dramatically alters the results of Dr. Buetow's regression analysis: ███

████████████████████████████████████████████████████

██████████████████████████.[88]  This one omitted variable demonstrably alters the results of the regression analysis.

---

[85] *Est. of Hill v. ConAgra Poultry Co.*, No. CIV.A 4:94CV0198-HLM, 1997 WL 538887, at *7–8 (N.D. Ga. Aug. 25, 1997).
[86] *See Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006); *Hill*, 1997 WL 538887, at *8.
[87] *See* Buetow Supp. Rep. ¶¶ 25–42; Buetow Dep. at 272:2–19.
[88] Wermers Rebuttal ¶ 93.

**B.    The Regression Analysis Contained in Dr. Buetow's Rebuttal Report Should Be Excluded Because It Cannot be Verified.**

Dr. Buetow performed a second regression analysis in which he compares "the risk-adjusted returns earned by [Professional Management participants] as compared to [non-participants]."[89]    Dr. Buetow contends that his analysis demonstrates that Plan participants who did _not_ enroll in Professional Management achieved a greater risk-adjusted return during the Class Period than participants who did enroll.[90]    He claims this shows that participants did not "benefit" from Professional Management.

Dr. Buetow's regression suffers from a fundamental problem: it cannot be replicated.  Although Dr. Buetow has provided (1) the raw data used in his regression and (2) a high-level written description of how his regression calculations were performed,[91] despite repeated requests from Defendants, he refused to provide the actual numerical calculations he performed.  This "intermediate" step is critical, as there are different ways to incorporate the return data into the regression, affecting its final results.  For example, while Dr. Buetow compares "weighted" returns of participants,[92] those returns can be "weighted" in different ways (such as by looking

---

[89] Buetow Rebuttal ¶ 58.

[90] _Id._ ¶ 59.

[91] _See_ Buetow Rebuttal, Appx. 2.

[92] _Id._ ¶ 57.

at different points in time to determine participants' assets).  Nor is it clear if Dr. Buetow accounts for the time required for Professional Management to transition participants to their new asset allocation after they enroll, as the returns earned during this period may be primarily attributable to participants' preexisting investments.

Dr. Buetow's lack of supporting data also makes it impossible to test under cross-examination, let alone verify, whether he performed his regression calculations correctly.  This is not a hypothetical concern:  the regression requires complicated calculations, such as subtracting varying tiers of Professional Management fees from participants' returns.[93]  And other backup data Dr. Buetow produced demonstrates that he committed errors in his calculations.[94]  Such prevalent errors have previously contributed to a court discrediting Dr. Buetow's opinions as "unreliable."[95]

In sum, a general description from Dr. Buetow of his regression analysis is not enough, and neither Defendants nor this Court are required to "tak[e]

---

[93] *See id*. (noting calculation is performed "net of fees").
[94] *See* Wermers Rebuttal ¶¶ 23–25.
[95] *See Ramos v. Banner Health*, 461 F. Supp. 3d 1069, 1091–92 (D. Colo. 2020) (noting Dr. Buetow "corrected his expert report multiple times to correct serious errors in his damage calculations").

[Dr. Buetow's] word for it" that the regression was done correctly.[96]  An expert who can only "identify his methodology," but cannot explain "its underlying premises and assumptions," has not demonstrated that his opinions are reliable.[97] And because the Court has an independent obligation to ensure the reliability of Dr. Buetow's expert testimony, the regression contained in his Rebuttal Report must be excluded.[98]

## **CONCLUSION**

This Court should exclude the expert opinions and testimony of Dr. Buetow.

Dated: July 12, 2021

/s/  *David Tetrick, Jr.*
David Tetrick, Jr.
Georgia Bar No. 713653
dtetrick@kslaw.com
Darren A. Shuler
Georgia Bar No. 644276
dshuler@kslaw.com
Danielle Chattin
Georgia Bar No. 486940
dchattin@kslaw.com
Benjamin B. Watson
Georgia Bar No. 632663
bwatson@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309

---

[96] *Frazier*, 387 F.3d at 1261.
[97] *See Barnette v. Grizzly Processing, LLC*, No. 10-77-ART, 2012 WL 293305, at *1 (E.D. Ky. Jan. 31, 2012); *see also Lexington Ins. Co. v. Newborn Fabricating, Inc.*, No. 14-CV-610, 2016 WL 6652796, at *6 (N.D. Okla. Aug. 29, 2016).
[98] *See McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1244 (11th Cir. 2005).

Telephone: (404) 572-4600
Fax: (404) 572-5139

*Attorneys for The Home Depot
Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1D, the undersigned certifies that the foregoing complies with the font and point selections permitted by LR 5.1B.  This Brief was prepared on a computer using the Times New Roman font (14 point).

Respectfully submitted this 12th day of July, 2021.

/s/ *David Tetrick, Jr.*
David Tetrick, Jr.
Georgia Bar No. 713653
dtetrick@kslaw.com
Darren A. Shuler
Georgia Bar No. 644276
dshuler@kslaw.com
Danielle Chattin
Georgia Bar No. 486940
dchattin@kslaw.com
Benjamin B. Watson
Georgia Bar No. 632663
bwatson@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Fax: (404) 572-5139

*Attorneys for The Home Depot Defendants*